1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  JASON A. FORGE (181542)
   RACHEL L. JENSEN (211456)
3  655 West Broadway, Suite 1900
   San Diego, CA 92101
4  Telephone: 619/231-1058
   619/231-7423 (fax)
5  jforge@rgrdlaw.com
   rjensen@rgrdlaw.com
6
   DOWD & DOWD P.C.
7  DOUGLAS P. DOWD
   ALEX R. LUMAGHI
8  211 North Broadway, Suite 4050         THE DRISCOLL FIRM, P.C.
   St. Louis, MO 63102                    JOHN J. DRISCOLL
9  Telephone: 314/621-2500                211 N. Broadway, Suite 4050
   314/621-2503 (fax)                     St. Louis, MO 63102
10 doug@dowdlaw.net                       Telephone: 314/932-3232
   alex@dowdlaw.net                       314/932-3233 (fax)
11 Co-Lead Counsel for Plaintiffs

12              UNITED STATES DISTRICT COURT

13            SOUTHERN DISTRICT OF CALIFORNIA

14 In re MORNING SONG BIRD FOOD      )  Lead Case No. 3:12-cv-01592-JAH-RBB
   LITIGATION                        )
15                                   )  CLASS ACTION
                                     )  AMENDED CONSOLIDATED CLASS
16 This Document Relates To:         )  ACTION COMPLAINT FOR VIOLATIONS
                                     )  OF:
17    ALL ACTIONS.                   )  1.  18 U.S.C. §1962(c) and (d);
                                     )  2.  15 U.S.C. §2301, et seq.;
18 _____  )  3.  CAL. CIVIL CODE §1750, et seq.;
                                        4.  CAL. BUS. & PROF. CODE §17200, et
19                                          seq.;
                                        5.  CAL. BUS. & PROF. CODE §17500, et
20                                          seq.;
                                        6.  ARK. CODE ANN. §4-88-101, et seq.;
21                                      7.  815 ILL. COMP. STAT. §505/1, et seq.;
                                        8.  KY. REV. STAT. ANN. §367.110, et
22                                          seq.;
                                        9.  MINN. STAT. §§325F.68-325F.69;
23                                      10. MO. REV. STAT. §407.010, et seq.;
                                        11. N.M. STAT. ANN. §57-12-1, et seq.;
24                                      12. BREACH OF EXPRESS WARRANTY;
                                        13. BREACH OF IMPLIED WARRANTY;
25                                      14. BREACH OF THE COMMON LAW
                                            IMPLIED WARRANTY OF FITNESS
26                                          FOR CONSUMPTION BY ANIMALS;
                                        15. INTENTIONAL
27                                          MISREPRESENTATION;
                                        16. NEGLIGENT MISREPRESENTATION;
28                                      17. UNJUST ENRICHMENT

                                        DEMAND FOR JURY TRIAL

809204_1

Plaintiffs Laura Cyphert, Milt Cyphert, Margaret Brumfield, Barbara Cowin, William Chapman, Marguerite Wolfgram, Ellen Larson, Geraldine Ulch, David Kirby, David Graham, Leanne Fox, Agnes Borchert, Edith Salkeld, and Billy Kloeppel ("Plaintiffs"), by and through their undersigned attorneys, bring this class action against defendants The Scotts Miracle-Gro Company ("SMG" or the "Company"), The Scotts Company LLC ("Scotts LLC") and individual Doe defendants 1-20 (collectively, "Defendants"), on their own behalf and on behalf of a class of similarly situated persons or entities (the "Class" or "Class Members").   Plaintiffs allege the following upon their own knowledge, or where there is no personal knowledge, upon the investigation of counsel and/or upon information and belief:

## INTRODUCTION

1.    This nationwide class action challenges Defendants' unlawful and unethical scheme to knowingly market and sell toxic bird food to millions of consumers throughout the United States.

2.    Scotts Miracle-Gro Company is the world's largest marketer of branded consumer lawn and garden products, and a leading maker of wild bird food.  SMG markets such products through a number of subsidiaries – each a separate legal entity.  On January 25, 2012, SMG entered into a plea agreement with the federal government, admitting guilt to 11 criminal misdemeanors relating to its misuse and misbranding of various pesticides.  SMG's plea revealed that SMG had ***knowingly*** manufactured, marketed, and sold approximately 73 million bags of its popular wild bird food products marketed under various brand names, including Morning Song, Country Pride, Scotts' Songbird Selections, and Scotts' Wild Bird Food (collectively, "Morning Song Bird Food"), containing harmful amounts of pesticides that are known to be, and labeled as, toxic to birds and other wildlife.  SMG was sentenced to pay approximately $4.5 million in penalties and charitable donations.

3.    Specifically, Defendants' Morning Song Bird Food contained pesticides, including Storcide II and Actellic 5E, which are known to be, and expressly labeled as, poisonous to birds and wildlife. Indeed, the Environmental Protection Agency's ("EPA") approved label for Storcide II warns that "Storcide II insecticide is extremely toxic to fish and toxic to birds and other wildlife." It further warns: "Exposed treated seeds are hazardous to birds and other wildlife.  Dispose of all

excess treated seeds and seed packaging by burial away from bodies of water." Despite these clear warnings, SMG and Scotts LLC used Storcide II to make Morning Song Bird Food, which they marketed, sold, and distributed for the express purpose of feeding birds.

4.   In 2007, a chemist and an ornithologist working for SMG both warned SMG about the threat to birds from the Company's inclusion of Storcide II and Actellic 5E in its bird food products. Disregarding these warnings, Defendants continued to make and sell millions of bags of the hazardous Morning Song Bird Food.

5.   By early 2008, the ornithologist was so upset with Defendants' continued use of the pesticides in Morning Song Bird Food, he threatened to report Defendants to the EPA. By that time, Defendants knew that they were already the subjects of an EPA investigation into other illegal activities.   Due to the pressure from the ornithologist and the existing EPA investigation, Defendants' scheme shifted tactics. On March 25, 2008, SMG telephoned the FDA and on March 26 and 27, 2008, it sent letters to the FDA. Although these communications purported to be notices of a voluntary recall of the Morning Song Bird Food, they were actually lulling communications. These communications lulled and deceived the FDA and, in turn, the public. They caused the FDA to issue an enforcement report that not only failed to disclose that Morning Song Bird Food had been treated with a pesticide that rendered it hazardous to wild birds and other wildlife, but actually misrepresented that because of the pesticides, Morning Song Bird Food should be used **only** for wild birds and wild animals.

6.   Defendants also issued an innocuously-worded letter to "Fellow Bird Lover[s]" saying it was replacing Morning Song Bird Food with a new product due to its inclusion of "certain insect controls." However, Defendants concealed the identities of the pesticides contained in the bird food, concealed the warnings that the pesticides themselves carried on their labels, concealed the danger those pesticides posed to the animals the food was to nourish, disregarded warnings of its own employees, concealed how long Morning Song Bird Food had been manufactured with such pesticides, did not offer to take back any unused Morning Song Bird Food or provide refunds for the same, and affirmatively misrepresented that the bird food did not pose a significant health risk to wild birds or small animals. Accordingly, many retailers did not remove the product from their

1   shelves and consumers continued to purchase and use the product without being apprised of the true

2   dangers of the products.  In fact, of the 73 million units at issue in this case, less than 2 million units

3   were recovered as a result of Defendants' "Fellow Bird Lover" letter, and Plaintiffs have reason to

4   believe that Defendants continued to treat the seeds with pesticides thereafter.

5       7.      Plaintiffs purchased Defendants' toxic bird food both before and after Defendants

6   issued its "Fellow Bird Lover" letter in the Spring of 2008.  Plaintiffs could not discern its harmful

7   effects because they used the food for wild birds.  No one, including Plaintiffs, would have

8   purchased the Morning Song Bird Food if they had not been misled as to its true nature, including

9   that it contained toxic pesticides and was hazardous to birds.

10      8.      Plaintiffs bring this action on behalf of themselves and all others similarly situated in

11  the United States who purchased Morning Song Bird Food treated with toxic chemicals or pesticides,

12  including Storcide II and Actellic 5E, including everyone who purchased Morning Song Bird Food

13  from November 2005 through no earlier than April 2008 ("Class Members").

14      9.      Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations

15  Act, 18 U.S.C. §1962; violations of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.*;

16  violations of California's Consumers Legal Remedies Act, California Civil Code §1750, *et seq.*;

17  violations of California's Unfair Competition Law, California Business and Professions Code

18  §17200, *et seq.*; violations of California's False and Misleading Advertising Law, California

19  Business and Professions Code §17500, *et seq.*; violations of the Arkansas Deceptive Trade Practices

20  Act, Ark. Code Ann. §4-88-101, *et seq.*; violations of the Illinois Consumer Fraud and Deceptive

21  Business Practices Act, 815 ILCS 505/1, *et seq.*; violations of the Kentucky Consumer Protection

22  Act, Ky. Rev. Stat. Ann. §§367.110-367.360; violations of the Minnesota Consumer Fraud Act,

23  Minn. Stat. §§325F.68-325F.69; violations of the Missouri Merchandising Practices Act, Mo. Rev.

24  Stat. §407.010, *et seq.*; violations of the New Mexico Unfair Practices Act, N.M. Stat. Ann. §57-12-

25  1, *et seq.*; breach of express warranty; breach of implied warranty of merchantability; breach of the

26  common law of implied warranty of fitness for consumption by animals; intentional

27  misrepresentation; negligent misrepresentation; and unjust enrichment.

28

10.     Plaintiffs seek on behalf of themselves and all Class Members nationwide monetary damages, restitution, injunctive relief, and all relief deemed appropriate, arising out of Defendants' illegal scheme and conspiracy alleged herein.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because Plaintiffs' claims arise under the RICO Statute, 18 U.S.C. §1962.  This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §1965(b) and (d).  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.  This Court also has jurisdiction pursuant to 28 U.S.C. §1332, as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

12.     Venue properly lies in this District pursuant to 28 U.S.C. §1391(a), because the Cyphert plaintiffs reside here, and Defendants have transacted substantial business within this District within the meaning of 28 U.S.C. §1391(a), as defined in 28 U.S.C. §1391(c), and because a substantial part of the events giving rise to the claims alleged herein occurred in the Southern District of California.  Specifically, Defendants marketed and sold their Morning Song Bird Food throughout the State of California, including throughout this District, and the Cyphert plaintiffs, as well as other members of the Class, purchased Defendants' toxic Morning Song Bird Food from retail outlets located within this District.

## PARTY ALLEGATIONS

**Plaintiffs**

13.     Plaintiffs Laura Cyphert and Milt Cyphert reside in San Diego County, California. From 2005-2010, the Cypherts were among the members of the unsuspecting public whom Defendants defrauded into buying toxic Morning Song Bird Food.  Approximately every one to three months throughout the period of 2005 through January 2010, the Cypherts purchased approximately one bag of wild bird seed marketed under Defendants' Morning Song Bird Food line from various San Diego County grocers and retailers, including Wal-Mart.  The Cypherts used the Morning Song

Bird Food to provide nourishment for wild birds in the wild bird feeder that they had maintained for well over a decade.  The Cypherts relied on labeling on the Morning Song Bird Food packaging that the Defendants' products were intended (and thus safe) as food for birds, expressly including finches.  The labels omitted material information, including that the Morning Song Bird Food products contained pesticides that are "extremely toxic to fish and toxic to birds and other wildlife" and that:  "Exposed treated seeds are hazardous to birds and other wildlife.  Dispose of all excess treated seeds and seed packaging by burial away from bodies of water."  The Cypherts would not have purchased the Morning Song Bird Food if they had been notified that the food was hazardous to birds or of the presence of, and warnings on, the pesticides.

14.     The Cypherts bought their last bag of Morning Song Bird Food from the Wal-Mart in El Cajon, California, in approximately January 2010.  Plaintiffs maintained both wild bird feeders and an aviary.  This particular bag was "Morning Song Premium Year-Round Wild Bird Food."

15.     Although the Cypherts had previously used other Morning Song Bird Food for their wild bird feeders and different food for their aviary, on one occasion in January 2010, they ran out of finch food and substituted Morning Song Bird Food for the approximately 100 Zebra Finches in their aviary.  Less than 24 hours later, all but eight of the Finches were dead.  In attempting to determine what killed their birds, the Cypherts captured and quarantined over two-dozen field mice.  They provided the field mice with water and food for a few days while observing them and waiting to relocate them.  Plaintiffs observed no signs of illness.  Eventually, Plaintiffs supplemented the mice's food with the Morning Song Bird Food.  They did this only once.  Twenty-four hours later, all of the field mice were dead.

16.     The Cypherts contacted their local Wal-Mart where they purchased the product and the Food and Drug Administration ("FDA") to report what had occurred.  The Cypherts also sent feed samples to SMG and the FDA.  SMG claimed that the samples contained "normal" levels of pesticides, but did not identify the pesticides or describe what purportedly constituted a "normal" level of pesticides in bird food.  The FDA declined to share with the Cypherts the results of its tests.  Neither SMG nor the FDA informed the Cypherts of any prior issues with Defendants' Morning Song Bird Food.

17.     Plaintiff Geraldine Ulch is a domiciliary and citizen of the State of Arkansas and purchased Defendants' Morning Song Bird Food in the State of Arkansas.  Plaintiff Ulch purchased 20-pound bags of mixed blends of wild bird seed from her local Wal-Mart marketed under Defendants' Morning Song Bird Food line approximately every two weeks from 2005 through 2012. Plaintiff used the products as wild bird feed.  The labeling on each of the products purchased by Plaintiff omitted material information, including that the Morning Song Bird Food products contained pesticides which were "extremely toxic to fish and toxic to birds and other wildlife" and that: "Exposed treated seeds are hazardous to birds and other wildlife.  Dispose of all excess treated seeds and seed packaging by burial away from bodies of water."  Plaintiff relied on these material omissions, as well as on statements made by Defendants on the Morning Song Bird Food packaging, that the Defendants' product was "wild bird seed" and that the product was in fact food for wild birds.  Plaintiff Ulch would not have purchased the Morning Song Bird Food if she had been notified that the food was hazardous to birds or of the presence of, and warnings on, the pesticides.

18.     Plaintiff William Chapman is a domiciliary and citizen of the State of Illinois and purchased Defendants' Morning Song Bird Food in the State of Illinois.   Plaintiff Chapman purchased bird seed marketed under Defendants' Morning Song Bird Food line from 2005 through at least 2011 from Wal-Mart.  The labeling on each of the products purchased by Plaintiff omitted material information, including that the Morning Song Bird Food products contained pesticides which were "extremely toxic to fish and toxic to birds and other wildlife" and that: "Exposed treated seeds are hazardous to birds and other wildlife.  Dispose of all excess treated seeds and seed packaging by burial away from bodies of water."  Plaintiff relied on these material omissions, as well as on statements made by Defendants on the Morning Song Bird Food packaging, that the Defendants' product was "wild bird seed" and that the product was in fact food for wild birds. Plaintiff Chapman would not have purchased the Morning Song Bird Food if he had been notified that the food was hazardous to birds or of the presence of, and warnings on, the pesticides.

19.     Plaintiff David Kirby is a domiciliary and citizen of the State of Kentucky and purchased Defendants' Morning Song Bird Food in the State of Kentucky.  Between 2005 and 2008, Plaintiff Kirby purchased bags of bird seed from his local Wal-Mart and Rural King marketed under

1    Defendants' Morning Song Bird Food line approximately every other week, and purchased more

2    than 50 bags of seed, including Black Oil Sunflower seed, Morning Song Chickadee & Nuthatcher

3    (Blended) food, and Morning Song Deluxe Wild Bird Food (Blend). Plaintiff used the products as

4    feed for wild birds. The labeling on each of the products purchased by Plaintiff omitted material

5    information, including that the Morning Song Bird Food products contained pesticides which were

6    "extremely toxic to fish and toxic to birds and other wildlife" and that: "Exposed treated seeds are

7    hazardous to birds and other wildlife. Dispose of all excess treated seeds and seed packaging by

8    burial away from bodies of water." Plaintiff relied on these material omissions, as well as on

9    statements made by Defendants on the Morning Song Bird Food packaging, that the Defendants'

10   product was "wild bird seed" and that the product was in fact food for wild birds. Plaintiff Kirby

11   would not have purchased the Morning Song Bird Food if he had been notified that the food was

12   hazardous to birds or of the presence of, and warnings on, the pesticides.

13       20.    Plaintiff David Graham is a domiciliary and citizen of the State of Kentucky and

14   purchased Defendants' Morning Song Bird Food in the State of Kentucky. Between 2005 and 2008,

15   Plaintiff Graham purchased bags of 20-pound bird seed marketed under Defendants' Morning Song

16   Bird Food line around once a month and purchased a total of approximately 15 bags of seed from the

17   Menards hardware store located in Marion, Illinois. Plaintiff used the products as feed for wild

18   birds. The labeling on each of the products purchased by Plaintiff omitted material information,

19   including that the Morning Song Bird Food products contained pesticides which were "extremely

20   toxic to fish and toxic to birds and other wildlife" and that: "Exposed treated seeds are hazardous to

21   birds and other wildlife. Dispose of all excess treated seeds and seed packaging by burial away from

22   bodies of water." Plaintiff relied on these material omissions, as well as on statements made by

23   Defendants on the Morning Song Bird Food packaging, that the Defendants' product was "wild bird

24   seed" and that the product was in fact food for wild birds. Plaintiff Graham would not have

25   purchased the Morning Song Bird Food if he had been notified that the food was hazardous to birds

26   or of the presence of, and warnings on, the pesticides.

27       21.    Plaintiff Leanne Fox is a domiciliary and citizen of the State of Kentucky and

28   purchased Defendants' Morning Song Bird Food in the State of Kentucky. Plaintiff Fox purchased

1   4-pound bags of Defendants' Morning Song Country Pride-ACO (Blend) once a month at her local
2   Fred's Super Dollar store in Murray, Kentucky from approximately 2006 through at least 2008.
3   Plaintiff used the products as feed for pet birds and wild birds.  The labeling on each of the products
4   purchased by Plaintiff omitted material information, including that the Morning Song Bird Food
5   products contained pesticides which were "extremely toxic to fish and toxic to birds and other
6   wildlife" and that:  "Exposed treated seeds are hazardous to birds and other wildlife.  Dispose of all
7   excess treated seeds and seed packaging by burial away from bodies of water."  Plaintiff relied on
8   these material omissions, as well as on statements made by Defendants on the Morning Song Bird
9   Food packaging, that the Defendants' product was "wild bird seed" and that the product was in fact
10   food for wild birds.  Plaintiff Fox would not have purchased the Morning Song Bird Food if she had
11   been notified that the food was hazardous to birds or of the presence of, and warnings on, the
12   pesticides.

13          22.     Plaintiff Marguerite Wolfgram is a domiciliary and citizen of the State of Minnesota
14   and purchased Defendants' Morning Song Bird Food in the State of Minnesota.  Plaintiff Wolfgram
15   purchased approximately one bag of wild bird seed marketed under Defendants' Morning Song Bird
16   Food line per month between 2005 and 2008 from her local Wal-Mart and Fleet Farm, including
17   Scotts Seed Fruit & Berry (Blend), Scotts No-Mess Patio Blend, Black Oil Sunflower Seed, and
18   Morning Song Cardinal Snack (Pressed Seed).  Plaintiff used the Morning Song Bird Food as feed
19   for wild birds.  The labeling on each of the products purchased by Plaintiff omitted material
20   information, including that the Morning Song Bird Food products contained pesticides which were
21   "extremely toxic to fish and toxic to birds and other wildlife" and that:  "Exposed treated seeds are
22   hazardous to birds and other wildlife.  Dispose of all excess treated seeds and seed packaging by
23   burial away from bodies of water."  Plaintiff relied on these material omissions, as well as on
24   statements made by Defendants on the Morning Song Bird Food packaging, that the Defendants'
25   product was "wild bird seed" and that the product was in fact food for wild birds.  Plaintiff
26   Wolfgram would not have purchased the Morning Song Bird Food if she had been notified that the
27   food was hazardous to birds or of the presence of, and warnings on, the pesticides.

28

23.     Plaintiff Ellen Larson is a domiciliary and citizen of the State of Minnesota and purchased Defendants' Morning Song Bird Food in the State of Minnesota.  Plaintiff Larson purchased the Morning Song Bird Food from Wal-Mart between 2005 and 2008.  Plaintiff used the Morning Song Bird Food as feed for wild birds.  The labeling on each of the products purchased by Plaintiff omitted material information, including that the Morning Song Bird Food products contained pesticides which were "extremely toxic to fish and toxic to birds and other wildlife" and that: "Exposed treated seeds are hazardous to birds and other wildlife.  Dispose of all excess treated seeds and seed packaging by burial away from bodies of water."  Plaintiff relied on these material omissions, as well as on statements made by Defendants on the Morning Song Bird Food packaging, that the Defendants' product was "wild bird seed" and that the product was in fact food for wild birds.  Plaintiff Larson would not have purchased the Morning Song Bird Food if she had been notified that the food was hazardous to birds or of the presence of, and warnings on, the pesticides.

24.     Plaintiff Margaret Brumfield is a domiciliary and citizen of the State of Missouri and purchased Defendants' Morning Song Bird Food in the State of Missouri.  Plaintiff Brumfield purchased approximately two 20-pound bags of wild bird seed a year marketed under Defendants' Morning Song Bird Food line from her local Wal-Mart from 2005 through at least 2011.  Plaintiff used the products as wild bird feed.  The labeling on each of the products purchased by Plaintiff omitted material information, including that the Morning Song Bird Food products contained pesticides which were "extremely toxic to fish and toxic to birds and other wildlife" and that: "Exposed treated seeds are hazardous to birds and other wildlife.  Dispose of all excess treated seeds and seed packaging by burial away from bodies of water."  Plaintiff relied on these material omissions, as well as on statements made by Defendants on the Morning Song Bird Food packaging, that the Defendants' product was "wild bird seed" and that the product was in fact food for wild birds.  Plaintiff Brumfield would not have purchased the Morning Song Bird Food if she had been notified that the food was hazardous to birds or of the presence of, and warnings on, the pesticides.

25.     Plaintiff Barbara Cowin is a domiciliary and citizen of the State of Missouri and purchased Defendants' Morning Song Bird Food in the State of Missouri.  Plaintiff Cowin purchased a 10-pound bag marketed under Defendants' Morning Song Bird Food line approximately once a

week from 2005 through at least 2011 from Wal-Mart and local pet stores. Plaintiff used the products as wild bird feed. The labeling on each of the products purchased by Plaintiff omitted material information, including that the Morning Song Bird Food products contained pesticides which were "extremely toxic to fish and toxic to birds and other wildlife" and that: "Exposed treated seeds are hazardous to birds and other wildlife. Dispose of all excess treated seeds and seed packaging by burial away from bodies of water." Plaintiff relied on these material omissions, as well as on statements made by Defendants on the Morning Song Bird Food packaging, that the Defendants' product was "wild bird seed" and that the product was in fact food for wild birds. Plaintiff Cowin would not have purchased the Morning Song Bird Food if she had been notified that the food was hazardous to birds or of the presence of, and warnings on, the pesticides.

26.    Plaintiff Agnes Borchert is a domiciliary and citizen of the State of New Mexico and purchased Defendants' Morning Song Bird Food in the State of New Mexico. Plaintiff Borchert purchased wild bird seed marketed under Defendants' Morning Song Bird Food line from her local Tru Value and Wal-Mart, two to three times per year from 2005 through at least 2011. Plaintiff used the products as feed for wild birds. The labeling on each of the products purchased by Plaintiff omitted material information, including that the Morning Song Bird Food products contained pesticides which were "extremely toxic to fish and toxic to birds and other wildlife" and that: "Exposed treated seeds are hazardous to birds and other wildlife. Dispose of all excess treated seeds and seed packaging by burial away from bodies of water." Plaintiff relied on these material omissions, as well as on statements made by Defendants on the Morning Song Bird Food packaging, that the Defendants' product was "wild bird seed" and that the product was in fact food for wild birds. Plaintiff Borchert would not have purchased the Morning Song Bird Food if she had been notified that the food was hazardous to birds or of the presence of, and warnings on, the pesticides.

27.    Plaintiff Edith Salkeld is a domiciliary and citizen of the State of New Mexico and purchased Defendants' Morning Song Bird Food in the State of New Mexico. Plaintiff Salkeld purchased approximately two bags a week of Defendant's Morning Song Bird Food from 2005 through at least 2011 from her local Wal-Mart and Smith's Food and Drug. Plaintiff used the products as feed for pet birds and wild birds. Plaintiff noticed an unusual number of dead birds

1    during the time that she used Morning Song Bird Food.  The labeling on each of the products

2    purchased by Plaintiff omitted material information, including that the Morning Song Bird Food

3    products contained pesticides which were "extremely toxic to fish and toxic to birds and other

4    wildlife" and that:  "Exposed treated seeds are hazardous to birds and other wildlife.  Dispose of all

5    excess treated seeds and seed packaging by burial away from bodies of water."  Plaintiff relied on

6    these material omissions, as well as on statements made by Defendants on the Morning Song Bird

7    Food packaging, that the Defendants' product was "wild bird seed" and that the product was in fact

8    food for wild birds.  Plaintiff Salkeld would not have purchased the Morning Song Bird Food if she

9    had been notified that the food was hazardous to birds or of the presence of, and warnings on, the

10   pesticides.

11          28.     Plaintiff Billy Kloeppel is a domiciliary and citizen of the State of New Mexico and

12   purchased Defendants' Morning Song Bird Food in the State of New Mexico. Plaintiff Kloeppel

13   purchased approximately 30 bags of seed marketed under Defendants' Morning Song Bird Food line

14   between 2005 and 2008 from Wal-Mart.  Plaintiff used the products as feed for wild birds.  The

15   labeling on each of the products purchased by Plaintiff omitted material information, including that

16   the Morning Song Bird Food products contained pesticides which were "extremely toxic to fish and

17   toxic to birds and other wildlife" and that:  "Exposed treated seeds are hazardous to birds and other

18   wildlife.  Dispose of all excess treated seeds and seed packaging by burial away from bodies of

19   water."  Plaintiff relied on these material omissions, as well as on statements made by Defendants on

20   the Morning Song Bird Food packaging, that the Defendants' product was "wild bird seed" and that

21   the product was in fact food for wild birds.  Plaintiff Kloeppel would not have purchased the

22   Morning Song Bird Food if he had been notified that the food was hazardous to birds or of the

23   presence of, and warnings on, the pesticides.

24          29.     None of the Plaintiffs received SMG's "Fellow Bird Lover" letter at the time it was

25   purportedly released in early 2008, nor were any Plaintiffs aware of Defendants' conduct or that the

26   seed they had purchased (and/or the chemicals used to treat them) was toxic to birds until, at the

27   earliest, the federal government disclosed its criminal prosecution of SMG in January of 2012.

28

Plaintiffs would not have purchased the Morning Song Bird Food had they known that the products contained pesticides that were toxic and harmful to birds.  Nor would Plaintiffs have purchased the Morning Song Bird Food had the packaging contained the pesticide warnings, including that Storcide II is toxic to birds and other wildlife and that exposed treated seeds are so hazardous to birds and other wildlife that they should be disposed of by burial away from bodies of water.  Indeed, no reasonable consumer seeking to purchase seed to feed wild birds would have purchased SMG's Morning Song Bird Food if it were accurately labeled and marketed as toxic and contained warnings that the chemicals used to treat the seeds rendered the seeds so hazardous to birds and other wildlife that they should be disposed of by burial away from bodies of water.

30.     Each of the Plaintiffs purchased the Morning Song Bird Food as consumers, not for resale, and for use as bird feed.  Each of the Plaintiffs suffered actual damages and an economic injury in fact when they spent money to purchase SMG's Morning Song Bird Food which was worthless because it was not fit for consumption by wild birds.  Instead, Plaintiffs were deceived into paying for seed that was actually poisonous, toxic, and hazardous to birds and other wildlife.

**Defendants**

31.     At all relevant times, defendant The Scotts Miracle Gro Company ("SMG") was a publicly traded Ohio corporation with its corporate headquarters located in Marysville, Ohio.  SMG manufactures and sells products including pesticides, herbicides, fertilizers, and bird and animal foods under numerous brand names.  SMG operates through an array of subsidiaries and shell corporations through which SMG manufactures and markets products throughout the entire country.  SMG's practice of conducting its business through subsidiaries and shell corporations is designed, in part, to shield SMG from legal liability for misconduct.

32.     Defendant The Scotts Company LLC ("Scotts LLC") is a private company based in Marysville, Ohio that produces, markets, and supplies products for lawn and garden care, as well as bird seed.  SMG owns Scotts LLC.

33.    Doe Defendants 1-20 are individual employees of SMG and/or its subsidiaries defendant Scotts LLC and Gutwein & Co. ("Gutwein"), who were involved in the marketing, design, decision to sell, and decision to continue to sell, the Morning Song Bird Food, even though it contained known toxic pesticides and was hazardous to birds and other wildlife, and/or who were involved in creating and circulating the deceptive letters described herein.

34.    Defendants SMG, Scotts LLC, and Doe Defendants 1-20 are referred to herein collectively as "Defendants."

## COMMON FACTUAL ALLEGATIONS

**Defendants' Illegal Scheme and Conspiracy to Sell Toxic Bird Food**

35.    At all relevant times, Defendants directed an illegal scheme to deceive consumers into buying the Morning Song Bird Food by misrepresenting and concealing its true nature: a substance so hazardous to birds and other wildlife that it was required to be disposed of by burial away from any bodies of water, due to Defendants' secret use of harmful pesticides, including Storcide II and Actellic 5E, to improve the its shelf life (referred to herein as the "Illegal Scheme").

36.    On January 25, 2012, SMG entered into a plea agreement with the federal government, admitting guilt to 11 misdemeanors relating to its misuse and misbranding of various pesticides. SMG's plea agreement revealed that SMG had knowingly manufactured, marketed, and sold approximately 73 million bags of wild bird food, including its popular "Morning Song" and "Country Pride" brands, containing harmful pesticides that are known to be, and labeled as, toxic to birds and other wildlife. SMG also pled guilty to ten other misdemeanors related to their falsification of pesticide registration documents in connection with other products. SMG was sentenced to pay a $4 million penalty and $500,000 in charitable donations to five organizations whose missions are to protect bird habitat environments. This fine represents the largest criminal penalty in the history of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §136, *et seq.*, which governs the manufacture, distribution, and sale of pesticides.

37.    SMG's guilty plea marked the first time it had publicly revealed that it had added to its popular bird food the pesticides Storcide II and Actellic 5E, which are poisonous to birds. Indeed, the EPA's approved label for Storcide II warns that "Storcide II insecticide is extremely

1   toxic to fish and toxic to birds and other wildlife."   It further warns:  Exposed treated seeds are

2   hazardous to birds and other wildlife.  Dispose of all excess treated seeds and seed packaging by

3   burial away from bodies of water."  The EPA fact sheet states that the active ingredient "pirimphos-

4   methyl [sic] is highly toxic to birds and fish."   In fact, on or about October 27, 2004, the

5   manufacturer of Storcide II applied to the EPA for permission to market Storcide II with an

6   equivocal warning label that read, "Exposed treated seeds *may* be hazardous to birds and other

7   wildlife,"[1] but the EPA rejected this equivocal language and required an unequivocal warning label

8   that read: "Exposed treated seeds *are* hazardous to birds and other wildlife.  Dispose of all excess

9   treated seeds and seed packaging by burial away from bodies of water."  Despite this clear warning,

10  Defendants continued to make and market the products as bird food even though Defendants had

11  treated it with chemicals that rendered it indisputably hazardous to birds and other wildlife.

12          38.     SMG's guilty plea marked the first time it had publicly revealed that during the

13  summer and fall of 2007, both a chemist and an ornithologist who worked for SMG warned SMG

14  about the application of the pesticides Storcide II and Actellic 5E to its bird food products.  The

15  explicit use restrictions and dangers described on the labels of these pesticides made it clear that they

16  were not authorized for use in bird seed.  Disregarding these warnings, Defendants continued to sell

17  the toxic Morning Song Bird Food for over two years and for at least six months after its chemist and

18  ornithologist had tried to stop them.

19          39.     By early 2008, the ornithologist was so upset with Defendants' continued use of the

20  pesticides in Morning Song Bird Food, he threatened to report Defendants to the EPA.  By that time,

21  Defendants knew that they were already the subjects of an EPA investigation into other illegal

22  activities.   Due to the pressure from the ornithologist and the existing EPA investigation,

23  Defendants' scheme shifted tactics.  On March 25, 2008, SMG telephoned the FDA and on March

24  26 and 27, 2008, it sent letters to the FDA.  Although these communications purported to be notices

25  of a voluntary recall of the Morning Song Bird Food, they were actually lulling communications.

26  _____

27  [1]       Unless otherwise indicated all emphases in this pleading are added.

28

1   These communications lulled and deceived the FDA and, in turn, the public. They caused the FDA

2   to issue an enforcement report that not only failed to disclose that Morning Song Bird Food had been

3   treated with a pesticide that rendered it hazardous to wild birds and other wildlife, but actually

4   misrepresented that because of the pesticides, Morning Song Bird Food should be used ***only*** for wild

5   birds and wild animals.

6        40.   In late March or early April 2008, Defendants issued an innocuously-worded letter to

7   "Fellow Bird Lover[s]" that said it was replacing the Morning Song Bird Food with a new product

8   due to its inclusion of "certain insect controls." However, Defendants concealed the identities of the

9   pesticides contained in the bird food, concealed the warnings the pesticides themselves carried on

10  their labels, concealed the danger those pesticides posed to the animals the food was to nourish,

11  concealed the disregarded warnings of its own employees, concealed how long Morning Song Bird

12  Food had been manufactured with such pesticides, did not offer to take back any unused Morning

13  Song Bird Food or give refunds, and affirmatively misrepresented that the bird food did not pose a

14  significant health risk to wild birds or small animals. In this letter, Defendants misleadingly stated:

15  "***We believe that the wild bird food and wild animal food did not constitute a significant health***

16  ***risk to wild birds*** . . . ."

17       41.   Due to Defendants' obfuscation, many retailers did not remove the product from their

18  shelves, and consumers continued to purchase and use the products without being apprised of their

19  true nature and the hazards they posed. In fact, of the approximately 73 million units at issue in this

20  case, less than 2 million units were recovered as a result of SMG's "Fellow Bird Lover" letter.

21       42.   Defendants deceived the public into buying the Morning Song Bird Food, and

22  avoided detection of the Illegal Scheme, by marketing the products as suitable for use as food for

23  ***wild*** birds and animals, whom Defendants expected would take the feed and fly, swim, or scurry

24  away, so that any toxic effects of the Morning Song Bird Food would go undetected.

25       43.   The fact that Defendants had actual knowledge of, and recklessly disregard, the

26  hazardous nature of the Morning Song Bird Food is demonstrated by, among other things:

27            (a)   The warning label on the packaging of the pesticides themselves, which

28  Defendants, including their agents and employees, handled on a daily basis, expressly warned that

1    the pesticides were "extremely toxic to fish and toxic to birds and other wildlife" and that "Exposed

2    treated seeds [which is what Defendants were selling] are hazardous to birds and other wildlife.

3    Dispose of all excess treated seeds and seed packaging by burial away from bodies of water."

4    Defendants disregarded these warnings and continued to manufacture, sell, and distribute millions of

5    packages of Morning Song Bird Food;

6              (b)      SMG has admitted that, at least throughout the time period of November 2005

7    through March 2008, at least three of its employees were specifically aware that the Morning Song

8    Bird Food was being treated with Storcide II;

9              (c)      In mid-2007, two individuals who worked for SMG, one a chemist and the

10    other an ornithologist, warned SMG against using the pesticides in Morning Song Bird Food and

11    tried to convince SMG to stop doing so.  Defendants disregarded these warnings and continued to

12    manufacture, sell, and distribute millions of packages of Morning Song Bird Food;

13             (d)      By early 2008, the ornithologist was so upset with Defendants' continued use

14    of the pesticides in Morning Song Bird Food, he threatened to report Defendants to the EPA.  By

15    that time, Defendants knew that they were already the subjects of an EPA investigation into other

16    illegal activities.[2]  Due to the pressure from the ornithologist and the existing EPA investigation,

17    Defendants' scheme shifted tactics.  On March 25, 2008, SMG telephoned the FDA and on March

18    26 and 27, 2008, it sent letters to the FDA.  Although these communications purported to be notices

19    of a voluntary recall of the Morning Song Bird Food, they were actually lulling communications.

20    These communications lulled and deceived the FDA.  They caused the FDA to issue an enforcement

21    report that not only failed to disclose that the pesticides Defendants had applied to the Morning Song

22    Bird Food had rendered it so hazardous to wild birds and other wildlife that the product was required

23    to be disposed of by burial away from a body of water, but actually misrepresented that because of

24    the pesticides, Morning Song Bird Food should be used ***only*** for wild birds and wild animals.

25    In fact, the FDA Enforcement Report read:

26

27    [2]      SMG has now entered into a settlement with the EPA with respect to these other illegal
activities, including approximately $8 million in penalties.

28

Manufacturer: The Scotts Company LLC, Boland, SD. Firm initiated recall is ongoing.

**REASON**

Animal food intended for feeding non-domestic birds and other wildlife species were found to have been treated with pesticides which were not labeled with instructions for approved use only on wild bird or wild animal products or on all of the individual components that might be present in such stored grain mixtures.

**VOLUME OF PRODUCT IN COMMERCE**

61,019,671 units (includes totals for V-114/V-161-2008)

**DISTRIBUTION**

Nationwide

**END OF ENFORCEMENT REPORT FOR MAY 28, 2008**

**###**

Compare this to the Storcide II Warning Label:

**ENVIRONMENTAL HAZARDS**

STORCIDE II insecticide is extremely toxic to fish and toxic to birds and other wildlife.  Do not apply directly to water, or to areas where surface water is present or to intertidal areas below the mean high water mark.  Do not discharge directly or indirectly into surface waters.  Do not contaminate water by cleaning of equipment or disposal of wastes.

Exposed treated seeds are hazardous to birds and other wildlife. Dispose of all excess treated seeds and seed packaging by burial away from bodies of water.

This pesticide is highly toxic to bees exposed to direct treatment or residues on crops or weeds.  Do not apply STORCIDE II insecticide or allow it to drift onto crops or weeds on which bees are actively foraging.

(e)     Similarly, Defendants issued a deceptively innocuous letter addressed to "Fellow Bird Lover[s]" in late March or early April 2008.  However, as aforementioned, the letter perpetuated Defendants' concealment of the Illegal Scheme by, among other things, concealing the identities of the pesticides that had rendered the Morning Song Bird Food hazardous, concealing the warnings the pesticides themselves carried (*e.g.*, "exposed treated seeds are hazardous to birds and other wildlife"), concealing the dangers of the "food" to birds and other wildlife, disregarding warnings of its own employees, concealing how long Morning Song Bird Food had been manufactured with such pesticides, failing to offer to take back any unused Morning Song Bird Food, or provide refunds, and affirmatively misrepresenting that the Morning Song Bird Food did not pose a significant health risk to wild birds or small animals; and

(f)     SMG has admitted that it was improper to use the pesticides in Morning Song Bird Food, but that it knowingly did so from at least November 2005 through March 2008.

44.     Defendants' execution and concealment of the Illegal Scheme deceived the public into buying approximately 73 million bags of Toxic Morning Song Bird Food at a total cost of over $500 million to consumers nationwide.

## RICO ALLEGATIONS

45.     Defendants engaged in a fraudulent scheme, common course of conduct and conspiracy to increase revenues and minimize losses for Defendants and their co-conspirators from the sale of defective Morning Song Bird Food.

46.     To achieve these goals, Defendants entered into agreements to sell the Morning Song Bird Food to the public, disseminated misleading advertising and marketing materials to sell such feed without disclosing that it was hazardous to the very animals it was marketed to nourish.  As a direct result of their conspiracy and fraudulent scheme, Defendants were able to extract revenues of hundreds of millions of dollars from Plaintiffs and the Class.

**The Morning Song Enterprise**

47.     SMG was formed in 2005.  It is an Ohio for-profit corporation that is publicly traded, has extensive SEC reporting obligations, has a Board of Directors, is required have its Board of Directors comprised of a majority of independent directors, is subject to the Sarbanes-Oxley Act, is required to have its financial statements audited by a registered public accounting firm, and has other reporting obligations, protections and responsibilities unique to publicly traded companies and the State of Ohio's laws for corporations.

48.     Scotts LLC was formed in 2004.  It is a domestic limited liability company that is not publicly traded, has no Board of Directors, has no independent directors, has no SEC reporting obligations, is not subject to the Sarbanes-Oxley Act, is not required have its financial statements audited, but it does have reporting obligations, protections and responsibilities unique to the State of Ohio's laws for limited liability companies.

49.     Gutwein was formed in 1950.  It is a private Indiana for-profit corporation that is not publicly traded, has no Board of Directors, has no independent directors, has no SEC reporting obligations, is not subject to the Sarbanes-Oxley Act, is not required have its financial statements audited, but it does have reporting obligations, protections and responsibilities unique to the State of Indiana's laws for corporations.

50.     SMG operates as a self-described "holding company" that conducts its business – legitimate and illegitimate – through a number of subsidiaries, each of which is a separate legal

entity.  Scotts LLC shares the same senior managing officers as SMG.  In November 2005, SMG acquired Gutwein.  Scotts LLC does not have any ownership interest in Gutwein, and Gutwein does not have any ownership interest in Scotts LLC.  SMG and Scotts LLC both used Gutwein to manufacture Morning Song Bird Food.  SMG also used Scotts LLC to market, distribute, and/or manufacture Morning Song Bird Food.

51.   Upon forming and acquiring Gutwein, SMG installed its executive officers as the executive officers of Gutwein.  For example, Jim Hagedorn, Chairman and Chief Executive Officer ("CEO") of SMG, was made CEO of Gutwein.

52.   Gutwein constituted an "enterprise" within the meaning of 18 U.S.C. §1961(4), through which Defendants conducted the pattern of racketeering activity described herein.  Gutwein engaged in, and its activities affected, interstate commerce, including manufacturing and distributing the Morning Song Bird Food.

53.   Alternatively, Scotts LLC was associated-in-fact with Gutwein and other individuals and entities for a number of common and ongoing purposes, including executing and perpetuating the Illegal Scheme, and constituted an "enterprise" within the meaning of 18 U.S.C. §1961(4), the activities of which affected interstate commerce, including manufacturing and distributing the toxic Morning Song Bird Food (the enterprises alleged in this and the previous paragraph are referred to collectively as the "Morning Song Enterprise").

54.   In addition to installing its Chairman and CEO as CEO of Gutwein, Defendants directed the affairs of the Morning Song Enterprise through, among other things, using SMG's executive officers to direct critical aspects of Morning Song Enterprise operations, including the following:

(a)   SMG's President and Chief Operating Officer was the leader of all aspects of the operations of SMG's subsidiaries, including Gutwein's consumer business marketing, sales, research and development, and supply chain;

(b)   SMG's Executive Vice President and Chief Marketing Officer was responsible for overseeing all of the marketing activities for SMG's wholly-owned brands, including Morning Song Bird Food; and

       (c)     SMG's Chief Environmental Officer was responsible for regulatory and compliance processes for all of SMG's subsidiaries, including Gutwein.

55.    The Morning Song Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as individuals and other entities associated-in-fact for the common purpose of engaging in Defendants' profit-making scheme.

56.    The Morning Song Enterprise is an ongoing and continuing organization consisting of legal entities, such as a corporation and a limited liability company, as well as individuals associated for the common or shared purpose of manufacture, distribution, or sale of the toxic bird seed to Plaintiffs and the Class through deceptive and misleading sales tactics or materials, and deriving profits from those activities.

57.    The Morning Song Enterprise functions by selling bird seed and other products to the consuming public.  Many of these products are legitimate and non-fraudulent.  However, Defendants, through the Morning Song Enterprise, have engaged in a pattern of racketeering activity which also involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the enterprise's activities through the Illegal Scheme.

58.    The Morning Song Enterprise engages in and affects interstate commerce because it involves commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale of toxic bird seed, and the receipt of monies from the sale of the same.

59.    Within the Morning Song Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis.  The Morning Song Enterprise used this common communication network for the purpose of manufacturing, marketing and selling toxic bird seed to the general public nationwide.

60.    Each participant in the Morning Song Enterprise had a systematic linkage because there are corporate ties, contractual relationships, financial ties, and continuing coordination of activities.  Through the Morning Song Enterprise, Defendants engaged in consensual decision making to implement the Illegal Scheme and to function as a continuing unit for the common purpose of exacting revenues and market advantage.  Furthermore, the Morning Song Enterprise

functions as a continuing unit with the purpose of assisting with, perfecting and furthering their Illegal Scheme.

61.     While Defendants participate in, and are members of, the Morning Song Enterprise, they also have a separate and distinct existence, including separate and distinct offices, bank accounts, employees, and financial statements.

62.     Each Defendant exercised substantial control over the direction of the Morning Song Enterprise by:

(a)     designing bird food containing pesticides that were unsuitable for use in food for wild birds and wildlife (the pesticides, but not the bird food, were so labeled);

(b)     knowingly manufacturing bird food with toxic insecticides;

(c)     persisting in the manufacturing, distribution, and/or sale of the hazardous Morning Song Bird Food even after the dangers were admittedly known;

(d)     designing and distributing marketing and sales materials that misrepresented and concealed the hazardous nature of the Morning Song Bird Food;

(e)     otherwise concealing the hazardous nature of the Morning Song Bird Food from the public and regulators;

(f)     distributing the hazardous Morning Song Bird Food all around the country;

(g)     failing to recapture the hazardous Morning Song Bird Food from retailers and consumers;

(h)     selling the hazardous Morning Song Bird Food to the public; and/or

(i)     collecting revenues and profits from Plaintiffs and the Class from the sale of the products.

63.     At all relevant times, each participant in the Morning Song Enterprise was aware of the Illegal Scheme, was a knowing and willing participant in the scheme, and reaped revenues and/or profits therefrom.

64.     The Morning Song Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

65.     Defendants have directed and controlled the ongoing organization necessary to implement their scheme and illicit business practices at meetings and through communications of which Plaintiffs cannot now know because all such information lies in Defendants' hands.

**RICO Conspiracy**

66.     Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.

67.     Defendants have engaged in a conspiracy to increase or maintain revenues and/or minimize losses of revenues or profits for Defendants and their unnamed co-conspirators through the Illegal Scheme.

68.     The objects of the conspiracy are: (a) to execute the Illegal Scheme; (b) to maximize profits and revenues for all Defendants; and/or (c) to minimize the losses from the defect for all Defendants.

69.     To achieve these goals, Defendants hid from the general public the dangers of the Morning Song Bird Food and obfuscated the true nature of the defect even after they issued the "Fellow Bird Lover" letter.  Defendants have also agreed to participate in other illicit and fraudulent practices, all in exchange for agreement to, and participation in, the conspiracy.

70.     Each Defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing, distributing, marketing, and selling the toxic bird food.

71.     Indeed, for the conspiracy to succeed, each Defendant and co-conspirator had to agree to implement and use the similar devices and fraudulent tactics against their intended targets.

72.     As a result of Defendants' Illegal Scheme and conspiracy, Plaintiffs and the Class purchased a product that was worse than worthless.  Instead of the bird food Defendants promised, Plaintiffs received bird poison.  But for Defendants' Illegal Scheme, no one would have purchased the Morning Song Bird Food.  Therefore, the damages that Defendants caused Plaintiffs and the Class may be measured, at a minimum, by each dollar paid for the toxic Morning Song Bird Food, which amounts to over $500 million.

**Pattern of Racketeering Activity**

73.     Defendants, each of whom is a person associated-in-fact with the Morning Song Enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c).   The racketeering activity was made possible by Defendants' regular and repeated use of the facilities, services, distribution channels, and employees of the Morning Song Enterprise.

74.     Defendants each committed multiple "Racketeering Acts," as described below, including aiding and abetting such acts.

75.     The Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission.  Further, the Racketeering Acts were continuous, occurring on a regular, and likely daily, basis throughout a time period beginning in November 2005 and continuing through 2010.

76.     Defendants participated in the operation and management of the Morning Song Enterprise by directing its affairs, as described above.

77.     In devising and executing the Illegal Scheme, Defendants committed acts constituting indictable offenses under 18 U.S.C. §§1341 and 1343, in that they devised and knowingly carried out a material scheme or artifice to defraud Plaintiffs and the Class or to obtain money from Plaintiffs and the Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.  For the purpose of executing the Illegal Scheme, Defendants committed these Racketeering Acts, which number in the thousands, intentionally, and knowingly with the specific intent to advance the Illegal Scheme.

78.     Defendants used thousands of mail and interstate wire communications to create and manage their fraudulent scheme through virtually uniform misrepresentations, concealments and material omissions.  Defendants' scheme includes, but is not limited to: manufacturing hazardous bird "food"; disseminating false and misleading marketing materials, advertisements, agreements, correspondence, websites; and receiving payments, revenues and profits.

79.     Defendants' fraudulent use of the mails and wires included the following items and communications sent by Defendants to each other, Plaintiffs and third parties via U.S. mail, commercial carrier, interstate wire, and/or other interstate electronic media:

(a)     misrepresentations and material omissions about the presence of toxic chemicals in the Morning Song Bird Food that was hazardous to the birds and other wildlife it was intended to feed, including marketing materials, advertisements, product packaging, labels, and the "Fellow Bird Lover" letter;

(b)     distribution and receipt of dangerous pesticides, seeds, and other ingredients used to make the Morning Song Bird Food;

(c)     distribution and receipt of the Morning Song Bird Food;

(d)     invoices and payments related to Defendants' improper scheme;

(e)     deposits of proceeds;

(f)     agreements; and

(g)     other documents and things.

80.     Defendants' have communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various subsidiaries, regional offices, affiliates, divisions and other entities in furtherance of their scheme.

81.     Defendants and third parties have exclusive custody or control over the records reflecting the precise dates and time of the mailings and wire transmissions described above.

82.     Throughout the Class Period, including on/in or about the dates or months set forth below, SMG and Scotts LLC, for the purpose of executing the above-described scheme caused to be delivered by mail or by a private or commercial interstate carrier, or received therefrom, according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, the items described above, including those alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| Research Triangle Park, NC | Reynolds, IN | January 2006 | Containers of Storcide II |
| Research Triangle Park, NC | Reynolds, IN | April 2006 | Containers of Storcide II |

| From | To | Date | Description |
|------|-----|------|-------------|
| Research Triangle Park, NC | Reynolds, IN | July 2006 | Containers of Storcide II |
| Research Triangle Park, NC | Reynolds, IN | October 2006 | Containers of Storcide II |
| Research Triangle Park, NC | Reynolds, IN | January 2007 | Containers of Storcide II |
| Research Triangle Park, NC | Reynolds, IN | April 2007 | Containers of Storcide II |
| Research Triangle Park, NC | Reynolds, IN | July 2007 | Containers of Storcide II |
| Research Triangle Park, NC | Reynolds, IN | October 2007 | Containers of Storcide II |
| Canal Winchester, OH | Silver Spring, MD | March 26, 2008 | Purported Voluntary Recall Letter |
| Canal Winchester, OH | Silver Spring, MD | March 27, 2008 | Purported Voluntary Recall Letter |

83.     Throughout the Class Period, including on/in or about the dates or months set forth below, SMG and Scotts LLC, for the purpose of executing the above-described scheme caused to be transmitted in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| Walmart, El Cajon, CA | Banknet, O'Fallon, MO | December 2005 | Credit Card Authorization |
| Walmart, San Diego, CA | Banknet, O'Fallon, MO | January 2006 | Credit Card Authorization |
| Walmart, El Cajon, CA | Banknet, O'Fallon, MO | June 2006 | Credit Card Authorization |
| Walmart, San Diego, CA | Banknet, O'Fallon, MO | December 2006 | Credit Card Authorization |
| Walmart, El Cajon, CA | Banknet, O'Fallon, MO | January 2007 | Credit Card Authorization |
| Walmart, San Diego, CA | Banknet, O'Fallon, MO | December 2007 | Credit Card Authorization |
| Walmart, El Cajon, CA | Banknet, O'Fallon, MO | January 2008 | Credit Card Authorization |

| From | To | Date | Description |
|------|-----|------|-------------|
| SMG, Canal Winchester, OH | FDA, Silver Spring Maryland | March 25, 2008 | Telephone Call regarding purported voluntary recall |
| Walmart, San Diego, CA | Banknet, O'Fallon, MO | January 2010 | Credit Card Authorization |

Defendants and third-parties have exclusive control over the documents reflecting the precise dates and times of the mailings and wire transmissions described above.

84.     Defendants' uniform acts of concealment and omissions were knowing and intentional and made for the purpose of deceiving the Class, executing the Illegal Scheme, and obtaining revenues and profits as a result thereof.

85.     Defendants knew and recklessly disregarded that their misrepresentations and omissions were material and were relied upon by Plaintiffs and the Class as shown by their payment for the hazardous Morning Song Bird Food.

**FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING**

86.     Defendants have affirmatively and fraudulently concealed their unlawful scheme, conspiracy and course of conduct from Plaintiffs.  Plaintiffs and other Class Members did not know and could not reasonably have known of Defendants' Illegal Scheme and could not have reasonably discovered the falsity of Defendants' representations, advertising and similar documents, nor could Plaintiffs and other Class Members reasonably have known the concealed information until on or about January 25, 2012, when SMG pled guilty to crimes relating to its concealment of the pesticides in the Morning Song Bird Food.  SMG's plea marked the first public disclosure of the pesticides used in the bird seed, the true nature of the defect, as well as the revelation that employees had warned SMG about the dangers long before the product was removed from the stream of commerce.

87.     As aforementioned, on or about March 25, 2008, SMG telephoned the FDA, and on March 26 and 27, 2008, it sent letters to the FDA concerning the Morning Song Bird Food. Although these communications purported to be notices of a voluntary recall of the Morning Song Bird Food, they were actually lulling communications.  These communications lulled and deceived the FDA.  They caused the FDA to issue an enforcement report that not only failed to disclose that Morning Song Bird Food had been treated with a pesticide that rendered it hazardous to wild birds

1   and other wildlife, but actually misrepresented that because of the pesticides, Morning Song Bird

2   Food should be used *only* for wild birds and wild animals.

    The FDA Enforcement Report read as follows:

    Manufacturer: The Scotts Company LLC, Boland, SD. Firm initiated recall is ongoing.
    **REASON**
    Animal food intended for feeding non-domestic birds and other wildlife species were found to have been
    treated with pesticides which were not labeled with instructions for approved use only on wild bird or wild
    animal products or on all of the individual components that might be present in such stored grain mixtures.
    **VOLUME OF PRODUCT IN COMMERCE**
    61,019,671 units (includes totals for V-114/V-161-2008)
    **DISTRIBUTION**
    Nationwide
    **END OF ENFORCEMENT REPORT FOR MAY 28, 2008**
    **###**

    Compare the above to the Storcide II Warning Label:

    **ENVIRONMENTAL HAZARDS**
    STORCIDE II insecticide is extremely toxic to fish and toxic to birds and other wildlife. Do not
    apply directly to water, or to areas where surface water is present or to intertidal areas below
    the mean high water mark. Do not discharge directly or indirectly into surface waters. Do not
    contaminate water by cleaning of equipment or disposal of wastes.
    Exposed treated seeds are hazardous to birds and other wildlife. Dispose of all excess treated
    seeds and seed packaging by burial away from bodies of water.
    This pesticide is highly toxic to bees exposed to direct treatment or residues on crops or
    weeds. Do not apply STORCIDE II insecticide or allow it to drift onto crops or weeds on which
    bees are actively foraging.

15          88.     Similarly, Defendants' statements in the "Fellow Bird Lover" letter in Spring 2008

16   were highly deceptive and intended to mislead purchasers of Morning Song products, including

17   Plaintiffs and the Class.  Scotts Miracle-Gro Company, a publicly-traded company with billions of

18   dollars in annual sales and millions of dollars in annual expenditures on television and other

19   advertising, did nothing to notify and alert the public, consumers and purchasers that the bird "food"

20   was, in fact, so hazardous to birds and other wildlife that it was required to be disposed of by burial

21   away from any bodies of water.  Rather than publicly identify the specific toxic pesticides used by

22   Defendants or provide the necessary warnings regarding toxicity, Defendants referred to these

23   chemicals generically as "insect controls."   Most importantly, Defendants intentionally and

24   materially omitted the material fact that the pesticides used in the Morning Song seed were known to

25   be toxic to birds and other wildlife, including when used as treatment for grain or seeds as in the

26   Morning Song products.  Instead, Defendants sought to create the impression that the replacement of

27   the products was solely a legal technicality, a "regulatory matter," because the "insect controls" were

1  not approved for use on animal seed, suggesting that the "Fellow Bird Lover" letter had little to do

2  with the safety or appropriateness of Morning Song products as feed for wild birds and wildlife.

3        89.    In fact, Defendants continued to deceptively suggest that the Morning Song products

4  were safe and appropriate for such use, stating to the public in the "Fellow Bird Lover" letter that:

5  "***We believe that the wild bird food and wild animal food did not constitute a significant health***

6  ***risk to wild birds, small animals or humans who handle the food***."  Through these and similar

7  statements, Defendants sought to minimize or evade liability for Defendants' wrongdoing, prevent

8  negative media attention and publicity regarding SMG's wrongful use of toxic pesticides in its

9  Morning Song products, and preserve Defendants' market share and ability to sell these types of

10  products in the future.  Plaintiffs did not receive or see, and were not otherwise aware of, the "Fellow

11  Bird Lover" letter prior to the year 2012, when the criminal prosecution came to light.

12        90.    As a result of Defendants' efforts to conceal the nature and extent of its criminal and

13  wrongful activity, Plaintiffs, the Class and the public at large could not have known of Defendants'

14  conduct until the federal government revealed its criminal prosecution of Defendants in January of

15  2012.  Nor could Plaintiffs, the Class, or the public at large, have learned of Defendants' Illegal

16  Scheme through the exercise of any level of diligence – as demonstrated, for example, by the

17  Cypherts' extraordinary, yet fruitless, diligence, and the fact that it took state and federal law

18  enforcement officials nearly four years to expose the Illegal Scheme.  Plaintiffs, the Class, and the

19  public at large do not have at their disposal anywhere near the investigative tools and resources that

20  the government used to expose Defendants' Illegal Scheme, including the federal grand jury's

21  subpoena power.

22        91.    The foregoing allegations, those that follow, and those facts to be proven at trial,

23  establish and will establish that the Defendants acted affirmatively, through active and intentional

24  fraudulent omission, concealment, and suppression of material information to conceal Defendants'

25  fraud from Plaintiffs and the Class.

26        92.    Defendants' conduct has been continuing in nature.  There is a substantial nexus

27  between the fraudulent conduct that occurred within the statute of limitations and the misconduct

28  that occurred prior to, and since, that time.  The acts involve the same type of illicit practices and are

1    recurring, continuous events.  Defendants' wrongful conduct and fraudulent concealment tolls the

2    running of any statute of limitations until, at the earliest, the federal prosecution was initiated in or

3    about January of 2012.  Furthermore, Defendants continued using toxic chemicals to treat the

4    Morning Bird Song Food even after 2008.  Defendants are estopped from asserting any statute of

5    limitations defense in this matter because of its conduct in concealing the fraud claims of Plaintiffs

6    and the Class and concealing the damages incurred by Plaintiffs and the Class.

7        93.    Defendants' fraudulent, criminal and wrongful behavior occurred nationwide, and did

8    not stop at the borders of any individual states.  The filing of this class action complaint serves to toll

9    and preserve the claims of the Class Members and other purchasers who were defrauded by

10   Defendants' wrongful and unlawful acts.

11                              **CLASS ACTION ALLEGATIONS**

12       94.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2),

13   and (b)(3), individually and as a class action on behalf of all persons in the United States who

14   purchased Morning Song Bird Food that defendants had rendered hazardous to birds and other

15   wildlife by treating it with toxic chemicals or pesticides, including Storcide II and Actellic 5E.

16       95.    Specifically excluded from the proposed Class are Defendants and their officers,

17   directors, agents, trustees, parents, corporations, trusts, representatives, employees, principals,

18   partners, joint ventures and entities controlled by Defendants; their heirs, successors, assigns or other

19   persons or entities related to, or affiliated with, Defendants; and the Judge(s) assigned to this action;

20   and any member of their immediate families.

21       96.    Subject to additional information obtained through further investigation and

22   discovery, the foregoing definition of the Class may be expanded or narrowed by amendment,

23   amended complaint or at class certification proceedings.

24       97.    **Numerosity**:  Class Members are so numerous that joinder of all individual members

25   is impracticable.  While the exact number and identities of the Class Members are unknown to

26   Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs allege that

27   the Class is comprised of thousands, if not millions, of individual members geographically disbursed

28

1   throughout the United States.  The number of Class Members and their geographical disbursement
2   renders joinder of all individual members impracticable if not impossible.

3        98.   **Existence and Predominance of Common Questions**:  There are questions of fact
4   and law common to Plaintiffs and other Class Members that predominate over any questions
5   affecting solely individual members including, *inter alia*, the following:

6        (a)   whether Defendants manufactured, marketed, distributed, and/or sold Morning
7   Song Bird Food that was tainted by the pesticides as described herein;

8        (b)   whether the Morning Song Enterprise was an enterprise engaged in, or the
9   activities of which affected, interstate or foreign commerce;

10       (c)   whether Defendants conducted or participated in the conduct of the Morning
11  Song Enterprise's affairs through a pattern of racketeering activities;

12       (d)   whether Defendants knowingly participated in, devised, or intended to devise
13  a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false
14  or fraudulent pretenses, representations, promises, or omissions;

15       (e)   whether the statements made or facts omitted as part of the scheme were
16  material; that is, whether they had a natural tendency to influence, or were capable of influencing, a
17  person to part with money or property;

18       (f)   whether Defendants acted with the intent to defraud; that is, the intent to
19  deceive or cheat;

20       (g)   whether Defendants used, or caused to be used, the mails or interstate wire
21  transmission to carry out, or attempt to carry out, an essential part of the scheme;

22       (h)   whether Defendants advertised, represented, or held out the Morning Song
23  Bird Food as a product that was safe for consumption by birds and wildlife;

24       (i)   whether Defendants expressly warranted the Morning Song Bird Food as a
25  product that was safe for consumption by birds and wildlife;

26       (j)   whether Defendants implicitly warranted the Morning Song Bird Food as a
27  product that was safe for consumption by birds and wildlife;

28

(k)     whether Defendants intended or foresaw that Plaintiffs, Class Members, or others would feed the Morning Song Bird Food to birds and wildlife;

(l)     whether Defendants acted knowingly or with reckless disregard in manufacturing, processing, distributing, and/or selling the Morning Song Bird Food;

(m)    whether Defendants were negligent in manufacturing and/or processing the Morning Song Bird Food;

(n)     whether Defendants' advertisements and/or labels were false, misleading or reasonably likely to deceive;

(o)     whether Defendants violated the RICO Statute, 18 U.S.C. §1962(c) and (d);

(p)     whether Defendants violated the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §2301, *et seq.*;

(q)     whether Defendants violated the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750, *et seq.*;

(r)     whether Defendants violated the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*;

(s)     whether Defendants violated the False and Misleading Advertising Law ("FAL"), Cal. Bus. & Prof. Code 17500, *et seq.*;

(t)     whether Defendants violated the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. §4-88-101, *et seq.*;

(u)     whether Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

(v)     whether Defendants violated the Kentucky Consumer Protection Act ("KCPA"), Ky. Rev. Stat. Ann. §§367.110-367.360;

(w)    whether Defendants violated the Minnesota Consumer Fraud Act ("MCFA"), Minn. Stat. §§325F.68-325F.69;

(x)     whether Defendants violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. §407.010, *et seq.*;

1          (y)     whether Defendants violated the New Mexico Unfair Practices Act

2   ("NMUPA"), N.M. Stat. Ann. §57-12-1, *et seq.*;

3          (z)     whether Defendants breached any express warranty to Plaintiffs and the other

4   Class Members;

5          (aa)    whether Defendants breached any implied warranty of merchantability to

6   Plaintiffs and the other Class Members;

7          (bb)    what is the measure and amount of damages suffered by Plaintiffs and Class

8   Members;

9          (cc)    whether Plaintiffs and Class Members are entitled to injunctive or declaratory

10  relief;

11         (dd)    whether Defendants' actions proximately caused damages to Plaintiffs and

12  Class Members;

13         (ee)    whether Defendants are liable for punitive or exemplary damages; and

14         (ff)    whether Defendants were unjustly enriched by the conduct complained of

15  herein.

16         99.    **Typicality**:  Plaintiffs' claims are typical of the claims of the other Class Members in

17  that all such claims arise out of Defendants' violations of 18 U.S.C. §§1962(c) and (d), and other

18  violations of federal, state and common law, and Defendants' conduct in manufacturing, producing

19  and entering into the stream of commerce the Morning Song Bird Food, Defendants' conduct

20  surrounding the March 2008 communications with the FDA, Defendants' conduct surrounding the

21  Spring 2008 "Fellow Bird Lover" letter, and Plaintiffs' and Class Members' purchase and use of the

22  toxic Morning Song Bird Food.  Plaintiffs and the other Class Members seek identical remedies

23  under identical legal theories, and there is no antagonism or material factual variation between

24  Plaintiffs' claims and those of other Class Members.

25         100.   **Adequacy**:  Plaintiffs will fairly and adequately protect the interests of the Class.

26  Plaintiffs' claims are coextensive with, and not antagonistic to, the claims of the other Class

27  Members.  Plaintiffs are willing and able to vigorously prosecute this action on behalf of the Class,

28  and Plaintiffs have retained competent counsel experienced in litigation of this nature.

101.   **Superiority**:  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class Members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants.  It would thus be virtually impossible for Class Members, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, even if Class Members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

102.   In the alternative, the Class may also be certified under Federal Rule of Civil Procedure 23(b)(2) because:

(a)   the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members that would establish incompatible standards of conduct for the Defendants;

(b)   the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

103.   Adequate notice can be given to Class Members directly using information maintained in Defendants' and/or third party retailers' records or through notice by publication.

104.   Damages may be calculated from the claims data maintained in Defendants' records, so that the cost of administering a recovery for the Class can be minimized.  However, the precise

1   amount of damages available to Plaintiffs and other Class Members is not a barrier to class

2   certification.

### COUNT I

#### Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c)-(d)

#### (On Behalf of All Class Members)

105.   Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

106.   This claim arises under 18 U.S.C. §1962(c) and (d), which provides in relevant part:

(c)   It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

(d)   It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

107.   At all relevant times, Defendants were "persons" within the meaning of 18 U.S.C. §1961(3), because each Defendant was "capable of holding a legal or beneficial interest in property." Defendants were associated with an illegal enterprise, as described below, and conducted and participated in that enterprise's affairs though a pattern of racketeering activity, as defined by 18 U.S.C. §1961(5), consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud in violation of 18 U.S.C. §1962(c).

108.   The Morning Song Enterprise was created and/or used as a tool to carry out the elements of Defendants' illicit scheme and pattern of racketeering activity.  The Morning Song Enterprise has ascertainable structures and purposes beyond the scope and commission of Defendants' predicate acts and conspiracy to commit such acts.  The enterprise is separate and distinct from Defendants.

109.   The members of the RICO enterprise all had the common purpose to increase and maximize revenues and profits for Defendants by increasing the shelf life of the toxic Morning Song Bird Food and continuing to sell such products despite the fact that they were known to contain harmful pesticides that poisoned rather than nourished the birds for which the product was intended.

110.   The Morning Song Enterprise has engaged in, and its activities affected, interstate and foreign commerce by designing, manufacturing, marketing, distributing and selling the toxic Morning Song Bird Food to millions of persons within and throughout the United States.

111.   The Morning Song Enterprise actively disguised the nature of Defendants' wrongdoing and concealed or misrepresented Defendants' participation in the conduct of the Morning Song Enterprise to maximize profits and market share while minimizing their exposure to criminal and civil penalties.

112.   Each of the Defendants exerted substantial control over the Morning Song Enterprise, and participated in the operation and managed the affairs of the enterprise as described herein.

113.   Defendants have committed or aided and abetted the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§1341 and 1343, within the past ten years.  The multiple acts of racketeering activity which Defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

114.   Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. §1961(1) include, but are not limited to:

(a)   **Mail Fraud**:  Defendants have violated 18 U.S.C. §1341, by sending or receiving materials via U.S. mail or commercial interstate carriers for the purpose of executing their scheme to manufacture, market, distribute and sell toxic Morning Song Bird Food by means of false pretenses, misrepresentations, promises, and/or omissions. The materials include, but are not limited to: the toxic bird food; marketing materials and advertisements; product packaging; contracts; correspondence; the "Fellow Bird Lover" letter issued by SMG; pesticides and other ingredients; invoices and payments; reports; and other materials relating to the marketing, distribution and sale of the bird food; and

(b)   **Wire Fraud**:  Defendants have violated 18 U.S.C. §1343, by transmitting and receiving materials by wire for the purpose of executing their scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and/or omissions.  The materials transmitted and/or received include, but are not limited to, those mentioned in subsection (a) above.

115.    Many of the precise dates of Defendants' fraudulent uses of the U.S. mail and wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.  Indeed, the success of Defendants' scheme depends upon secrecy, and Defendants have withheld details of the scheme from Plaintiffs and Class Members.  Generally, however, Plaintiffs have described occasions on which the predicate acts of mail and wire fraud would have occurred.  They include thousands of communications to perpetuate and maintain the scheme, including, among other things, the materials described in the preceding paragraph.

116.    Defendants have obtained money and property belonging to Plaintiffs and the Class as a result of these statutory violations.  Plaintiffs and other Class Members have been injured in their business or property by Defendants' overt acts of mail and wire fraud, and by their aiding and abetting each others' acts of mail and wire fraud.

117.    In violation of 18 U.S.C. §1962(d), Defendants conspired to violate 18 U.S.C. §1962(c), as described herein.  Various other persons, firms and corporations, not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy.

118.    Each Defendant aided and abetted violations of the above laws, thereby rendering them indictable as a principal in the 18 U.S.C. §§1341 and 1343 offenses pursuant to 18 U.S.C. §2.

119.    Plaintiffs and the Class have been injured in their property by reason of Defendants' violations of 18 U.S.C. §1962(c) and (d), including the purchase price of the product.  In the absence of Defendants' violations of 18 U.S.C. §1962(c) and (d), Plaintiffs and the Class would not have incurred these costs and expenses.

120.    Plaintiffs and the Class relied, to their detriment, on Defendants' fraudulent misrepresentations and omissions, which were made by means of websites, mass mailings, newspaper advertisements, product packaging, telephone calls, marketing materials and virtually uniform representations or omissions.  Plaintiffs' and the Class' reliance is evidenced by their purchases.

121.    Plaintiffs' and the Class' injuries were directly and proximately caused by Defendants' racketeering activity.

122.    Defendants knew Plaintiffs and the Class relied on their representations and omissions about the suitability of the Morning Song Bird Food as food for birds.  Defendants knew and intended that consumers would incur substantial costs as a result.

123.    Under the provisions of 18 U.S.C. §1964(c), Plaintiffs are entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorneys' fees.

124.    Defendants are accordingly liable to Plaintiffs for three times their actual damages as proved at trial plus interest and attorneys' fees.

## COUNT II

### Violations of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.*

### (On Behalf of All Class Members)

125.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

126.    Plaintiffs and Class Members are "consumers" within the meaning of the MMWA.

127.    Defendants, through their agents, employees and/or subsidiaries, are "supplier[s]" and "warrantor[s]" within the meaning of the MMWA.

128.    The Morning Song Bird Food is a "consumer product" within the meaning of the MMWA.

129.    Defendants' written affirmations of fact, promises and/or descriptions as alleged herein created a "written warranty" as to the Morning Song Bird Food and/or there existed an implied warranty for the sale of such product within the meaning of the MMWA.  Such warranties are further described in the express and implied warranty counts below.

130.    For the reasons detailed above, Defendants breached these express and implied warranties, as the Morning Song Bird Food was not fit for its intended use.  Defendants were on notice of the defect as evidenced by their "Dear Fellow Bird Lover" letter, yet they have refused to remedy such breaches and their conduct caused damages to Plaintiffs and Class Members.

131.    The amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

132.    Resorting to any informal dispute settlement procedure and/or affording Defendants another opportunity to cure these breaches of warranties is unnecessary and/or futile.  Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as Defendants failed to remedy the problems associated with the Morning Song Bird Food and, as such, indicated they have no desire to participate in such a process at this time.  Any requirement under the MMWA or otherwise that Plaintiffs resort to any informal dispute settlement procedure and/or afford Defendants a reasonable opportunity to cure the breach of warranties described above is excused and/or has been satisfied.

133.    As a result of Defendants' breaches of warranty, Plaintiffs and the other Class Members have sustained damages and other losses in an amount to be determined at trial.  Plaintiffs and the other Class Members are entitled to recover damages, specific performance, costs, attorneys' fees, rescission and/or other relief as is deemed appropriate.

### COUNT III

**Violations of the Consumers Legal Remedies Act,
California Civil Code §1750, *et seq*.**

**(On Behalf of Plaintiffs Laura Cyphert and Milt Cyphert and
All California Class Members)**

134.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

135.    This Count is brought pursuant to the Consumers Legal Remedies Act ("CLRA").  Plaintiffs and the other Class Members are consumers as defined by California Civil Code §1761(d).  Their purchases of the Morning Song Bird Food constitute transactions for the sale of "goods" within the meaning of California Civil Code §§1770(a) and 1761.

136.    Defendants, through their agents, employees and/or subsidiaries, violated the CLRA by engaging in the following practices proscribed by California Civil Code §1770(a) in transactions that were intended to result in, and did result in, the sale of the product in the State of California:

(a)    representing that the Morning Song Bird Food had characteristics and benefits which it did not have;

(b)    representing that the Morning Song Bird Food was of a particular standard, quality or grade, which it was not;

1    (c)    advertising the Morning Song Bird Food with intent not to sell it as

2  advertised; and

3    (d)    representing that the Morning Song Bird Food was supplied in accordance

4  with previous representations when it was not.

5    137.    Defendants knew, or should have known, that their representations and

6  advertisements regarding the Morning Song Bird Food were false and misleading.

7    138.    Defendants' conduct is malicious, fraudulent and wanton, and provided misleading

8  information to Plaintiffs, the Class, and the general public.

9    139.    By reason of the foregoing, Plaintiffs and Class Members have been irreparably

10  harmed, entitling them to both injunctive relief and restitution.  Thus, pursuant to California Civil

11  Code §1782(d), Plaintiffs seek a Court order enjoining the above-described wrongful acts and

12  practices of Defendants and for restitution and disgorgement.

13    140.    Pursuant to §1782 of the CLRA, Plaintiffs have notified Defendants in writing of the

14  particular violations of §1770 of the Act and demanded that Defendants rectify the actions described

15  above by providing complete monetary relief, agreeing to be bound by their legal obligations and to

16  give notice to all affected customers of their intent to do so.  Plaintiffs sent this notice by certified

17  mail, return receipt requested, to Defendants' principal place of business.

18    141.    Defendants failed to rectify or agree to rectify the problems associated with the

19  actions detailed above or give notice to all affected consumers within 30 days of the date of written

20  notice pursuant to California Civil Code §1782.  As a result, Plaintiffs are seeking monetary

21  damages under the CLRA.

22    142.    As a proximate result of Defendants' deceptive acts, Plaintiffs and the public,

23  including the Class, have been damaged.

24    143.    Plaintiffs also seek injunctive relief for the violation of the CLRA.

25    144.    Plaintiffs seek attorneys' fees and costs as allowed by law.

26

27

28

**COUNT IV**

**Violation of California's Unfair Competition Law,
California Business and Professions Code §17200, *et seq*.**

**(On Behalf of Plaintiffs Laura Cyphert and Milt Cyphert and
All California Class Members)**

145.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

146.    The Unfair Competition Law ("UCL") prohibits any "unlawful . . . business act or practice."   Defendants, through their agents, employees and/or subsidiaries, violated the UCL's prohibition against engaging in unlawful acts and practices by, *inter alia*, engaging in false and misleading advertising and omitting material facts, as set forth more fully herein; and violating 18 U.S.C. §1962(c) and (d); California Civil Code §§1572-1573, §§1709-1711 and §1770; and the common law.

147.    Plaintiffs reserve the right to allege other violations of law, which constitute other unlawful business acts or practices.  Such conduct is ongoing and continues to this date.

148.    The UCL also prohibits any "unfair or fraudulent business act or practice."

149.    Defendants' acts, omissions, misrepresentations, practices and non-disclosures alleged herein also constitute "unfair" business acts and practices within the meaning of the UCL in that Defendants' conduct is substantially injurious to consumers, offends public policy and is immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious and the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

150.    As stated in this Complaint, Plaintiffs allege violations of consumer protection, unfair competition and truth in advertising laws in California resulting in harm to consumers.  Plaintiffs assert violations of the public policy of engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers.  The conduct constitutes violations of the unfairness prong of the UCL.  There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

151.    Defendants' claims, non-disclosures and misleading statements, as more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of the UCL.

152.    Defendants' conduct caused and continues to cause substantial injury to Plaintiffs and the other Class Members.  Plaintiffs have suffered injury-in-fact and have lost money as a result of Defendants' unfair conduct.

153.    Defendants have thus engaged in unlawful, unfair and fraudulent business acts and practices in false advertising, entitling Plaintiffs and the other Class Members to judgment and equitable relief against Defendants as set forth in the Prayer for Relief.

154.    Pursuant to California Business & Professions Code §17203, Plaintiffs and the Class Members are entitled to *inter alia*:

(a)    an order requiring Defendants to cease the unlawful and unfair acts alleged herein and requiring Defendants to engage in a corrective marketing campaign;

(b)    full restitution of all moneys paid to Defendants for the Morning Song Bird Food;

(c)    pre-judgment interest at the highest rate allowable by law; and

(d)    payment of their attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure §1021.5.

**COUNT V**

**Violation of California's False and Misleading Advertising Law,
California Business & Professions Code §17500, *et seq*.**

**(On Behalf of Plaintiffs Laura Cyphert and Milt Cyphert and
All California Class Members)**

155.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

156.    Defendants' acts and practices as described herein have deceived and/or are likely to deceive Class Members and the public.  Defendants falsely advertised that the Morning Song Bird Food was safe as birdseed.

157.    By their actions, Defendants disseminated uniform advertising concerning the Morning Song Bird Food that by its nature is unfair, deceptive, untrue or misleading within the meaning of California Business & Professions Code §17500, *et seq*.  Such advertisements were likely to deceive the consuming public for the reasons detailed herein.

158.    The above-described false, misleading and deceptive advertising Defendants disseminated continues to have a likelihood to deceive in that Defendants failed to disclose the true nature of the Morning Song Bird Food as containing toxins that are not approved for birdseed and not safe for the use of same.  Defendants failed to instigate a public information campaign to alert consumers of the dangers of Morning Song Bird Food, which continued to create a misleading perception of the birdseed.

159.    In making and disseminating the statements alleged herein, Defendants knew or should have known their advertisements were untrue and misleading in violation of California Business & Professions Code §17500, *et seq*.  Plaintiffs and the other Class Members based their decisions to purchase the Morning Song Bird Food in substantial part on Defendants' omitted material facts.  The revenues to Defendants attributable to products sold in those false and misleading advertisements amount to hundreds of millions of dollars.  Plaintiffs and the Class were injured in fact and lost money or property as a result.

160.    The misrepresentations and non-disclosures by Defendants of the material facts detailed above constitute false and misleading advertising and, therefore, constitute a violation of California Business & Professions Code §17500, *et seq*.

161.    As a result of Defendants' wrongful conduct, Plaintiffs and the Class lost money. Plaintiffs and the Class are therefore entitled to restitution as appropriate for this Cause of Action.

**COUNT VI**

**Violation of Arkansas Deceptive Trade Practices Act
Arkansas Code Annotated §4-88-101, *et seq*.**

**(On behalf of Plaintiff Geraldine Ulch and All Arkansas Class Members)**

162.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

163.    This Count is brought pursuant to the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. §4-88-101, *et seq*.

164.    Plaintiff purchased Defendants' Morning Song Bird Food.  Plaintiff purchased Defendants' products for her own use as a consumer, and not for resale.

165.    At the time Plaintiff purchased Defendants' Morning Song Bird Food, she was unaware that Morning Song products contained Storcide II and Actellic 5E, pesticides which are toxic to birds and other wildlife. Plaintiff believed she was purchasing bird seed which was safe and appropriate to feed to birds and other wildlife, and which did not contain pesticides or toxic chemicals.

166.    Plaintiff and the other Class Members are persons within the meaning of the ADTPA. Ark. Code Ann. §4-88-102(5).

167.    The ADTPA generally prohibits "deceptive and unconscionable trade practices," including, but not limited to, false representations relating to goods and services.  Ark. Code Ann. §4-88-107. The ADTPA specifically prohibits "knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model[.]" Ark. Code Ann. §4-88-107(a)(1).  The ADTPA also prohibits "any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. §4-88-107(a)(10).

168.    Defendants' commission of unlawful acts in violation of the ADTPA includes one or more of the following:

a.    Omitting, suppressing, and/or concealing the material fact that the Defendants' Morning Song Bird Food contained the pesticides Storcide II and Actellic 5E;

b.    Omitting, suppressing, and/or concealing the material fact that the pesticides used in Defendants' Morning Song Bird Food were known to be toxic to birds, fish and other wildlife, including when used as treatment on seed;

c.    Affirmatively misrepresenting to purchasers, including through package labeling, advertising, and other means, that the Morning Song Bird Food were appropriate and proper for use as bird seed, despite the fact that the products contained toxic pesticides;

d.    Failing to alert the public and purchasers regarding the dangers arising from Defendants' use of pesticides which were known to be toxic to birds, fish and other wildlife, including when used as treatment on seed; and

e.    Unlawfully promoting and marketing Defendants' Morning Song Bird Food which contained registered pesticides, without the required warnings, and without disclosing these material facts to purchasers.

169.     Defendants' illegal and wrongful actions as described above were both deceptive and unconscionable under the ADTPA. Defendants' actions were unconscionable in that they affront the sense of justice, decency, or reasonableness. Furthermore, Defendants' aforesaid unlawful actions violate the public policies and laws of the State of Arkansas and of the United States.

170.     Defendants' violations of Ark. Code Ann. §4-88-107(a)(1) were committed with the intent to deceive Plaintiff and the Class.

171.     Plaintiff and the Class suffered actual damage or injury as a result of Defendants' violations of the ADTPA pursuant to Ark. Code Ann. §4-88-113(f). As a result of Defendants' concealment of its unlawful acts and violations of the ADTPA, Plaintiff and the Class were deceived and were not aware that the Morning Song products they purchased were in fact toxic and harmful to birds and other wildlife.

172.     The Defendants knew or ought to have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury or damage to Plaintiff and the Class, yet Defendants continued their conduct with malice or in reckless disregard of the consequences, from which malice may be inferred. As a result, Plaintiff and the Class are entitled to an award of punitive damages pursuant to Ark. Code Ann. §16-55-206.

173.     Plaintiff and Class Members therefore request actual damages in an amount to be proven at trial, punitive damages, reasonable attorneys' fees and their costs herein.

### COUNT VII

**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 Illinois Compiled Statutes Annotated 505/1, *et seq.***

**(On behalf of Plaintiff William Chapman and All Illinois Class Members)**

174.     Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

175.     This Count is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*.

176.     Plaintiff purchased Morning Song Bird Food.   Plaintiff purchased Defendants' products for his own use as a consumer, and not for resale.

177.   At the time Plaintiff purchased Morning Song Bird Food, he was unaware that Morning Song products contained Storcide II and Actellic 5E, pesticides which are toxic to birds and other wildlife. Plaintiff believed he was purchasing bird seed which was safe and appropriate to feed to birds and other wildlife, and which did not contain pesticides or toxic chemicals.

178.   Plaintiff and the Illinois Class Members are persons as defined by the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1(c).

179.   The Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 provides as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact… in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

180.   The Illinois Consumer Fraud and Deceptive Business Practices Act further provides in 815 ILCS 505/10a, as follows:

> Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper.

181.   As described herein, Defendants' misconduct, material misstatements and omissions, and unfair, unethical and unscrupulous conduct, which occurred in the course of conduct involving trade or commerce, are unlawful. Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money, including money from Plaintiff and the Class.

182.   Defendants' unlawful acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act include the following:

> a.   Omitting, suppressing, and/or concealing the material fact that the Defendants' Morning Song products contained the pesticides Storcide II and Actellic 5E;
>
> b.   Omitting, suppressing, and/or concealing the material fact that the pesticides used in Morning Song Bird Food were known to be toxic to birds, fish and other wildlife, including when used as treatment on seed;

c.      Affirmatively misrepresenting to purchasers, including through package labeling, advertising, and other means, that the Morning Song Bird Food were appropriate and proper for use as bird seed, despite the fact that the products contained toxic pesticides;

d.      Failing to alert the public and purchasers regarding the dangers arising from Defendants' use of pesticides which were known to be toxic to birds, fish and other wildlife, including when used as treatment on seed; and

e.      Unlawfully promoting and marketing Defendants' Morning Song Bird Food which contained registered pesticides, without the required warnings, and without disclosing these material facts to purchasers.

183.    Plaintiff and the Class were deceived and suffered actual damages in violation of 815 ILCS 505/2, when they paid for Defendants' Morning Song Bird Food based on Defendants' omissions and misrepresentations, and when the Morning Song Bird Food in fact contained chemicals toxic to birds.

184.    Defendants intended that Plaintiff and the Class rely on their representations that the Morning Song Bird Food was appropriate for use as bird seed.

185.    Furthermore, Defendants' illegal and wrongful conduct as set forth above, including Defendants self-dealing, misrepresentations and material omissions intended to benefit Defendants at the expense of Plaintiff and purchasers, constituted outrageous conduct, was perpetrated by evil motive and with reckless indifference to the rights of Plaintiff and others, justifying the imposition of punitive damages.

186.    Plaintiff and the Class therefore request actual damages in an amount to be proven at trial, punitive damages, reasonable attorneys' fees and their costs herein.

## COUNT VIII

### Violation of Kentucky Consumer Protection Act
### Kentucky Revised Statutes and Rules §§367.110-367.360

### (On behalf of Plaintiffs David Kirby, David Graham, Leanne Fox and All Kentucky Class Members)

187.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

188.    This Count is brought pursuant to the Kentucky Consumer Protection Act ("KCPA"), Kentucky Revised Statutes and Rules §§367.110-367.360.

189.   Plaintiffs purchased Defendants' Morning Song Bird Food.  Plaintiffs purchased Defendants' products for their own use as consumers, and not for resale.

190.   At the time Plaintiffs purchased Defendants' Morning Song Bird Food, they were unaware that Morning Song products contained Storcide II and Actellic 5E, pesticides which are toxic to birds and other wildlife. Plaintiffs believed they were purchasing bird seed which was safe and appropriate to feed to birds and other wildlife, and which did not contain pesticides or toxic chemicals.

191.   Plaintiffs and the Class have standing under the KCPA in that Plaintiffs and the Class purchased Defendants' products primarily for personal, family or household purposes, and have suffered an ascertainable loss of money or property as a result of Defendants' unlawful acts in violation of the KCPA.

192.   Plaintiffs and the Class additionally have standing under Ky. Rev. Stat. §446.070, which provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation . . . ." Plaintiffs and the Class fall within the class of persons intended to be protected by Ky. Rev. Stat. §367.110, *et seq.*

193.   The KCPA prohibits "[u]nfair, false, misleading or deceptive acts or practices in the conduct of any trade or commerce . . . ." Ky. Rev. Stat. §367.170.

194.   Defendants' commission of unlawful acts in violation of the KCPA includes one or more of the following:

a.   Omitting, suppressing, and/or concealing the material fact that the Defendants' Morning Song Bird Food contained the pesticides Storcide II and Actellic 5E;

b.   Omitting, suppressing, and/or concealing the material fact that the pesticides used in Defendants' Morning Song Bird Food were known to be toxic to birds, fish and other wildlife, including when used as treatment on seed;

c.   Affirmatively misrepresenting to purchasers, including through package labeling, advertising, and other means, that the Morning Song Bird Food products were appropriate and proper for use as bird seed, despite the fact that the products contained toxic pesticides;

d.   Failing to alert the public and purchasers regarding the dangers arising from Defendants' use of pesticides which were known to be toxic to birds, fish and other wildlife, including when used as treatment on seed; and

1       e.      Unlawfully promoting and marketing Defendants' Morning Song Bird Food products which contained registered pesticides, without the required warnings, and without disclosing these material facts to purchasers.

2

3      195.     Defendants' aforesaid acts were false, misleading and deceptive, and therefore in

4 violation of the KCPA. Furthermore, Defendants' acts were unfair and unconscionable, in that

5 Defendants, in good conscience, could not sell poisoned bird seed to consumers when Defendants

6 knew that Plaintiffs and Class Members wished to purchase the products specifically to provide a

7 benefit to birds and other wild animals. Nor could Defendants in good conscience fail to notify

8 Plaintiffs and Class Members of the toxic pesticides in the Morning Song Bird Food, thereby

9 allowing Plaintiffs and Class Members to unknowingly continue to feed toxic seed to birds and other

10 wildlife.

11      196.     As a direct result of Defendants' unlawful acts in violation of the KCPA, Plaintiffs

12 and Class Members suffered an ascertainable loss of money when they purchased Defendants'

13 Morning Song Bird Food, which was in fact toxic and dangerous to birds and other wildlife.

14      197.     Defendants' actions were committed with oppression, fraud, or malice, and/or with a

15 complete and reckless disregard for the rights of Plaintiffs and the Class, entitling Plaintiffs to

16 punitive damages under Ky. Rev. Stat. §411.184.

17      198.     Plaintiffs and Class Members therefore request actual damages in an amount to be

18 proven at trial, punitive damages, reasonable attorneys' fees and their costs herein.

19 **COUNT IX**

20 **Violation of Minnesota Consumer Fraud Act**<br>**Minnesota Statutes §§325F.68-325F.69**

21

22 **(On behalf of Plaintiffs Marguerite Wolfgram, Ellen Larson and**<br>**All Minnesota Class Members)**

23      199.     Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

24      200.     This Count is brought pursuant to the Minnesota Consumer Fraud Act ("MCFA"),

25 Minn. Stat. §§325F.68-325F.69.

26      201.     Plaintiffs purchased Defendants' Morning Song Bird Food. Plaintiffs purchased

27 Defendants' products for their own use as consumers, and not for resale.

28

202.    At the time Plaintiffs purchased Defendants' Morning Song Bird Food, they were unaware that Morning Song products contained Storcide II and Actellic 5E, pesticides which are toxic to birds and other wildlife. Plaintiffs believed they were purchasing bird seed which was safe and appropriate to feed to birds and other wildlife, and which did not contain pesticides or toxic chemicals.

203.    Plaintiffs and other Class Members are persons within the meaning of the MCFA.

204.    Plaintiffs and the Class have standing to bring this action pursuant to Minn. Stat. §8.31, subd. 3a, known as the Private Attorney General Act, which provides that any person injured by a violation of the MCFA may bring a civil action, including costs of investigation and reasonable attorneys' fees.

205.    The MCFA prohibits "[t]he act, use or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive trade practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby . . . ." Minn. Stat. §325F.69, subd. 1.

206.    Plaintiffs and the Class bring this action on behalf of the public interest and the interests of Minnesota purchasers.  Among other things, this action is brought to punish Defendants and to deter Defendants and other parties from engaging in wrongful conduct that is harmful to the public and to the environment, including illegally manufacturing and distributing products as animal food that contain toxic chemicals harmful to those same animals.

207.    Defendants' commission of unlawful acts in violation of the MCFA includes one or more of the following:

a.    Omitting, suppressing, and/or concealing the material fact that the Defendants' Morning Song Bird Food contained the pesticides Storcide II and Actellic 5E;

b.    Omitting, suppressing, and/or concealing the material fact that the pesticides used in Defendants' Morning Song Bird Food were known to be toxic to birds, fish and other wildlife, including when used as treatment on seed;

c.    Affirmatively misrepresenting to purchasers, including through package labeling, advertising, and other means, that the Morning Song Bird Food were appropriate and proper for use as bird seed, despite the fact that the products contained toxic pesticides;

d.      Failing to alert the public and purchasers regarding the dangers arising from Defendants' use of pesticides which were known to be toxic to birds, fish and other wildlife, including when used as treatment on seed; and

e.      Unlawfully promoting and marketing Defendants' Morning Song Bird Food which contained registered pesticides, without the required warnings, and without disclosing these material facts to purchasers.

208.    As a result of the above unlawful acts, Defendants made intentional misrepresentations relating to the sale of merchandise to Plaintiffs and Class Members.

209.    Defendants' misrepresentations caused actual damage to the Plaintiffs and the Class and constituted the "causal nexus" of Plaintiffs' and the Class Members' damages.  Because Defendants failed to notify Plaintiffs and the Class that its products contained toxic pesticides, Plaintiffs and the Class purchased Defendants' Morning Song Bird Food based on the understanding that it was proper and appropriate to use the products as bird seed, and without knowing that the products in fact contained pesticides toxic to birds and other wildlife.

210.    Defendants' wrongful and illegal acts show a deliberate disregard for the rights or safety of others.  Defendants had knowledge of facts and/or intentionally disregarded facts that created a high probability of injury to the rights or safety of others, yet Defendants deliberately proceeded to act in conscious or intentional disregard of, and with indifference to, the high degree of probability of injury to the rights or safety of others.  Defendants' conduct therefore entitles Plaintiffs and the Class to an award of punitive damages pursuant to Minn. Stat. §549.20.

211.    Plaintiffs and Class Members therefore request actual damages in an amount to be proven at trial, punitive damages, reasonable attorneys' fees and their costs herein.

## COUNT X

**Violation of the Missouri Merchandising Practices Act
Missouri Revised Statutes §407.010, *et seq.***

**(On behalf of Plaintiffs Margaret Brumfield, Barbara Cowin
and All Missouri Class Members)**

212.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

213.    This Count is brought pursuant to the Missouri Merchandising Practices Act, Mo. Rev. Stat. §407.020, *et seq.*

214.   Plaintiffs purchased Defendants' Morning Song Bird Food.  Plaintiffs purchased Defendants' products for their own use as consumers, and not for resale.

215.   At the time Plaintiffs purchased Defendants' Morning Song Bird Food, they were unaware that Morning Song products contained Storcide II and Actellic 5E, pesticides which are toxic to birds and other wildlife. Plaintiffs believed they were purchasing bird seed which was safe and appropriate to feed to birds and other wildlife, and which did not contain pesticides or toxic chemicals.

216.   At all relevant times, Plaintiffs and other Class Members were purchasers within the meaning of Mo. Rev. Stat. §407.025.1.

217.   At all relevant times, Defendants conducted trade and commerce in the State of Missouri within the meaning of Mo. Rev. Stat. §407.010(7).

218.   At all relevant times, Plaintiffs, other Class Members, and Defendants were persons within the meaning of Mo. Rev. Stat. §407.010(5).

219.   The Missouri Merchandising Practices Act, Mo. Rev. Stat. §407.020.1, *et seq.*, provides in pertinent part that:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice. . . .  Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

220.   Defendants, individually and/or jointly, by and through their employees, agents, apparent agents, liaisons, and/or sales representatives, engaged in concealment, suppressions, and/or omissions, misrepresentations, unlawful schemes and courses of conduct intended to induce the Plaintiffs and Class Members to purchase Morning Song Bird Food through one or more of the following unfair and/or deceptive acts and/or practices:

a.   Omitting, suppressing, and/or concealing the material fact that the Morning Song Bird Food contained the pesticides Storcide II and Actellic 5E;

b.   Omitting, suppressing, and/or concealing the material fact that the pesticides used in Morning Song Bird Food were known to be toxic to birds, fish and other wildlife, including when used as treatment on seed;

c.    Affirmatively misrepresenting to purchasers, including through package labeling, advertising, and other means, that the Morning Song Bird Food were appropriate and proper for use as bird seed, despite the fact that the products contained toxic pesticides;

d.    Failing to alert the public and purchasers regarding the dangers arising from Defendants' use of pesticides which were known to be toxic to birds, fish and other wildlife, including when used as treatment on seed; and

e.    Unlawfully promoting and marketing Defendants' Morning Song Bird Food which contained registered pesticides, without the required warnings, and without disclosing these material facts to purchasers.

221.    Defendants' unfair and/or deceptive acts and/or practices violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. §407.020.

222.    The facts which Defendants misrepresented, omitted, suppressed, and/or concealed as alleged in the preceding paragraphs were material in that they concerned facts that would have been important to a reasonable consumer in making a decision whether to purchase Morning Song Bird Food.  Whether or not bird seed contains chemicals toxic to birds would be material and important to a reasonable consumer in deciding whether to purchase bird seed.

223.    Defendants' conduct as alleged in the preceding paragraphs was unfair in that it: (a) offended public policy; (b) it was immoral, unethical, oppressive, and/or unscrupulous; and/or (c) it caused substantial economic injury to consumers, namely Plaintiffs and Class Members.

224.    Defendants' unfair and/or deceptive acts and/or practices alleged in the preceding paragraphs occurred in connection with Defendants' conduct of trade and commerce in Missouri.

225.    Defendants intended for Plaintiffs and Class Members to purchase Defendants' wild bird seed products in reliance upon Defendants' unfair and/or deceptive acts and/or practices in the marketing, promotion, and sale of their products.

226.    As a direct and proximate result of Defendants' unfair and/or deceptive acts and/or practices, Plaintiffs and Class Members did not receive what they bargained for and believed they were receiving, bird seed that was appropriate for use as feed and not toxic and dangerous to birds and other wildlife, and have therefore suffered an ascertainable loss.

227.    Defendants' unfair and/or deceptive acts and/or practices were outrageous due to Defendants' evil motive and/or reckless indifference to the rights of others; and committed with

1  complete indifference to and conscious disregard for Plaintiffs' and the Class' rights, entitling

2  Plaintiffs and the Class to punitive damages.

3      228.   Plaintiffs and the Class therefore request actual damages in an amount to be proven at

4  trial, punitive damages, reasonable attorneys' fees and their costs herein.

5  **COUNT XI**

6  **Violation of New Mexico Unfair Practices Act**
**New Mexico Statutes §57-12-1, *et seq.***

7

8  **(On behalf of Plaintiffs Agnes Borchert, Edith Salkeld, Billy Kloeppel and**
**All New Mexico Class Members)**

9      229.   Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

10      230.   This count is brought pursuant to the New Mexico Unfair Trade Practices Act

11  ("NMUPA"), N.M. Stat. Ann. §57-12-1, *et seq.*

12      231.   Plaintiffs purchased Defendants' Morning Song Bird Food.  Plaintiffs purchased

13  Defendants' products for their own use as consumers, and not for resale.

14      232.   At the time Plaintiffs purchased Defendants' Morning Song Bird Food, they were

15  unaware that the products contained Storcide II and Actellic 5E, pesticides which are toxic to birds

16  and other wildlife.  Plaintiffs believed they were purchasing bird seed which was safe and

17  appropriate to feed to birds and other wildlife, and which did not contain pesticides or toxic

18  chemicals.

19      233.   Plaintiffs and Class Members are persons within the meaning of the NMUPA, and

20  have suffered a loss of money or property, real or personal, as a result of the employment by

21  Defendants of methods, acts, or practices declared unlawful by the NMUPA.  N.M. Stat. Ann. §57-

22  12-10(B).

23      234.   The NMUPA, N.M. Stat. Ann. §57-12-2(D), defines an "unfair or deceptive trade

24  practice" as "an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or

25  misleading oral or written statement, visual description or other representation of any kind

26  knowingly made in connection with the sale, lease, rental or loan of goods or services or in the

27  extension of credit or in the collection of debts by a person in the regular course of the person's trade

28  or commerce, that may, tends to or does deceive or mislead any person[.]"  Among other things, the

NMUPA also prohibits "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have." N.M. Stat. Ann. §57-12-2(D)(5).

235.    Among other things, NMUPA imposed a duty on Defendants to disclose material facts regarding its products, including any material facts reasonably necessary to prevent Defendants' representations that its Morning Song Bird Food products were safe and appropriate for use as wild bird seed and animal feed from being misleading.

236.    Defendants' commission of unlawful acts in violation of the NMUPA includes one or more of the following:

a.    Omitting, suppressing, and/or concealing the material fact that the Defendants' Morning Song Bird Food contained the pesticides Storcide II and Actellic 5E;

b.    Omitting, suppressing, and/or concealing the material fact that the pesticides used in Defendants' Morning Song Bird Food products were known to be toxic to birds, fish and other wildlife, including when used as treatment on seed;

c.    Affirmatively misrepresenting to purchasers, including through package labeling, advertising, and other means, that the Morning Song Bird Food products were appropriate and proper for use as bird seed, despite the fact that the products contained toxic pesticides;

d.    Failing to alert the public and purchasers regarding the dangers arising from Defendants' use of pesticides which were known to be toxic to birds, fish and other wildlife, including when used as treatment on seed; and

e.    Unlawfully promoting and marketing Defendants' Morning Song Bird Food which contained registered pesticides, without the required warnings, and without disclosing these material facts to purchasers.

237.    Defendants' misrepresentations and material omissions regarding the toxic chemicals in its Morning Song Bird Food constitute both "unfair or deceptive trade practices" and "unconscionable trade practices" within the meaning of the NMUPA.

238.    Defendants' illegal and wrongful actions constituted "unconscionable trade practices" in that, among other reasons, their concealment and omission of material facts and misrepresentations resulted in a gross disparity between the value received by Plaintiffs and the Class and the price paid, in that bird seed which is toxic to birds has no value.

239.    The Defendants made representations and material omissions of fact regarding its Morning Song products to the public at large, and said representations and material omissions were false and/or misleading.

240.    Defendants' false or misleading representations and omissions of material fact were knowingly made in connection with the sale of goods or services in the regular course of the Defendants' trade or commerce, within the meaning of N.M. Stat. Ann. §57-12-2(D) – (E).

241.    Defendants' representations and material omissions were of the type that may, tends to, or does deceive or mislead any person.

242.    Plaintiffs and the Class suffered a loss of money or property, real or personal, as a direct and proximate result of Defendants' violations of the NMUPA when they purchased Defendants' toxic Morning Song Bird Food.

243.    Plaintiffs and the Class therefore seek actual damages (or statutory damages in the sum of one hundred dollars ($100.00) if that amount is greater) and attorneys' fees pursuant to N.M. Stat. Ann. §57-12-10.  In light of the fact that Defendants willfully engaged in the outrageous and wrongful conduct described above, Plaintiffs and the Class also request statutory treble damages pursuant to N.M. Stat. Ann. §57-12-10(b).

244.    Plaintiffs and Class Members therefore request actual damages in an amount to be proven at trial, treble statutory damages, reasonable attorneys' fees and their costs herein.

## COUNT XII

### Breach of Express Warranty

245.    Plaintiffs incorporate the above allegations by reference as if set forth herein.

246.    Defendants, through their agents, employees and/or subsidiaries, expressly warranted that Morning Song Bird Food was safe for consumption by birds and wildlife.

247.    Plaintiffs and the other Class Members formed a contract with Defendants at the time Plaintiffs and the other Class Members purchased the Morning Song Bird Food.  The terms of the contract include the promises and affirmations of fact and express warranties made by Defendants on their websites and through their marketing and advertising campaign that the Morning Song Bird Food was fit for its intended use, as described above.

248.   These express warranties included, but are not limited to:

(a)   "Morning Song® Premium Year-Round Wild Bird Food is a mixture of song-birds' favorite seeds, such as sunflower seed, safflower seed and white millet.  This combination of seeds can be offered year-round to attract and retain the most appealing variety of wild birds."

(b)   "Attract your favorite birds[:]   Cardinals[;] Finches[;] Chickadees[;] Nuthatches[;] Titmice[;] Jays[.]"

(c)   "Essentials for Attracting a Variety of Wild Birds.  Food:  Offer a fresh, consistent food supply to attract and keep wild birds in your backyard.  For best results, use separate feeding stations filled with different Morning Song food mixes, suets, and pressed seed."

(d)   "INGREDIENTS:  Milo, White Millet, Black Oil Sunflower, Safflower[.]"

(e)   "GUARANTEED ANALYSIS:  Crude Protein (min) 9%[;] Crude Fat (min) 4%[;] Crude Fiber (max) 6%[;] Moisture (max) 12%[.]"

249.   This marketing and advertising constitute express warranties, became part of the basis of the bargain, and are part of a standardized contract between Plaintiffs and the other Class Members, on the one hand, and Defendants on the other.

250.   Plaintiffs and the other Class Members were exposed to these statements and reasonably relied upon such the promises and affirmations of fact contained in Defendants' marketing campaign.

251.   The Morning Song Bird Food did not conform to this express warranty because it was not, and is not, safe and causes serious harm to birds and wildlife, including death.

252.   Defendants breached the terms of their contracts, including the express warranties, with Plaintiffs and the other Class Members, by not providing the Morning Song Bird Food as advertised and described above.

253.   As a direct and proximate result of the breach of said warranties, and as the direct and legal result of the defective condition of Morning Song Bird Food as manufactured and/or supplied by Defendants, and other wrongdoing of Defendants described herein, Plaintiffs were injured and suffered damages.

254.    All conditions precedent to Defendants' liability under this express contract, including notice, as described herein, have been performed by Plaintiffs.  Defendants were put on notice of the defect, as evidenced by their deceptive "Dear Bird Lover" letter.  And the Cyphert plaintiffs gave notice to Defendants of this breach in January or February 2010, when they called to complain about the death of their birds and returned the remainder of the product.

**COUNT XIII**

**Breach of Implied Warranty of Merchantability**

255.    Plaintiffs incorporate the above allegations by reference as if set forth herein.

256.    Defendants, through their agents, employees and/or subsidiaries, manufactured, marketed, sold, or distributed Morning Song Bird Food.  When Defendants placed the Morning Song Bird Food into the stream of commerce, they knew, reasonably should have known, or were obligated to understand that the intended and ordinary purpose of the Morning Song Bird Food was to provide food, not poison, to birds and other wildlife.  Defendants impliedly warranted that Morning Song Bird Food was of merchantable quality and safe and fit for ordinary use.

257.    Plaintiffs reasonably relied upon the skill, superior knowledge and judgment of Defendants as to whether the Morning Song Bird Food was of merchantable quality and safe and fit for ordinary use as food for birds.

258.    Due to Defendants' wrongful conduct as alleged herein, Plaintiffs could not have known about the risks and side effects associated with the Morning Song Bird Food.

259.    In breach of said implied warranty, the Morning Song Bird Food was not of merchantable quality and was not safe or fit for ordinary use.  The Morning Song Bird Food cannot perform its ordinary and represented purpose of feeding birds because the product is poisonous to such animals and thus is not suitable for that purpose as was advertised by Defendants.

260.    Plaintiffs and the other Class Members purchased the Morning Song Bird Food and used it for the ordinary and intended purpose of feeding birds and wildlife.  Plaintiffs and Class Members entered into agreements with Defendants or their agents and received uniform warranties in connection with the purchase of such bird seed.

261.    As a direct and proximate result of Defendants' breach of implied warranty, Plaintiffs suffered damages as alleged herein.

262.    All conditions precedent to Defendants' liability, as described herein, have been performed by Plaintiffs.  Defendants were on notice of the defect, as evidenced by their deceptive "Dear Bird Lover" letter.  And the Cyphert plaintiffs gave notice to Defendants of this breach in January or February 2010, when they called to complain about the death of their birds and returned the remainder of the product.

263.    Defendants' breach of the warranty described above also constitutes a violation of California Civil Code §1792, *et seq*.

### COUNT XIV

**Breach of the Common Law Implied Warranty of Fitness for Consumption by Animals**

**(On behalf of Plaintiffs Margaret Brumfield, Barbara Cowin
and all Missouri Class Members)**

264.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

265.    Defendants were and are merchants in the business of selling wild bird seed.

266.    Defendants manufactured and sold wild bird seed to Plaintiffs and Class Members knowing that Plaintiffs and Class Members would use it as feed for birds and other wildlife.

267.    Defendants impliedly warranted that Morning Song Bird Food was of merchantable quality and safe and fit for ordinary use for consumption by birds and other wildlife.  Plaintiffs and Class Members reasonably relied upon Defendants' superior skill and judgment as a producer of wild bird seed, and relied upon Defendants' implied warranty of fitness for consumption by birds and other wildlife.

268.    Due to Defendants' wrongful conduct as alleged herein, Plaintiffs could not have known about the risks and side effects associated with the Morning Song Bird Food.

269.    In breach of said implied warranty, the Morning Song Bird Food was not fit for consumption by birds or other wildlife.

270.    As a direct and proximate result of Defendants' breach of implied warranty, Plaintiffs suffered damages in the amount paid for the toxic Morning Song Bird Food.

**COUNT XV**

**Intentional Misrepresentation**

271.    Plaintiffs incorporate the above allegations by reference as if set forth herein.

272.    At all relevant times, Defendants and/or their subsidiaries were engaged in the business of designing, manufacturing, marketing, distributing or selling the Morning Song Bird Food.

273.    Defendants, through their agents, employees and/or subsidiaries, delivered the Morning Song Bird Food to retail stores, distributors and various other distribution channels.

274.    Defendants willfully, falsely and knowingly misrepresented various material facts regarding the quality and character of the Morning Song Bird Food.  These misrepresentations are contained in various advertising and marketing disseminated or caused to be disseminated by Defendants, and such misrepresentations were further reiterated and disseminated by Defendants' officers, agents, representatives, servants or employees acting within the scope of their authority, so employed by Defendants to merchandise and market the Morning Song Bird Food.  Specifically, Defendants concealed that the Morning Song Bird Food contained poison for the very animals it was intended to nourish.

275.    Defendants' representations were made with the intent that the general public, including Plaintiffs and the other Class Members, rely upon them.  Defendants' representations were made with knowledge of the falsity of such statements or in reckless disregard of the truth thereof.  If Plaintiffs and Class Members had been aware of these suppressed facts, Plaintiffs and Class Members would not have purchased the Morning Song Bird Food.   In reliance upon these misrepresentations, Plaintiffs purchased the Morning Song Bird Food and were damaged thereby.

276.    Defendants misrepresented material facts with the intent to defraud Plaintiffs and Class Members.  The information withheld from Plaintiffs and the other Class Members is material and would have been considered material by a reasonable person, as more detailed herein.

277.    Plaintiffs purchased the Morning Song Bird Food under the false impression that the product was suitable as bird seed as it was advertised, the direct and proximate results of which were injury and harm to Plaintiffs and Class Members.

**COUNT XVI**

**Negligent Misrepresentation**

278.   Plaintiffs incorporate the above allegations by reference as if set forth herein.

279.   Defendants, through their agents, employees and/or subsidiaries, negligently and recklessly misrepresented various material facts regarding the quality and character of the Morning Song Bird Food, under circumstances where Defendants either knew or reasonably should have known that the representations were not true. These misrepresentations were contained in various advertising and marketing from Defendants, and such misrepresentations were further reiterated and disseminated by the officers, agents, representatives, servants or employees of Defendants acting within the scope of their authority.

280.   The information withheld from Plaintiffs and the other Class Members is material and would have been considered as such by a reasonable person, as detailed herein.

281.   Plaintiffs purchased the Morning Song Bird Food under the false impression that the product was suitable as bird seed as it was advertised, the direct and proximate results of which were injury and harm to Plaintiffs and Class Members.

**COUNT XVII**

**Unjust Enrichment**

282.   Plaintiffs incorporate the above allegations by reference as if set forth herein.

283.   As a direct, proximate, and foreseeable result of Defendants' acts and otherwise wrongful conduct, Plaintiffs and the Class suffered damages.  Defendants profited and benefited from the sale of the toxic Morning Song Bird Food while the Morning Song Bird Food caused Plaintiffs and Class Members to incur losses and damages.

284.   Defendants have voluntarily accepted and retained these profits and benefits, derived from consumers, including Plaintiffs and other Class Members, with full knowledge and awareness that, as a result of Defendants' unconscionable wrongdoing, consumers, including Plaintiffs and other Class Members, were not receiving products of the quality, nature, fitness, or value that had been represented by Defendants or that reasonable consumers expected.  Plaintiffs purchased Morning Song Bird Food that they expected would be safe and healthy for birds and wildlife and

1  instead have seen the death of their birds after eating the toxic bird food that Plaintiffs unwittingly

2  fed them.

3       285.   By virtue of the conscious wrongdoing alleged in this Complaint, Defendants have

4  been unjustly enriched at the expense of Plaintiffs and Class Members, who are entitled to, and

5  hereby seek, the disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits,

6  to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court

7  deems just and proper to remedy Defendants' unjust enrichment.

8       286.   Unless successful on the preceding counts of this Complaint, Plaintiffs have no

9  adequate remedy at law.

10                          **PRAYER FOR RELIEF**

11       WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for

12  relief and judgment against Defendants as follows:

13       A.   For an order certifying the Class under the appropriate provisions of Federal Rule of

14  Civil Procedure 23, as well as any appropriate subclasses, and appointing Plaintiffs and their legal

15  counsel to represent the Class as Class Counsel;

16       B.   Awarding actual, compensatory, and consequential damages;

17       C.   Awarding punitive and treble damages as provided under relevant laws;

18       D.   Awarding reimbursement, restitution and disgorgement from Defendants of the

19  benefits unjustly conferred by Plaintiffs and the Class;

20       E.   Awarding injunctive relief as appropriate;

21       F.   Awarding declaratory relief;

22       G.   For pre- and post-judgment interest to the Class, at the highest rate allowed by law;

23       H.   Awarding costs, including experts' fees, and attorneys' fees and expenses, and the

24  costs of prosecuting this action; and

25       I.   Granting such other and further relief as is just and proper.

26

27

28

1                                **JURY TRIAL DEMANDED**

2       Plaintiffs hereby demand a trial by jury on all issues triable by a jury.

3  DATED:  January 31, 2013                ROBBINS GELLER RUDMAN
                                              &amp; DOWD LLP

4                                 JASON A. FORGE
                                RACHEL L. JENSEN

5

6                                          s/ JASON A. FORGE

7                                         JASON A. FORGE

8                               655 West Broadway, Suite 1900
                              San Diego, CA  92101

9                               Telephone:  619/231-1058
                              619/231-7423 (fax)

10

11                               ROBBINS GELLER RUDMAN
                                 &amp; DOWD LLP

12                               PAUL J. GELLER
                              120 East Palmetto Park Road, Suite 500

13                               Boca Raton, FL  33432
                              Telephone:  561/750-3000

14                               561/750-3364 (fax)

15                               DOWD &amp; DOWD P.C.
                              DOUGLAS P. DOWD

16                               ALEX R. LUMAGHI
                              211 North Broadway, Suite 4050

17                               St. Louis, MO  63102
                              Telephone:  314/621-2500

18                               314/621-2503 (fax)

19                               THE DRISCOLL FIRM, P.C.
                              JOHN J. DRISCOLL

20                               211 N. Broadway, Suite 4050
                              St. Louis, MO  63102

21                               Telephone:  314/932-3232
                              314/932-3233 (fax)

22                               Co-Lead Counsel for Plaintiffs

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on January 31, 2013, I authorized the electronic filing of the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4

the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5

caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6

CM/ECF participants indicated on the attached Manual Notice List.

7

I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on January 31, 2013.

9

10

 s/ JASON A. FORGE
JASON A. FORGE

11

ROBBINS GELLER RUDMAN
& DOWD LLP

12

655 West Broadway, Suite 1900
San Diego, CA  92101-3301

13

Telephone:  619/231-1058
619/231-7423 (fax)

14

15

E-mail:  jforge@rgrdlaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

809204_1

# Mailing Information for a Case 3:12-cv-01592-JAH-RBB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Douglas P. Dowd**
  doug@dowdlaw.net,donna@dowdlaw.net,laura@dowdlaw.net

- **John J. Driscoll , IV**
  john@thedriscollfirm.com,nikki@thedriscollfirm.com

- **Jason A Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jeffrey J. Jones**
  jjjones@jonesday.com

- **Alex R. Lumaghi**
  alex@dowdlaw.net,laura@dowdlaw.net

- **Kelli J. Stiles**
  kjstiles@jonesday.com

- **Edward P Swan , JR**
  pswan@jonesday.com,kphewitt@jonesday.com,dpippin@jonesday.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)