Edward Patrick Swan, Jr. (State Bar No. 89429)
pswan@jonesday.com
JONES DAY
12265 El Camino Real, Suite 200
San Diego, CA  92130.4096
Telephone:  +1.858.703.3132
Facsimile:   +1.858.314.1150

Jeffrey J. Jones (admitted *pro hac vice*)
Kelli J. Stiles (admitted *pro hac vice*)
jjjones@jonesday.com
kjstiles@jonesday.com
JONES DAY
325 John H. McConnell Boulevard, Suite 600
P.O. Box 165017
Columbus, OH  43216
Telephone:  +1. 614.469.3939
Facsimile:   +1.614.461.4198

Attorneys for Defendants
THE SCOTTS MIRACLE-GRO COMPANY
AND THE SCOTTS COMPANY LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re MORNING SONG BIRD FOOD LITIGATION, | Lead Case No. 3:12-cv-01592-JAH-RBB |
| | <u>CLASS ACTION</u> |
| This Document Relates To:<br><br>ALL ACTIONS. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date:  April 29, 2013<br>Time:  2:30 p.m.<br>Judge:  Honorable John A. Houston<br>Courtroom: 13B<br><br>[Federal Rule of Civil Procedure 12(b)]<br><br>[Filed Concurrently With Notice of Motion and Motion]<br><br>**Oral Argument Requested** |

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION .................................................................. 1

II.     BACKGROUND ................................................................... 4

    A.      Scotts And The Wild Bird Food ............................... 4

    B.      The Plaintiffs ................................................................ 7

    C.      The Class Action Complaint ....................................... 8

III.    ARGUMENT ....................................................................... 8

    A.      Plaintiffs' Claims Should Be Dismissed For Lack Of Standing. ......... 8

        1.      Legal Standard .............................................. 8

        2.      Plaintiffs Lack Standing To Pursue Their Requested Relief. ......... 9

            (a)     The Non-California Plaintiffs Fail To Allege Facts Sufficient To Demonstrate That They Suffered An Injury In Fact. ......... 9

            (b)     The Cypherts' Claims Likewise Fail For Lack Of Standing. ......... 14

            (c)     Plaintiffs Also Have Failed To Plead Facts To Support Any Entitlement To Injunctive Relief. ......... 16

    B.      All Counts Should Be Dismissed For The Additional Reason That Plaintiffs Fail To State Valid Claims Under Federal Rule of Civil Procedure 12(b)(6). ......... 17

        1.      Legal Standard .............................................. 17

        2.      Counts 1 and 3–14 Should Be Dismissed Because Plaintiffs Have Failed To Plead The Element Of An Actual Injury Caused By Scotts. ......... 18

        3.      Counts 1–5, 7–8, 11–13, and 15–17 Are Barred By The Statutes of Limitations. ......... 21

            (a)     Counts 2, 8, and 12–13 Began To Run Upon The Date Of The Alleged Violation And Expired Before Plaintiffs Filed Their First Complaint With This Court. ......... 21

            (b)     Counts 1, 3–5, 7, 11, and 15–17, Which Are Arguably Subject To The Discovery Rule, Were Also Not Timely Filed. ......... 22

**TABLE OF CONTENTS**
**(continued)**

Page

(c) Plaintiffs' Theory For Equitable Tolling Is Not Supported By The Factual Allegations. ......................... 24

(d) Plaintiffs' Asserted Wild Bird Food Purchases After 2008 Do Not Save Their Expired Claims. ............ 28

4. Count 1, Alleging That Defendants Violated RICO, Must Be Dismissed On Independent Bases Under Rule 12(b)(6). ................................................................... 28

(a) The Law Of RICO ............................................. 29

(b) Overview of Plaintiffs' RICO Allegations. .................... 30

(c) Count 1 Must Be Dismissed Because It Does Not Meet  Rule 9(b)'s Heightened Pleading Standard. ........ 31

(d) Count 1 Must Be Dismissed Because Plaintiffs' Allegations Under Section 1962(c) Fail The "Separate and Distinct" Test. ......................................... 33

(e) Count 1 Also Must Be Dismissed Because It Fails To State A Conspiracy Claim Under Section 1962(d). ................................................................... 34

5. Counts 2 And 12, Plaintiffs' Express Warranty and Magnuson-Moss Warranty Act Claims, Fail As A Matter Of Law. ................................................................... 34

(a) Plaintiffs Fail To Plead Breach Of An Express Warranty. ......................................................... 34

(b) Plaintiffs' Magnuson-Moss Warranty Act Claim Fails. ................................................................. 37

6. Counts 3–10 and 15–16 Fail Because The Plaintiffs Do Not Plead Their Claims With The Specificity Required Under Rule 9(b). ................................................... 38

7. Count 17, Plaintiffs' Unjust Enrichment Claim, Is Not A Proper Cause Of Action. ........................................... 39

IV. CONCLUSION ................................................................ 40

# TABLE OF AUTHORITIES

Page

**CASES**

*Adams v. I-Flow Corp.*, No. CV09-09550 R(SSx), 2010 WL 1339948
(Mar. 30, 2010) ................................................................................... 23

*Alfi v. Nordstrom, Inc.*,
No. 09cv1249 BEN (CAB), 2010 WL 5093434 (S.D. Cal. Dec. 08, 2010) ...... 11

*Amburgy v. Express Scripts, Inc.*,
671 F. Supp. 2d 1046 (E.D. Mo. 2009) ............................................... 19

*American Suzuki Motor Corp v. Superior Court*,
37 Cal. App. 4th 1291 (Cal. Ct. App. 1995)................................... 20, 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................... 17, 18

*Baker v. Beech Aircraft Corp.*,
39 Cal. App. 3d 315 (Cal. Ct. App. 1974)................................... 24, 27

*Balistreri v. Pacifica Police Dept.*,
901 F.2d 696 (9th Cir. 1988) .......................................................... 17

*Bates v. United Parcel Serv., Inc.*,
511 F.3d 974 (9th Cir. 2007) ..................................................... 16, 17

*Bedolla v. Logan & Frazer*,
52 Cal. App. 3d 118 (Cal. Ct. App. 1975)........................................ 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 545 (2007) ........................................................... 17, 28

*Branch v. Tunnell*,
14 F.3d 449 (9th Cir. 1994) ........................................................... 5

*Broberg v. Guardian Life Ins. Co.*,
171 Cal. App. 4th 912 (Cal. Ct. App. 2009)..................................... 23

*Buckland v. Threshold Enters., Ltd.*,
155 Cal. App. 4th 798 (Cal. Ct. App. 2007)..................................... 18

*Burdick v. Union Sec. Ins. Co.*,
   No. CV 07-4028 ABC (JCx), 2009 WL 4798873 (C.D. Cal. Dec. 9, 2009) ..... 23

*Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*,
   169 Cal. App. 4th 116 (Cal. Ct. App. 2008)......................................................21

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158 (2001) ...................................................................................30, 33

*Chavarria v. Fleetwood Retail Corp.*,
   115 P.3d 799 (N.M. Ct. App. 2005) ...................................................................19

*Clemens v. DaimlerChrysler Corp.*,
   534 F.3d 1017 (9th Cir. 2008)...........................................................................38

*Compagnie De Reassurance D'Ile de France v. New England Reins. Corp.*,
   57 F.3d 56 (1st Cir. 1995) ..................................................................................34

*Cook v. State Farm Mut. Auto. Ins. Co.*,
   No. 2002-CA-000801-MR, 2004 WL 2011375 (Ky. Ct. App. Sept. 10,
   2004)...................................................................................................................22

*Craig & Bishop, Inc. v. Piles*,
   247 S.W.3d 897 (Ky. 2008)................................................................................19

*Daugherty v. Am. Honda Motor Co.*,
   144 Cal. App. 4th 824 (Cal. Ct. App. 2006).......................................................38

*Diaz v. Gates*,
   420 F.3d 897 (9th Cir. 2005) ..............................................................................20

*Dowell v. Biosense Webster, Inc.*,
   179 Cal. App. 4th 564 (Cal. Ct. App. 2009).......................................................18

*Edmunson v. Procter & Gamble Co.*,
   No. 10-CV-2256-IEG (NLS), 2011 WL 1897625 (S.D. Cal. May 17,
   2011)..................................................................................................35, 36, 37

*FDIC v. Dintino*,
   167 Cal. App. 4th 333 (Cal. Ct. App. 2008).......................................................23

*Fitzgerald. v. Chrysler Corp.*,
   116 F.3d 225 (7th Cir. 1997) ..............................................................................30

*Fogie v. Thorn Americans, Inc.*,
    190 F.3d 889 (8th Cir. 1999)...................................................................34

*Fraley v. Facebook, Inc.*,
    830 F. Supp. 2d 785 (N.D. Cal. 2011)......................................................9

*Galbraith v. Cnty. of Santa Clara*,
    307 F.3d 1119 (9th Cir. 2002) ..................................................................5

*Global Total Office LP v. Global Allies, LLC*,
    No. 10 C 1896, 2011 WL 3205487 (N.D. Ill. July 28, 2011) ...........................39

*Graham v. Fed. Emergency Mgmt. Agency*,
    149 F.3d 997 (9th Cir. 1998) ..................................................................16

*Grimmet v. Brown*,
    75 F.3d 506 (9th Cir. 1996) ....................................................................29

*Grisham v. Philip Morris U.S.A., Inc.*,
    40 Cal. 4th 623 (2007).......................................................................24, 25

*Hairston v. South Beach Beverage Co.*,
    No. CV 12-1249-JFW (DTBx), 2012 WL 1893818 (C.D. Cal. May 18,
    2012).......................................................................................37, 38

*Harrison v. Leviton Mfg. Co.*,
    No. 05-CV-0491-CVE-FHM, 2006 WL 2990524 (N.D. Okla. Oct. 19,
    2006)............................................................................................14

*Hollon v. Consumer Plumbing Recovery Ctr.*,
    Civil Action No. 5:05-414-JMH, 2006 U.S. Dist. LEXIS 29872 (E.D. Ky.
    May 15, 2006)....................................................................................39

*Horne v. Harley-Davidson, Inc.*,
    660 F. Supp. 2d 1152 (C.D. Cal. 2009)......................................................21

*Ice Cream Distrib. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*,
    No. 09-5815CW, 2010 WL 3619884 (N.D. Cal. Sept. 10, 2010)......................30

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*,
    601 F. Supp. 2d 1201 (S.D. Cal. 2009) ......................................................34

*In re GlenFed Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994)...............................................................38, 40

*In re McNeil Consumer Healthcare, Mktg. & Sales Practices Litig.*,
  MDL No. 2190, 2011 WL 2802854 (E.D. Pa. July 15, 2011) ................... 12, 13

*In re Taxable Municipal Bond Securities Litigation*,
  51 F.3d 518 (5th Cir. 1995) ........................................................................ 20

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Prac., &
  Prods. Liab. Litig.*,
  785 F. Supp. 2d 883 (C.D. Cal. 2011) .............................................31, 33, 34, 35

*Johannson v. Wachovia Mortg., FSB*,
  No. C 11-02822 WHA, 2012 WL 1594829 (N.D. Cal. May 04, 2012) ............. 23

*Kaing v. Pulte Homes, Inc.*,
  No. 09-5057 SC, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010) ........................ 15

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ..................................................................... 39

*Keegan v. American Honda Motor Co.*,
  No. CV 10-09508 MMM (AJWx), 284 F.R.D. 504 (C.D. Cal. June 12,
  2012) ............................................................................................................. 23

*Khasin v. The Hershey Co.*,
  No. 5:12-CV-01862 EJD, 2012 WL 5471153 (N.D. Cal. Nov. 09, 2012) ........ 20

*Kinzler v. PNC Bank N.A.*,
  No. 4:12-CV-00097 BRW, 2012 WL 956165 (E.D. Ark. Mar. 21, 2012) ........ 39

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997) ...............................................................................25, 28

*Koronthaly v. L'Oreal USA, Inc.*,
  374 Fed. App'x 257 (3rd Cir. 2010) ............................................................. 14

*Krieger v. Nick Alexander Imports, Inc.*,
  234 Cal. App. 3d 205 (Cal. Ct. App. 1991) ................................................... 22

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*,
  940 F.2d 397 (9th Cir. 1991) ....................................................................31, 32

*Lauriedale Assocs. v. Wilson*,
  7 Cal. App. 4th 1439 (Cal. Ct. App. 1992) ................................................... 40

*Lauter v. Anoufrieva*,
   642 F. Supp. 2d 1060 (C.D. Cal. 2009) ............................................................ 29

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
   431 F.3d 353 (9th Cir. 2005) ............................................................ 23, 30, 33

*Lorenz v. CSX Corp.*,
   1 F.3d 1406 (3d Cir. 1993) ............................................................ 34

*Lorenzo v. Qualcomm Inc.*,
   603 F. Supp. 2d 1291 (S.D. Cal. 2009) ............................................................ 40

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................ 15, 16

*Meaunrit v. Pinnacle Foods Group, LLC*,
   No. C 09-04555 CW, 2010 WL 1838715 (N.D. Cal. May 05, 2010) .... 10, 11, 13

*Melchior v. New Line Productions, Inc.*,
   106 Cal. App. 4th 779 (Cal. Ct. App. 2003) ............................................................ 40

*Meridian Project Sys., Inc. v. Hardin Constr. Co.*,
   404 F. Supp. 2d 1214 (E.D. Cal. 2005) ............................................................ 39

*Midwest Theatres Corp. v. IMAX Corp.*,
   Civil No. 08-5823 (DSD/SRN), 2009 WL 649701 (D. Minn. Mar. 11, 2009) ............................................................ 39

*Mitchell v. Skyline Homes*,
   No. CIV S-09-2241 KJM, 2010 WL 1791281 (E.D. Cal. May 03, 2010) ......... 21

*Murphy v. Hunt*,
   455 U.S. 478 (1982) ............................................................ 16

*Nelsen v. King County*,
   895 F.2d 1248 (9th Cir. 1990) ............................................................ 16, 17

*Nuñag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*,
   790 F. Supp. 2d 1134 (C.D. Cal. 2011) ............................................................ 31, 32

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ............................................................ 16

*Oliveira v. Amoco Oil Co.,*
  776 N.E.2d 151 (Ill. 2002) .................................................................................... 19

*Oshana v. Coca-Cola Co.,*
  472 F.3d 506 (7th Cir. 2007) ................................................................................ 14

*Owen v. General Motors Corp.,*
  No. 06-4067-CV-C-NKL, 2006 WL 2808632 (W.D. Mo. Sept. 28, 2006) ....... 39

*Parks Sch. of Bus., Inc. v. Symington,*
  51 F.3d 1480 (9th Cir. 1995) ................................................................................... 4

*Pirelli Armstrong Tire Corp. v. Walgreen Co.,*
  No. 09C2046, 2009 WL 2777995 (N.D. Ill. Aug. 31, 2009) .............................. 23

*Platt Elec. Supply, Inc. v. EOFF Elec., Inc.,*
  522 F.3d 1049 (9th Cir. 2008) .............................................................................. 23

*Ramsey v. Culpepper,*
  738 F.2d 1092 (10th Cir. 1984) ............................................................................ 23

*Rivera v. Wyeth-Ayerst Labs.,*
  283 F.3d 315 (5th Cir. 2002) ................................................................... 11, 12, 14

*Rodarte v. Philip Morris, Inc.,*
  No. CV03-0353FMC(CTX), 2003 WL 23341208 (C.D. Cal. June 23,
  2003) ..................................................................................................................... 37

*Saaremets v. Whirlpool Corp.,*
  Civ. No. S-09-2337 FCD/EFB., 2010 U.S. Dist. LEXIS 26165 (E.D. Cal.
  Mar. 18, 2010) ...................................................................................................... 23

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.,*
  806 F.2d 1393 (9th Cir. 1986) .............................................................................. 30

*Steele v. Hospital Corp. of America,*
  36 F.3d 69 (9th Cir. 1994) .................................................................................... 21

*Suckow Borax Mines Consol. v. Borax Consol.,*
  185 F.2d 196 (9th Cir. 1951) ................................................................................ 24

*Swift & Co. v. Elias Farms, Inc.,*
  539 F.3d 849 (8th Cir. 2008) ................................................................................ 19

*United States v. McNeil PPC, Inc., et al.*,
  Case No. 2:11-cv-01745-RB, Dkt. No. 9 (Mar. 16, 2011) ................................ 12

*United States v. The Scotts Miracle-Gro Co.*,
  Case No. 2:12cr24, Sentencing Hearing Transcript (S.D. Ohio Sept. 7,
  2012) ............................................................................................................... 7

*Wagh v. Metris Direct, Inc.*,
  363 F.3d 821 (9th Cir. 2003) ........................................................................ 34

*Wallis v. Ford Motor Co.*,
  208 S.W.3d 153 (Ark. 2005) ......................................................................... 19

*Watts v. Sechler*,
  140 S.W.3d 232 (Mo. Ct. App. 2004) ........................................................... 20

*Whitson v. Bumbo*,
  No. C07-05597 MHP, 2009 WL 1515597 (N.D. Cal. Apr. 15, 2009) ......... 10, 13

*Williams v. Purdue Pharma Co.*,
  297 F. Supp. 2d 171 (D.D.C. 2003) .............................................................. 14

*Williams v. WMX Techs., Inc.*,
  112 F.3d 175 (5th Cir. 1997) ........................................................................ 33

*Yield Dynamics, Inc. v. TEA Sys. Corp.*,
  154 Cal. App. 4th 547 (Cal. Ct. App. 2007) ................................................. 20

STATUTES

815 Ill. Comp. Stat. 505/10 ................................................................................ 19, 23

7 U.S.C. § l36 ........................................................................................................ 6

15 U.S.C. § 2301 ................................................................................................... 38, 39

15 U.S.C. § 2302 ................................................................................................... 38

18 U.S.C. § 1961 ................................................................................................... 30, 34

18 U.S.C. § 1962 ................................................................................................... passim

18 U.S.C. § 1964 ................................................................................................... 20, 29

28 U.S.C. § 2303 ................................................................................................... 38

Ark. Code Ann. § 4-88-113 ................................................................. 19

Cal. Bus. & Prof. Code § 17208 ......................................................... 23

Cal. Civ. Code § 1780 .......................................................................... 18

Cal. Civ. Code § 1783 .......................................................................... 23

Cal. Civ. Code § 2313 .......................................................................... 35

Cal. Com. Code § 2725 .................................................................. 21, 22

Ky. Rev. Stat. Ann. § 367.170 ............................................................. 19

Ky. Rev. Stat. Ann. § 367.220 ....................................................... 19, 22

Minn. Stat. § 8.31 ................................................................................. 20

Mo. Rev. Stat. § 407.025 ..................................................................... 20

N.M. Stat. Ann. § 37-1-4 ..................................................................... 23

N.M. Stat. Ann. § 57-12-10 ................................................................. 19

**RULES**

Fed. R. Civ. P. 8(a) .............................................................................. 29

Fed. R. Civ. P. 9(b) ....................................................................... passim

Fed. R. Civ. P. 12(b)(1) .................................................................... 1, 9

Fed. R. Civ. P. 12(b)(6) ................................................... 1, 5, 17, 29

MPA IN SUPPORT OF MOTION TO DISMISS
3:12-cv-01592-JAH-RBB

1   **I.      INTRODUCTION**

2          Plaintiffs crafted their sixty-plus page, seventeen-count Amended

3   Consolidated Class Action Complaint ("Complaint") with the obvious purpose of

4   masking the numerous defects in their case and avoiding the Complaint's necessary

5   dismissal.  Plaintiffs' "everything-but-the-kitchen-sink" strategy fails.  Upon even

6   cursory inspection, the crucial deficiencies in Plaintiffs' claims are evident.  The

7   Court should dismiss the Complaint under Civil Rules 12(b)(1) and 12(b)(6).

8          In their Complaint, Plaintiffs—people who allegedly purchased wild bird

9   food products manufactured and/or distributed by Defendants more than four years

10  ago—bring a putative nationwide class action with various proposed statewide sub-

11  classes against The Scotts Miracle-Gro Company ("SMG") and The Scotts

12  Company LLC ("Scotts LLC") (collectively, "Scotts").  Plaintiffs purport to bring

13  the class action on behalf of all persons who purchased Scotts' wild bird food that

14  had been treated with one of two pesticides, Storcide II and Actellic (the

15  "Pesticides"), for insect control purposes.  Plaintiffs concede that in March 2008,

16  Scotts voluntarily informed the Food and Drug Administration ("FDA") that the

17  Pesticides had been improperly applied to wild bird food until March 12, 2008, and

18  that Scotts initiated a voluntary recall of the product.  Moreover, in March 2008,

19  Scotts informed the public that insect controls not approved for use on animal seed

20  had been applied to the wild bird food and that the affected wild bird food was

21  being removed from store shelves.

22          Plaintiffs' allegations amount to the following:  (1) Plaintiffs bought Scotts'

23  wild bird food; (2) Scotts misrepresented the safety of the food because Scotts did

24  not disclose to consumers that it contained Pesticides not approved for use on wild

25  bird food; (3) Plaintiffs would not have purchased the food if they had known it

26  contained the Pesticides; and, thus, (4) Plaintiffs and a class of persons who

27  purchased the wild bird food containing these Pesticides deserve damages, a

28  declaratory judgment, and injunctive relief because they overpaid for the food.

The Complaint, however, suffers from numerous deficiencies that require its dismissal. At the very outset, Plaintiffs fail to establish that the Court has subject matter jurisdiction. The civil law should not be expanded to regulate every hypothetical ill in the absence of some real injury to the civil plaintiff. For twelve of the fourteen Plaintiffs (the "Non-California Plaintiffs"), the Complaint does not allege a single fact demonstrating that they suffered any real injury as a result of their purchases of the wild bird food. The Non-California Plaintiffs bought a product, used it, reported no problems with it, and never even asked Scotts for a refund of any of their purchases. (Had they done so, Scotts would have given them their money back under Scotts' "No Quibble Guarantee.") Their claims are based on a "benefit of the bargain" theory arising out of purely hypothetical harm, which is not sufficient to maintain standing. Those claims fail.

The Complaint also fails to demonstrate that the remaining two Plaintiffs, Laura and Milt Cyphert, have standing to bring their claims. Although the Complaint alleges that the Cypherts purchased Scotts' wild bird food in January 2010 and that certain of their domestic birds died after ingesting the wild bird food, the Complaint fails to allege any facts showing that the birds' alleged deaths are traceable to Scotts' application of the Pesticides. The Cypherts purchased their wild bird food in January 2010—*nearly two years after Scotts ceased using the Pesticides and recalled the product.* The Complaint does not allege that the product the Cypherts purchased *was even treated with the Pesticides*. Thus, the Cypherts also lack standing.

Plaintiffs' claims also suffer from other significant defects as well. Counts 1 and 3–14 should be dismissed because, even if Plaintiffs' allegations could support the more liberal standard for Article III jurisdiction (and they cannot), Plaintiffs fail to plead facts sufficient to meet the more exacting standard of actual injury caused by Scotts. Counts 1–5, 7–8, 11–13, and 15–17 must also be dismissed because they are barred by their statutes of limitations. Recognizing that Scotts ceased applying

the Pesticides by March 12, 2008, and, thus, many claims are long barred, Plaintiffs cobble together the claim that the statutes of limitations were equitably tolled until January 2012, when Scotts agreed to plead guilty to a single misdemeanor relating to improper use of the Pesticides.

The gist of Plaintiffs' equitable tolling claim is that, even though Scotts explicitly disclosed to the government, to its retailers, and to the public that it had been applying materials to its wild bird food that were not approved for that use by the Environmental Protection Agency ("EPA"), Scotts somehow engaged in "fraudulent concealment" because:  (1) Scotts' *self-disclosure* to the FDA—which started a *four year investigation*—was really just intended to "lull" the FDA into inaction; and (2) the public disclosure called the unapproved materials "insect controls" rather than "pesticides."  Those far-fetched allegations fail on their face. Far from "concealing" anything, Scotts went out of its way—again and again—to voluntarily disclose the problem.

As set forth below, the full and plain language of Scotts' disclosures were more than adequate to reveal Plaintiffs' claims more than four years before Plaintiffs sued Scotts.  Plaintiffs' last-ditch attempt to avoid dismissal by adding even more vague claims that Scotts used unnamed "toxic chemicals" (other than the Pesticides) after 2008 likewise fails.  Their apparent reference to other unidentified sales involving other unidentified "chemicals" only highlights the fatal flaw in their Complaint—a complete failure to allege any actual injury associated with the use of any specific products.

Plaintiffs' alleged violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)-(d), should be dismissed on several additional bases.  The RICO count alleges, *inter alia*, that (i) SMG and Scotts LLC were RICO "persons"; (ii) Scotts "associated" with its own corporate affiliate, Gutwein & Co. ("Gutwein"); (iii) Gutwein was an illegal "enterprise" under RICO; and (iv) Scotts conducted and participated in Gutwein's affairs

through a pattern of racketeering activity. Plaintiffs fail to plead their RICO allegations with the particularity required under Rule 9(b) and fail to set out several required elements of §§ 1962(c)-(d). Plaintiffs attempt to take a square peg (Scotts' error in not immediately discovering the unapproved Pesticides) and fit it into a round hole (that Scotts purposely engaged in a pattern of "racketeering" through an enterprise separate from itself and its affiliates for criminal purposes). Under Plaintiffs' far-fetched theory, every consumer product allegation made against any corporation could open the door to a RICO claim. Courts routinely reject such theories, as should this Court here. As set forth below, Plaintiffs' remaining claims also fail on additional grounds.

For each of these reasons, the Court should dismiss the Complaint. Or, at a minimum, the Court should dismiss the Non-California Plaintiffs who come nowhere close to alleging any actual injury or damages that could warrant relief.

## II.    BACKGROUND

### A.    Scotts And The Wild Bird Food[1]

In November 2005, Scotts entered the wild bird food business via its acquisition of Gutwein. (Am. Compl. ¶ 50.) Scotts continued to manufacture the wild bird food in the same manner that it had been manufactured for a number of years while under the prior ownership, including treating it with one of two Pesticides, Storcide II and Actellic, to avoid insect infestation. (*Id.* at ¶¶ 3–4, 38.) In late 2007, certain Scotts employees learned that the Pesticides were being applied to the wild bird food and further determined that the Pesticides were not approved by the EPA for that use. (*Id.* at ¶ 4.) These employees began an internal discussion about the matter. (*Id.*)

---

[1] Despite the numerous factual inaccuracies in the Complaint, particularly with respect to Plaintiffs' allegations about Scotts' communications with retailers and distributors concerning the voluntary recall and the propriety of the recall, Scotts assumes the alleged facts to be true solely for purposes of this Motion. *See Parks Sch. of Bus., Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir. 1995) (at the motion to dismiss stage, the allegations of material fact in a plaintiff's complaint are taken as true). Nothing in this Motion should be construed as an admission of such facts.

1    In March 2008, after the matter came to the attention of Scotts' General

2    Counsel, Scotts ceased using the Pesticides *and voluntarily disclosed the problem*

3    *to the government, distributors, and retailers*.  (*Id.* at ¶¶ 5–6, 43(d).)  Scotts called

4    the FDA on March 25, 2008, and then sent a follow-up letter on March 26, 2008

5    (*id.* at ¶¶ 5, 39, 43(d), 87), stating that:  (1) Scotts' use of the Pesticides to treat wild

6    bird food had ended by March 12, 2008; (2) all shipments containing the Pesticides

7    had been stopped by March 12, 2008; and (3) the EPA had been notified about the

8    Pesticide use.  (March 26, 2008, Letter to the FDA attached hereto as Ex. A, pp. 1–

9    2.)  Scotts also informed the FDA that Scotts was in the process of conducting a

10   voluntary recall of all wild bird food treated with the Pesticides shipped between

11   November 15, 2005, and March 12, 2008.  (*Id.* at ¶ 5.)

12   Scotts also *voluntarily disclosed* its use of the Pesticides to the public in

13   March 2008 by issuing a communication entitled "Dear Fellow Bird Lover," which

14   stated that Scotts was ceasing the sale of its wild bird food and replacing the food at

15   retailers throughout the country because Scotts determined that the "insect controls"

16   used to prevent wild bird food from becoming infested with "moths and other

17   problem causing insects" were "*not* EPA-approved for wild bird food or wild

18   animal food."  (Communication attached hereto as Ex. B (emphasis added).)[2]

19   Based on independent testing, Scotts determined that, at the minimal dosage levels

20   used to prevent insect infestation, the Pesticides "did not constitute a significant

21   health risk to wild birds."  *Id*.  Nonetheless, out of an abundance of caution, Scotts

22

23   _____

     [2] Plaintiffs refer extensively to the FDA letter and "Fellow Bird Lover" communication in
24   the Complaint, but selectively discuss only portions of those documents.  The Court should
     consider the complete versions of both documents.  *See, e.g.*, *Branch v. Tunnell*, 14 F.3d 449,
25   454 (9th Cir. 1994) (holding that "documents whose contents are alleged in a complaint and
     whose authenticity no party questions, but which are not physically attached to the pleading, may
26   be considered in ruling on a Rule 12(b)(6) motion to dismiss" and affirming the district court's
     decision to consider a deposition transcript and affidavit when ruling on the defendant's motion to
27   dismiss), overruled on other grounds by *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th
     Cir. 2002).  (*See also* Am. Compl. ¶¶ 6, 7, 29, 40-41, 43(e), 69, 79, 88, 89, 99, 114(a), 130,
28   (referring to "Dear Fellow Bird Lover" communication); ¶¶ 5, 39, 43(d), 87, 99 (referring to the
     FDA letter).)

took steps to recall the wild bird food and inform the public, its retailers, and the government of the problem.

Scotts then fully cooperated with the government in the course of its investigation *over the next four years* regarding the wild bird food and other unrelated pesticide registration matters.  After an exhaustive investigation, the government identified a *single misdemeanor labeling violation* related to the wild bird food.  *See* 7 U.S.C. § l36j(a)(2)(G).  Scotts entered into a plea agreement with the government in early 2012, admitting that it violated that labeling law from November 2005 through March 2008.  (Am. Compl. ¶¶ 2, 36.)  Scotts never pled guilty to harming birds or failing to conduct a legally sufficient recall.  Nor did the government ever charge Scotts with these acts, let alone with fraud or any other criminal conspiracy in connection with wild bird food after investigating the company over the course of four years.

Judge Graham, a well respected senior federal judge who conducted the sentencing proceedings, found at the conclusion of the government investigation:

> [A]fter having reviewed all of this information, I have concluded that to the contrary of what one might suspect or imply from just the facts, that, indeed, Scotts is a good corporate citizen.  And some of the reasons why I came to this conclusion included the fact that <u>Scotts voluntarily revealed these violations when management learned of them, even though they had not yet been discovered or detected by any governmental agency.  So they, in effect, stepped forward and said:  We have done something wrong, we just discovered it, we want to make a full disclosure.  And that self-reporting has been followed by complete cooperation with the government in the investigation of this case, as vouched for by the governmental agency that's charged with enforcing these laws and by the U.S. Attorney's Office, who has reported to the Court that Scotts has completed—or has cooperated completely in the investigation of these violations.</u>

Judge Graham accepted Scotts' plea and approved the penalties and charitable donations the parties had proposed. *See United States v. The Scotts Miracle-Gro Co.,* Case No. 2:12cr24, Sentencing Hearing Transcript (S.D. Ohio Sept. 7, 2012) (excerpt attached hereto as Ex. C (emphasis added).)

### B.    The Plaintiffs

The named Plaintiffs in this action are residents of California, Arkansas, Illinois, Kentucky, Minnesota, Missouri, and New Mexico who allegedly purchased Scotts' wild bird food. (Am. Compl. ¶¶ 13–28.)  Plaintiffs fall into two groups:

The Non-California Plaintiffs, consisting of all of Plaintiffs except California residents Laura and Milt Cyphert, claim to have been damaged because they allegedly paid more for the wild bird food than they believe it was worth. (*Id.* at ¶ 30.)  The Non-California Plaintiffs do not allege that any birds or other animals were injured by consuming wild bird food treated with the Pesticides.  They also do not claim they suffered any actual injury to themselves or their property.[3]  The Non-California Plaintiffs also do not allege that they had to return or exchange the food, that they discarded any of the food, or that they stopped using any of the food.  Nor do they allege that they sought and were denied a refund.

Laura and Milt Cyphert claim that their domestic zebra finches, which were housed in the Cypherts' aviary in San Diego, California, died after the Cypherts fed them Scotts' wild bird food in January 2010. (*Id.* at ¶ 15.)  The Cypherts decided to feed their domestic finches the wild bird food after running out of the food they typically used, which was formulated specifically for domestic finches. (*Id.*)  The Cypherts purchased the food from a local Wal-Mart *nearly two years after Scotts ceased using the Pesticides and recalled affected wild bird food*. (*Id.* at ¶ 14.) Following the alleged deaths of their domestic finches, the Cypherts sent samples

---

[3]  Although Non-California Plaintiff Edith Salkeld ambiguously alleges that she "noticed an unusual number of dead birds" (Am. Compl. ¶ 27), she does not allege that Scotts' wild bird food caused the deaths, where she saw the alleged dead birds, what in fact caused the deaths, or that she suffered any harm to person or property because of her wild bird food purchases. (*See id.*)

of the wild bird food to both Scotts and the FDA.  (*Id.* at ¶ 16.)  Scotts allegedly informed the Cypherts that the food contained "normal" levels of pesticides.  (*Id.*)  The FDA "declined to share with the Cypherts the results" of the tests performed on the samples.  (*Id.*)  The Complaint makes no allegation that the wild bird food that the Cypherts purchased in January 2010 was appropriate for consumption by domestic finches, that the wild bird food was treated with the Pesticides at issue in this case, or that the Pesticides caused the domestic finches' deaths.

Unrelated to their January 2010 purchase of wild bird food that allegedly harmed their domestic finches, the Cypherts also claim to have purchased Scotts' wild bird food at various points during the years that Scotts *was* applying the Pesticides to the food (November 2005–March 2008).  (*Id.* at ¶ 13.)  Like the Non-California Plaintiffs, the Cypherts do not allege that their use of the food during that time frame caused harm to any birds.  They also never allege that they were unable to use the wild bird food, that they ever sought to return it, or that they ever requested, let alone were denied, a refund for the wild bird food.

### C.     The Class Action Complaint

On October 9, 2012, Plaintiffs filed a Consolidated Complaint (the "Original Complaint") that asserted 19 claims for relief.  (Dkt. No. 10.)  After Scotts filed a Motion to Dismiss those claims on January 7, 2013 (Dkt. No. 21), Plaintiffs decided to amend their Original Complaint by dismissing some claims and amending others, apparently recognizing that such claims were groundless at the outset and could not be sustained.  Plaintiffs' remaining claims fail as well.

## III.     ARGUMENT

### A.     Plaintiffs' Claims Should Be Dismissed For Lack Of Standing.

#### 1.     Legal Standard

"A Rule 12(b)(1) motion to dismiss tests whether a complaint alleges grounds for federal subject matter jurisdiction.  If the plaintiff lacks standing under Article III of the U.S. Constitution, then the court lacks subject matter jurisdiction,

1  and the case must be dismissed." *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785,

2  793 (N.D. Cal. 2011).  "Once a party has moved to dismiss for lack of subject

3  matter jurisdiction under Rule 12(b)(1), the opposing party bears the burden of

4  establishing the court's jurisdiction." *Id.*

5          **2.**        **Plaintiffs Lack Standing To Pursue Their Requested Relief.**

6       "[S]tanding requires that (1) the plaintiff suffered an injury in fact, i.e., one

7  that is sufficiently 'concrete and particularized' and 'actual or imminent, not

8  conjectural or hypothetical,' (2) the injury is 'fairly traceable' to the challenged

9  conduct, and (3) the injury is 'likely' to be 'redressed by a favorable decision.'" *Id.*

10  (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  In all cases,

11  including class actions, "[s]tanding must be shown with respect to each form of

12  relief sought, whether it be injunctive relief, damages or civil penalties." *Id.* (citing

13  *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 185 (2000)).

14  In this case, Plaintiffs cannot show standing with respect to the relief requested.

15          **(a)**       **The Non-California Plaintiffs Fail To Allege Facts**

16                       **Sufficient To Demonstrate That They Suffered An Injury In Fact.**

17       The law does not regulate every hypothetical ill in the absence of some real

18  injury to the civil plaintiff.  Numerous courts, including federal courts in California,

19  have dismissed class action complaints in their entirety where the plaintiff

20  employed a "benefit of the bargain" theory of injury like the one Plaintiffs put

21  forward here.  Under such a theory, plaintiffs allege that each member of the class

22  was denied a "benefit of the bargain" because of some theoretical risk posed by a

23  consumer product, but did not suffer an actual concrete injury.  In this case,

24  according to their own allegations, the non-California Plaintiffs bought a product,

25  used it, and reported no problems caused by it.  They never sought to return the

26  product or requested a refund for it, nor were they ever denied a refund.

27       For obvious reasons, courts routinely view such hypothetical "benefit of the

28  bargain" cases skeptically.  For instance, a California district court found that a

"benefit of the bargain" theory was insufficient to support Article III jurisdiction in *Whitson v. Bumbo*, No. C07-05597 MHP, 2009 WL 1515597, at *9 (N.D. Cal. Apr. 15, 2009). The plaintiff in *Whitson* filed suit on behalf of herself and a class, alleging that she did not receive the benefit of her bargain because the Bumbo baby seat she purchased could cause infants to fall from raised surfaces. *Id.* at *1–2. Although other consumers reported injuries from babies falling, the plaintiff did not allege any such injury. *Id.* She did not plead that any baby used her seat, that she relied on advertising showing the seat above floor-level, or that the seat manifested the purported defect—the ability to release babies sitting in the seat on raised surfaces. She also did not plead that she sought to return the product to Bumbo and was denied a refund. *See Id.* at *4. Instead, the plaintiff alleged that she paid more for the seat than it was worth given the risk that the alleged defect could cause harm. The court dismissed her claim, ruling that the plaintiff did not "have standing for her claims under a 'benefit of the bargain' theory or any other stated theory" due to her lack of an actual injury. *Id.* at *6.

Likewise, another California district court ruled that diminished value of pot pies due to alleged contamination was insufficient to establish an injury in fact. *Meaunrit v. Pinnacle Foods Group, LLC*, No. C 09-04555 CW, 2010 WL 1838715, at *1 (N.D. Cal. May 05, 2010). The *Meaunrit* plaintiffs claimed they were forced to throw away pot pies because of a hidden defect—contamination that could lead to bacterial infection—as revealed in "recent reports." *Id.* at *1. They did not allege that they tried to return their pot pies for a refund. The defendant moved to dismiss the plaintiffs' claims based on a lack of Article III standing, asserting that the plaintiffs had not suffered a cognizable injury. The plaintiffs responded that they had suffered an injury based on their "purchase of goods that are not suitable for consumption." *Id.* at *2. They went on to assert that they "bargained for and were promised safe pot pies but instead received products that . . . were not safe to consume." *Id.* at *3. The court found that the plaintiffs had not pled a cognizable

1  injury in fact.  At most, the Complaint asserted that food borne pathogens could

2  cause illness and that this possibility diminished the economic value of the product.

3  The court concluded that such a "speculative, hypothetical injury is not sufficient to

4  support Article III standing." *Id.  See also Alfi v. Nordstrom, Inc.*, No. 09cv1249

5  BEN (CAB), 2010 WL 5093434, at *5 (S.D. Cal. Dec. 08, 2010) (J. Benitez)

6  ("Plaintiff's argument [was] based on conjecture."  Because plaintiff did not

7  "describe an actual, concrete injury," he lacked standing.).

8         The Fifth Circuit likewise *reversed* an order certifying a class and dismissed

9  the case because the economic injury alleged by purchasers of the defective pain

10  medication Duract was insufficient for Article III standing in *Rivera v. Wyeth-*

11  *Ayerst Labs.*, 283 F.3d 315, 320-21 (5th Cir. 2002).  Wyeth had ceased

12  manufacturing Duract after some long-term users reported liver failure.  Wyeth also

13  established a program to refund Duract users for any unused pills.  *Id.* at 317.  Two

14  years after Duract was taken off the market, the plaintiffs filed suit, seeking to

15  represent all patients who had ingested Duract but suffered no physical or

16  emotional injury.  The plaintiffs claimed that the class suffered economic injury

17  caused by paying more for Duract than it was worth due to alleged defects.  *Id.*

18  The plaintiffs did not allege that Duract was an ineffective pain killer or that they

19  took advantage of the refund program.  The district court granted class certification

20  and Wyeth appealed.  The Fifth Circuit vacated and entered a judgment of

21  dismissal, finding that "this suit does not even present a justiciable case or

22  controversy under Article III."  *Id.* at 318.  The court stated that Rivera's "claim to

23  injury runs something like this:  Wyeth sold Duract; Rivera purchased and used

24  Duract; Wyeth did not list enough warnings on Duract, and/or Duract was

25  defective; other patients were injured by Duract; Rivera would like her money

26  back[.]"  *Id.* at 319.  The court explained:  "What the courts require . . . is that the

27  injury be personal.'"  *Id.* at 320.  Because the plaintiffs were not themselves

28  "among the injured," the court concluded that they lacked Article III standing to

1    pursue relief on behalf of the purported class.  *Id.*  In other words, the plaintiffs'

2    alleged "economic damages" were insufficient to support jurisdiction.  *Id.*

3         Finally, in *In re McNeil Consumer Healthcare, Mktg. & Sales Practices*

4    *Litig.*, MDL No. 2190, 2011 WL 2802854, at *10 (E.D. Pa. July 15, 2011), the

5    court held that the economic injury allegedly suffered by purchasers of tainted over-

6    the-counter Johnson & Johnson's brand healthcare products was insufficient under

7    Article III.  The plaintiffs claimed that McNeil Consumer Healthcare ("McNeil")

8    inappropriately manufactured the products but that consumers were unaware of

9    defects at the time of purchase due to McNeil's efforts to conceal the issues.  The

10   plaintiffs cited failure of production controls to ensure consistency in strength, the

11   use of contaminated raw materials, the manufacture of "super potent" batches, the

12   presence of foreign materials, and a lack of cleanliness and record keeping.  *Id.* at

13   *2.  Prior to the lawsuit, McNeil effectively conceded the deficiencies by closing

14   the manufacturing facility at issue and responding to a Congressional safety

15   investigation.[4]  *Id.*  McNeil also launched a product recall and accompanying

16   refund offer.  The complaint did not allege "that any named plaintiff attempted to

17   avail himself of the refund offer and was not made whole."  *Id.* at *3.  Instead,

18   Plaintiffs claimed they paid "inflated prices" based on a belief that the products

19   were safe and effective.  *Id.* at *7.  The defendants moved to dismiss based on a

20   lack of standing, arguing that they could not discern what, if any, actual harm the

21   plaintiffs had suffered.  *Id.* at *8.  Finding that the "plaintiffs have not established

22   injury-in-fact," *id.* at *10, the court dismissed all claims.  *Id.* at *15.

23        Applying this authority here, the Complaint likewise fails to raise a legally

24   cognizable injury in fact.  The Non-California Plaintiffs have failed to make any

25   allegations that could support an actual injury.  Obviously, if Plaintiffs alleged that

26   _____

27        [4] McNeil entered into a consent decree with the United States whereby it agreed to destroy
     defective products, cease operations at its Ft. Washington, Pennsylvania factory, permit expert
     and FDA inspections, and hire an independent safety auditor.  *United States v. McNeil PPC, Inc.,*

28   *et al.,* Case No. 2:11-cv-01745-RB, Dkt. No. 9 (Mar. 16, 2011).

they noticed or learned of any problems, sought to return unused wild bird food, and were denied the ability to do so, the circumstances would be very different.  Or, if Plaintiffs alleged actual harm to person or property in connection with the use of the product, the standing issues would be very different.  Here, Plaintiffs bought a product, used it, and reported no problems with it.  They never sought a refund in connection with any used or unused product, nor were they ever denied a refund.  Under those circumstances, Plaintiffs cannot have standing to pursue their claims.

Lacking any other injury argument, Plaintiffs resort to alleging, in hypothetical terms, that they would not have purchased Scotts' wild bird food if they had known that it was "hazardous to birds" or if they had been given the product warnings from the Storcide II label.  (Am. Compl. ¶¶ 17-28, 30.)  They vaguely claim "actual damages" and "an economic injury in fact" because they spent money on allegedly defective and dangerous wild bird food.[5]  (*Id.* at ¶ 30.)  In short, Plaintiffs base their claims on a theoretical risk of harm to birds and other wildlife (*see id.* at ¶ 30), which is not sufficient to establish Article III standing.  *See Whitson,* 2009 WL 1515597 at *6; *Meaunrit*, 2010 WL 1838715 at *3.  Simply alleging that an item is defective, that theoretical hazards could cause an injury, or that additional product warnings are needed cannot give rise to relief.  Instead, Plaintiffs must allege that they were personally injured or that their property was harmed.  *See Rivera,* 283 F.3d at 320 (the plaintiffs had to be "among the injured" and the injury had to be personal in order for them to have Article III standing).

The Non-California Plaintiffs here do not claim either personal injury or property damage.  Plaintiff Salkeld vaguely states that she noticed an "unusual number of dead birds" from 2005–2011 (Am. Compl. ¶ 27), but her allegations are

---

[5] Several important facts are likewise missing from the Amended Complaint, including: (1) how much Plaintiffs paid for the product; (2) under what circumstances and at which dosage levels the Pesticides cause harm; and (3) whether Plaintiffs ever sought to return the product or seek a refund.  *See In re McNeil*, 2011 WL 2802854, at **9–10.  Plaintiffs Chapman,  Larson, Borchert, Salkeld, and Kloeppel do not even allege which type of wild bird food they purchased.  *See id.*

not sufficient to support standing.  She does not assert that wild bird food treated with the Pesticides caused the bird deaths, where she allegedly saw the dead birds (near her bird feeder or at some other location), or that she suffered any form of personal harm as a result of the product.  Nor does she seek any damages for the loss of any property.  The other Plaintiffs likewise come nowhere close to alleging the requisite personal or property damage needed for standing.

In short, Plaintiffs claim they were injured solely because they were denied a hypothetical benefit of their bargain.  (*See id.* at ¶ 30.)  Numerous courts around the country (including in California) have considered and rejected Article III standing in similar circumstances.[6]  *See, e.g., Rivera*, 283 F.3d at 319–320.  Defendants respectfully submit that the Court should likewise do so here.  Put simply, people who purchased wild bird food and used it without suffering an actual harm or injury to themselves or their property lack standing to pursue their claims.

### (b) The Cypherts' Claims Likewise Fail For Lack Of Standing.

The Cypherts have two types of claims:  (1) those arising out of their pre-January 2010 purchases *for which there are no reported injuries* and (2) those arising out of their January 2010 wild bird food purchase.  The first category of claims fail for the same reasons that the Non-California Plaintiffs' claims fail:  the Cypherts seek to recover damages based on the same hypothetical injury theory.

---

[6] *See, e.g., Koronthaly v. L'Oreal USA, Inc.*, 374 Fed. App'x 257, 259 (3rd Cir. 2010) (Standing was lacking where a lipstick purchaser purporting to represent a class alleged that the inclusion of lead was unacceptable, but did not claim any adverse health effects.  To the extent her injury was based on "benefit of the bargain," the court found that she "mistakenly relie[d] on contract law."); *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 176–78 (D.D.C. 2003) (The standing requirement was not met where purported class representatives failed to allege injury in fact arising out of prescription drug use.  "Without alleging that a product failed to perform as advertised, a plaintiff has received the benefit of his bargain and has no basis to recover purchase costs."); *Harrison v. Leviton Mfg. Co.*, No. 05-CV-0491-CVE-FHM, 2006 WL 2990524, at *5 (N.D. Okla. Oct. 19, 2006) (a plaintiff purporting to represent a class lacked standing where he claimed electrical equipment was unsafe, but not that it caused (or would soon cause) a fire or other concrete harm).  *See also Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2007) (affirming denial of class certification, in part because "[c]ountless members of Oshana's putative class could not show any damage, let alone damage proximately caused by Coke[]").

In their second category of claims, the Cypherts allege that their domestic birds died, but, notably, Plaintiffs' carefully worded Complaint fails to allege that the Pesticides at issue caused those deaths.  Standing not only requires an actual injury but also causation.  The Supreme Court has made clear that "the injury has to be 'fairly traceable to the challenged action of the defendant[.]'" *Lujan*, 504 U.S. at 560.  Causation was found to be lacking in *Kaing v. Pulte Homes, Inc.*, No. 09-5057 SC, 2010 WL 625365, at *4 (N.D. Cal. Feb. 18, 2010), *aff'd* 464 Fed. Appx. 630 (9th Cir. Dec 29, 2011).  There, the plaintiff filed suit on behalf of a purported class after her home was foreclosed.  She claimed that the builder and mortgagor caused her foreclosure and reduced property value.  *Id.* at *1–3.  Ruling on a motion to dismiss, the court found that the plaintiff faced an "insurmountable problem with respect to the causation element of standing" *id.* at *6, since any diminution in value was at least partially attributable to other factors or decisions. *Id.*  On those facts, the court found an absence of standing.

At first blush, the Cypherts appear to be a closer call on the issue of standing because they assert an injury in fact—the deaths of their domestic birds—following an alleged purchase of wild bird food in January 2010.  (Am. Compl. ¶ 15.)  But the Complaint fails to demonstrate the causation needed to establish standing.  The Cypherts' alleged January 2010 purchase falls well outside of the timeframe in which the Pesticides were being applied to the wild bird food (2005–2008).  (Am. Compl. ¶ 43(d).)  *Moreover, even after reading Scotts' prior Motion to Dismiss and amending their allegations, the Cypherts never allege that the Pesticides caused the death of their birds*.  Nor do they allege or seek any damages associated with the loss of their birds.  Indeed, based on their allegations, the Cypherts purchased wild bird food that was not manufactured using the Pesticides at issue and then misused it by feeding it to their ***domestic*** zebra finches.[7]  Given the absence of any specific

---

[7] Plaintiffs Fox and Salkeld also allege that they used the wild bird food for an-off label purpose —as feed for domestic as opposed to wild birds.  (Am. Compl. ¶¶ 21, 27.)

1   causation allegation and their off-label use, the Cypherts cannot claim that their

2   birds' deaths are "fairly traceable" to Scotts.  *See Lujan*, 504 U.S. at 560.  The

3   Cypherts thus lack Article III standing to pursue the relief sought.

4              (c)      **Plaintiffs Also Have Failed To Plead Facts To Support**
                        **Any Entitlement To Injunctive Relief.**
5

6          To have standing to pursue an injunction, a plaintiff must demonstrate that he

7   has suffered or is threatened with a "concrete and particularized" legal harm,

8   coupled with a "sufficient likelihood that he will again be wronged in a similar

9   way." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (citing

10  *Lujan*, 504 U.S. at 560, and *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

11  A plaintiff must establish a "real and immediate threat of repeated injury." *O'Shea*

12  *v. Littleton*, 414 U.S. 488, 496 (1974).  The "mere physical or theoretical

13  possibility" of a challenged action affecting the plaintiff is insufficient. *Murphy v.*

14  *Hunt*, 455 U.S. 478, 482 (1982).  The plaintiff must also show that "a favorable

15  decision is *likely* to redress" his injuries. *Graham v. Fed. Emergency Mgmt.*

16  *Agency*, 149 F.3d 997, 1003 (9th Cir. 1998), *abrogated on other grounds by Levin*

17  *v. Commerce Energy, Inc.*, 130 S.Ct. 2323 (2010).

18         The Court of Appeals for the Ninth Circuit found a lack of standing to pursue

19  injunctive relief because the plaintiffs failed to show a threat of future harm in

20  *Nelsen v. King County*, 895 F.2d 1248, 1249 (9th Cir. 1990).  The plaintiffs, former

21  residents of an inpatient treatment facility, filed a class action lawsuit in an effort to

22  relocate the facility. *Id.*  The district court dismissed their claims for injunctive

23  relief, finding that the plaintiffs were not residents at the time suit was filed.

24  Accordingly, their injunctive claims were deemed moot. *Id.*  On review, the Ninth

25  Circuit affirmed, noting that "past exposure to harm is largely irrelevant when

26  analyzing claims of standing for injunctive relief." *Id.* at 1251.  Instead, the

27  analysis is focused "exclusively on whether there exists a threat of future harm."

28

*Id.* Applying those principles, the court found that the plaintiffs' alleged past harm was not sufficient to justify prospective relief. *Id.* at 1252.

Plaintiffs' Complaint does not support injunctive relief because Plaintiffs were not actually injured by Scotts' conduct and cannot show they will "again be wronged in a similar way." *Bates*, 511 F.3d at 985. Plaintiffs have not asserted any threat of future harm. Their Complaint does not include a single allegation that Scotts continues to use (or plans to use) the Pesticides at issue in this case in its wild bird food. Scotts used the Pesticides from November 2005 through March 2008. (*See* Am. Compl. ¶ 43.) Scotts' past use of the Pesticides cannot establish standing for prospective relief given that the claimed injury is not possible going forward. *See Nelsen*, 895 F.2d at 1251. Due to the lack of an actual injury, both prior and prospective, Plaintiffs lack standing to pursue injunctive relief.

**B.**     **All Counts Should Be Dismissed For The Additional Reason That Plaintiffs Fail To State Valid Claims Under Federal Rule of Civil Procedure 12(b)(6).**

**1.**     **Legal Standard**

Rule 12(b)(6) authorizes dismissal for "failure to state a claim upon which relief can be granted." Dismissal under Rule 12(b)(6) is appropriate when a complaint lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988), *overruled on other grounds by Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 562–63 (2007). Only actual factual allegations, not legal conclusions, are accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949. Although detailed factual allegations are not required, they "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545 (2007). "[W]here the well-pleaded facts do not

permit the court to infer more than the mere possibility of misconduct," dismissal is warranted.  *Iqbal*, 129 S.Ct. at 679.

> **2.     Counts 1 and 3–14 Should Be Dismissed Because Plaintiffs Have Failed To Plead The Element Of An Actual Injury Caused By Scotts.**

Plaintiffs cannot establish Article III standing, let alone meet the more exacting standard of demonstrating an injury as an element of many of the claims they have raised.  Counts 1 (RICO), 3–11 (consumer protection laws), and 12–14 (breach of express and implied warranties of merchantability and fitness) should be dismissed because Plaintiffs have not adequately pled an injury in fact.

Each of the consumer protection statutes cited in the Complaint requires an actual injury caused by a defendant's allegedly unfair conduct.  For example:

- **California:**  "Any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by [the Consumers Legal Remedies Act] may bring an action against that person."  Cal. Civ. Code § 1780.  *See also Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564, 569 n.4 (Cal. Ct. App. 2009) ("the Unfair Competition Law requires the claimant to have 'suffered injury in fact and ha[ve] lost money or property as a result of the unfair competition.'" (quoting Cal. Bus. & Prof. Code § 17204)); *Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 819 (Cal. Ct. App. 2007), *overruled on other grounds by Kwikset Corp. v. Superior Court of Orange Cnty.*, 51 Cal. 4th 310 (Cal. 2011) ("an individual [may] assert a claim under the [False Advertising Law] only if he or she 'has suffered an injury in fact and has lost money or property as a result of such unfair competition.'" (quoting Cal. Bus. & Prof. Code § 17535)).

- **Kentucky:**  Any person who suffers "any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170" may bring an action under the Consumer Protection Act.  Ky. Rev. Stat. Ann.

§ 367.220.  *See also Craig & Bishop, Inc. v. Piles*, 247 S.W.3d 897, 905 (Ky. 2008) ("damages may be awarded when a purchaser suffers some sort of damage as a result of an unlawful trade practice").[8]

Similarly, RICO claims require proof of an actual monetary loss as a result of a defendant's racketeering activity.  18 U.S.C. § 1964 makes clear that, to maintain a civil action for damages under any RICO theory, a plaintiff must plead and prove that he has been "injured in his business or property by reason of a violation of section 1962."  Federal courts consistently hold that to satisfy the injury requirement of section 1964, a plaintiff must prove an actual, concrete monetary loss (*i.e.*, an "out-of-pocket" loss).  *See, e.g.*, *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (injury is compensable under RICO if it constitutes "harm to a specific

---

[8] The other state consumer fraud laws also require an actual injury caused by the Defendant:

**Arkansas**:  The Deceptive Trade Practices Act provides a private right of action to "any person" who suffers actual damage or injury as a result of a violation of the Act and otherwise meets the requirements of the Act.  Ark. Code Ann. § 4-88-113(f).  *See also Wallis v. Ford Motor Co.*, 208 S.W.3d 153, 162 (Ark. 2005) (Deceptive Trade Practices Act plaintiffs must show actual damage or injury caused by deceptive conduct).

**Illinois**:  "Any person who suffers actual damage as a result of a violation of [the Illinois Consumer Fraud Act] committed by another person may bring an action against such person." 815 Ill. Comp. Stat. 505/10a.  *See also Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002) ("[A] private cause of action brought under [the Illinois Consumer Fraud Act] requires proof of 'actual damage.'  Further, a private cause of action … requires proof that the damage occurred 'as a result of' the deceptive act or practice.  As noted previously, this language imposes a proximate causation requirement").

**Missouri**:  Under the Merchandising Practices Act, an "ascertainable loss" must be "a result of" the defendant's unlawful acts.  Mo. Rev. Stat. § 407.025(1).  *See also Amburgy v. Express Scripts, Inc.*, 671 F. Supp. 2d 1046, 1057 (E.D. Mo. 2009) (only one who suffers ascertainable damage may bring a private cause of action).

**Minnesota**:  Injury must be caused "by a violation" of the Consumer Fraud Act.  Minn. Stat. § 8.31(Sub. 3a).  *See also Swift & Co. v. Elias Farms, Inc.*, 539 F.3d 849, 856 (8th Cir. 2008) (to recover under the Consumer Fraud Act, plaintiffs must show that they were injured).

**New Mexico**:  The Unfair Practices Act Provides a private right of action only to those whose loss of money or property occurred "as a result of any employment by another person of a method, act, or practice declared unlawful by the Unfair Practices Act."  N.M. Stat. Ann. § 57-12-10(B).  *See also Chavarria v. Fleetwood Retail Corp.*, 115 P.3d 799, 810 (N.M. Ct. App. 2005) (a mere violation of the Unfair Practices Act is not sufficient—injury must be shown), reversed in part on other grounds, 143 P.3d 717 (2006).

1    business or property interest"); *In re Taxable Municipal Bond Securities Litigation*,

2    51 F.3d 518, 523-24 (5th Cir. 1995) (RICO requires a conclusive financial loss).

3        Finally, Plaintiffs' breach of express and implied warranty claims arising

4    under California and Missouri law require a concrete injury caused by the

5    defendant. *See Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 573

6    (Cal. Ct. App. 2007) (breach of express warranty claims fail where plaintiffs do not

7    identify any concrete injury associated with breach of express warranty); *American*

8    *Suzuki Motor Corp v. Superior Court*, 37 Cal. App. 4th 1291, 1295 (Cal. Ct. App.

9    1995) (breach of implied warranty claims fail where plaintiff class representatives

10    cannot show that products malfunctioned or caused injury); *Khasin v. The Hershey*

11    *Co.*, No. 5:12-CV-01862 EJD, 2012 WL 5471153, at *8 (N.D. Cal. Nov. 09, 2012)

12    ("The Song-Beverly Act provides a right of action for a buyer of consumer goods

13    who is harmed by the manufacturer or seller's failure to comply under an express or

14    implied warranty or service contract."); *Watts v. Sechler*, 140 S.W.3d 232, 239

15    (Mo. Ct. App. 2004) (a party may recover under the Missouri common law implied

16    warranty of fitness for consumption by animals where the party is damaged because

17    of the defendant's conduct).

18        As established in Section III.A, *supra*, Plaintiffs have failed to allege facts

19    showing they suffered any actual injury as a result of Scotts' alleged conduct.  The

20    Non-California Plaintiffs bought a product, used it, and reported no problems with

21    it.  They never sought to return any unused product, nor did they ask for a refund

22    for any used product. *See, e.g., Steele v. Hospital Corp. of America*, 36 F.3d 69,

23    70-71 (9th Cir. 1994) (patients who did not suffer a business or property loss

24    because of fraudulent insurance billings lacked Article III standing to pursue RICO

25    damages); *American Suzuki*, 37 Cal.App.4th at 1295 (people who suffered no

26    personal injury or property damage from an allegedly defective vehicle could not

27    maintain an action for breach of implied warranty).  The same is true with respect

28    to the Cypherts' vague allegations of purchases between 2005–2010 and their

alleged purchase in January 2010 for the reasons previously noted.  Counts 1 and 3–14 should be dismissed based on the lack of an injury.

### 3. Counts 1–5, 7–8, 11–13, and 15–17 Are Barred By The Statutes of Limitations.

The Court should dismiss Counts 1–5, 7–8, 11–13, and 15–17 because the statutes of limitations had already expired by the time suit was filed.  Plaintiffs' assertion that the limitations periods were equitably tolled because of Scotts' fraudulent concealment is unsupported and cannot withstand analysis.

#### (a) Counts 2, 8, and 12–13 Began To Run Upon The Date Of The Alleged Violation And Expired Before Plaintiffs Filed Their First Complaint With This Court.

Counts 2 (Magnuson-Moss Warranty Act), 12 (breach of express warranty), and 13 (breach of the implied warranty of merchantability) are governed by a **four year** statute of limitations.[9]  Count 8  (Kentucky Consumer Protection Act ("CPA")) includes a **two year** limitations period.[10]  The statutes of limitations for each of those claims are triggered when the violation of law occurs, regardless of when the aggrieved party became aware of the violation.[11]

Under Plaintiffs' theory, the alleged violations of various state and federal laws occurred in this case when Scotts tendered bags of wild bird food containing the Pesticides to consumers.  *See* Cal. Com. Code § 2725; *Cook*, 2004 WL 2011375

---

[9] *Horne v. Harley-Davidson, Inc.*, 660 F. Supp. 2d 1152, 1157 (C.D. Cal. 2009) (Magnuson-Moss Warranty Act); Cal. Com. Code § 2725 (breach of express and implied warranties); *Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 169 Cal. App. 4th 116, 128-29 (Cal. Ct. App. 2008) (breach of express warranty); *Mitchell v. Skyline Homes*, No. CIV S-09-2241 KJM, 2010 WL 1791281, at *1 (E.D. Cal. May 03, 2010) (breach of implied warranty of merchantability).

[10] Ky. Rev. Stat. Ann. § 367.220 (Kentucky CPA—1 year after termination of Attorney General action or 2 years, whichever is later).

[11] Cal. Com. Code § 2725 (statute of limitations that applies to MMWA, express warranty, and implied warranty claims begins to run "when the breach" of warranty "occurs"); *Krieger v. Nick Alexander Imports, Inc.*, 234 Cal. App. 3d 205, 215 (Cal. Ct. App. 1991) (same); *Cook v. State Farm Mut. Auto. Ins. Co.*, No. 2002-CA-000801-MR, 2004 WL 2011375, at **3–4 (Ky. Ct. App. Sept. 10, 2004) (the Kentucky CPA does not include a "discovery rule").

at \*4.  Scotts discontinued the use of the Pesticides and halted all shipments containing the Pesticides by March 12, 2008.  Scotts also began a voluntary recall of all lots of wild bird food treated with the Pesticides that were shipped between November 15, 2005, and March 12, 2008 and that were held by distributors or retailers.  (Ex. A.)  Plaintiffs did not state the exact dates of any wild bird food purchases containing the Pesticides that were made in 2008 or earlier, but their purchases must have occurred by approximately March 12, 2008.  Accordingly, the statutes of limitations for Counts 2, 8, and 12–13 began to run on or around March 12, 2008.  Plaintiffs' claims under Count 8 were barred in 2010, given the two year statute of limitations.  Claims under Counts 2, 12, and 13 were barred as of approximately March 12, 2012, given the four year statutes of limitations.  Plaintiffs filed their first Complaint in this Court on June 27, 2012,[12] after the statutes of limitations for Counts 2, 8, 12, and 13 had expired.

> **(b)**     **Counts 1, 3–5, 7, 11, and 15–17, Which Are Arguably Subject To The Discovery Rule, Were Also Not Timely Filed.**

Counts 1 (RICO), 4 (California Unfair Competition Law ("UCL")) and 11 (New Mexico Unfair Practices Act ("UPA")) are governed by **four year** statutes of limitations.[13]  Counts 3 (California Consumers Legal Remedies Act ("CLRA")), 5 (California False and Misleading Advertising Law ("FAL")), 7 (Illinois Consumer Fraud and Deceptive Business Practices Act ("DBPA")), 15 (intentional misrepresentation), and 17 (unjust enrichment) are governed by **three year** statutes of limitations.[14]  A **two year** limitations period applies to Count 16 (negligent

---

[12] Case 3:12-cv-01592-JAH-NLS, Dkt. No. 1, Filed 06/27/12.

[13] Cal. Bus. & Prof. Code § 17208 (California UCL); N.M. Stat. Ann. § 37-1-4 (New Mexico UPA).

[14] *See* Cal. Civ. Code § 1783 (California CLRA); *Saaremets v. Whirlpool Corp.*, Civ. No. S-09-2337 FCD/EFB., 2010 U.S. Dist. LEXIS 26165, at \*7 (E.D. Cal. Mar. 18, 2010) (California FAL); 815 Ill. Comp. Stat. 505/10a(e) (Illinois DBPA); *Johannson v. Wachovia Mortg.*, *FSB*, No. C 11-02822 WHA, 2012 WL 1594829, at \*4 (N.D. Cal. May 04, 2012) (intentional misrepresentation); *FDIC v. Dintino*, 167 Cal. App. 4th 333, 347 (Cal. Ct. App. 2008) (unjust enrichment based on fraud).

misrepresentation).[15]  Those statutes of limitations began to run when Plaintiffs knew or should have known about their alleged injuries.[16]

Although Plaintiffs allege that they "did not receive or see, and were not otherwise aware of, the 'Fellow Bird Lover' [communication] prior to the year 2012, when the criminal prosecution came to light" (Am. Compl. ¶ 89), they never allege or attempt to assert that they were unaware of Scotts' voluntary recall beginning in March 2008.  (Ex. A.)  Plaintiffs all alleged that they were regular purchasers of the wild bird food.  (Am. Compl. ¶¶ 13–28.)  In fact, many Plaintiffs acknowledge that they *stopped buying* Scotts' wild bird food in 2008, the year that the recall was conducted.  (Am. Compl. ¶¶ 19–23, 28.)  Their decision to stop purchasing Scotts' wild bird food in 2008 surely is no coincidence.  To the contrary, it only confirms that they were aware of the recall in approximately March 2008 and knew or should have known about their claimed injuries.

Given that the applicable statutes of limitations began to run in approximately March 2008, Counts 1, 3–5, 7, 11, and 15–17 are barred.  Count 16 was barred in 2010 due to its two year statute of limitations.  Counts 3, 5, 7, 15 and 17, which have three year statutes of limitations, were barred in 2011.  And Counts 1, 4, and 11, which have a four-year statute of limitations are foreclosed as well.  Those claims all expired by approximately March 2008, months before the first Complaint related to this case was filed with the Court on June 27, 2012.[17]

---

[15] *Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1054 (9th Cir. 2008).

[16] *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (RICO); *Keegan v. American Honda Motor Co.*, No. CV 10-09508 MMM (AJWx), 284 F.R.D. 504, 543 (C.D. Cal. June 12, 2012) (California CLRA); *Broberg v. Guardian Life Ins. Co.*, 171 Cal. App. 4th 912, 920-21 (Cal. Ct. App. 2009); *Burdick v. Union Sec. Ins. Co.*, No. CV 07-4028 ABC (JCx), 2009 WL 4798873, at *10 n. 16 (C.D. Cal. Dec. 9, 2009) (California FAL); *Pirelli Armstrong Tire Corp. v. Walgreen Co.*, No. 09C2046, 2009 WL 2777995, at *7 (N.D. Ill. Aug. 31, 2009), aff'd, 631 F.3d 436 (7th Cir. 2011) (Illinois DBPA); *Ramsey v. Culpepper*, 738 F.2d 1092, 1095 (10th Cir. 1984) (New Mexico UPA); *Johannson*, 2012 WL 1594829 at *4 (intentional misrepresentation); *Platt*, 522 F.3d at 1054 (negligent misrepresentation); *Adams v. I-Flow Corp.*, No. CV09-09550 R(SSx), 2010 WL 1339948, at *4 (Mar. 30, 2010) (negligence and strict liability); *FDIC*, 167 Cal.App.4th at 347 (unjust enrichment to remedy a fraud claim).

[17] Case 3:12-cv-01592-JAH-NLS, Dkt. No. 1, Filed 06/27/12.

### (c)    Plaintiffs' Theory For Equitable Tolling Is Not Supported By The Factual Allegations.

Recognizing that many of their claims are time-barred, Plaintiffs resort to claiming that fraudulent concealment equitably tolled the statutes of limitations. But Plaintiffs fail to plead facts sufficient to show fraudulent concealment, a doctrine based on the principle that "[a] defendant's fraud in concealing a cause of action against him will toll the statute of limitations[.]"  *Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 637 (2007).  The Ninth Circuit has made clear that fraudulent concealment must be pled with particularity under Rule 9(b).  *See Suckow Borax Mines Consol. v. Borax Consol.*, 185 F.2d 196, 209 (9th Cir. 1951).  "[T]o establish fraudulent concealment, the complaint must show:  (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry."  *Baker v. Beech Aircraft Corp.*, 39 Cal. App. 3d 315, 321 (Cal. Ct. App. 1974).

Fraudulent concealment requires scrutiny of both the plaintiff's actual knowledge and when that plaintiff reasonably could have discovered the claim through the exercise of due diligence.  *Baker*, 39 Cal. App. 3d at 321.  *See also Bedolla v. Logan & Frazer*, 52 Cal. App. 3d 118, 129 (Cal. Ct. App. 1975) ("[A] plaintiff must affirmatively excuse his failure to discover the fraud  . . . by showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry.").  Even where a defendant affirmatively concealed its fraud (contrary to Scotts' voluntary disclosures here), the plaintiff still bears the burden of proving that he could not, through reasonable diligence, have discovered the facts constituting the fraud within the statute of limitations.  *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997) (in RICO context, a plaintiff who is not reasonably diligent may not raise fraudulent concealment to toll the statute of limitations).  Put simply, "tolling will

last as long as a plaintiff's reliance on the misrepresentations is reasonable" based on the specific factual circumstances.  *See Grisham*, 40 Cal. App. 4th at 637.

Plaintiffs assert that Scotts' fraudulent concealment equitably tolled the statutes of limitations until January 2012, when SMG pled guilty to a misdemeanor related to the use of the Pesticides.  (Am. Compl. ¶¶ 86, 90.)  Plaintiffs insist that "Plaintiffs, the Class and the public at large could not have known of Defendants' conduct until the federal government revealed its criminal prosecution of Defendants in January of 2012." (*Id.* at ¶ 90.)  But, as Plaintiffs acknowledge, Scotts voluntarily disclosed its Pesticide use to the FDA, retailers, distributors, and the public in the spring of 2008.  Scotts also undertook a recall of the affected wild bird food products.  Plaintiffs nonetheless claim Scotts "concealed" its fraudulent conduct.  That assertion borders on frivolous.

Plaintiffs try to characterize Scotts' cooperation with the government as deceptive.  They describe Scotts' disclosures to the FDA, which led to a *four year government investigation*, as "lulling communications" intended to "deceive[] the FDA," but provide no factual allegations to support those characterizations. (*Id.* at ¶ 87.)  The communications themselves certainly do not support Plaintiffs' descriptions.  To the contrary, the communications explicitly disclosed that Scotts had used the unapproved Pesticides Storcide II and Actellic 5E to treat wild bird food until March 12, 2008.  (Ex. B, pp. 1–2.)  In a ten page letter to the FDA, Scotts further stated that all shipments of the affected wild bird food had been halted and that Scotts was in the process of conducting a voluntary recall of all lots of wild bird food treated with the Pesticides that had been shipped between November 15, 2005, and March 12, 2008, and that currently were held by retailers and distributors.  (*Id.* at p. 2.)  Further, after thoroughly considering the matter, Judge Graham concluded Scotts' "self-reporting has been followed by complete cooperation with the government in the investigation of this case, as vouched for by the governmental agency that's charged with enforcing these laws and by the U.S.

Attorney's Office . . ." (Ex. C.)  In the end, the Complaint fails to specify anything false in Scotts' disclosure to the FDA or its cooperation with the government investigation.  Any suggestion along those lines is completely unsupported in reality.  (*See* Am. Compl. ¶ 87.)

Plaintiffs also assert that the "Dear Fellow Bird Lover" communication contained omissions and misrepresentations that concealed Scotts' unlawful activities.  (*Id.* at ¶¶ 88–89.  *See also* Ex. B.)  According to Plaintiffs, the first purported omission or misrepresentation was the description of the Pesticides as "insect controls" and the failure to "publicly identify the specific toxic pesticides used." (*Id.* at ¶ 88.)  That is groundless.  As Plaintiffs concede, Scotts plainly disclosed that it used insect controls that were not approved by the EPA for wild bird food and, as a result, had ceased all production of that food.  (*Id.  See also* Ex. A.)  Plaintiffs do not dispute that pesticides are, by definition, insect controls.  Indeed, insecticides and pesticides are used interchangeably.  In fact, the communication explicitly stated that the insect controls were used to control pests— i.e., to "make sure that our bird and animal food wasn't infested with moths and other problem-causing insects."  (Ex. A.)  Plaintiffs next assert that Scotts did not "provide the necessary warnings regarding toxicity" because Scotts stated that "[w]e believe that the wild bird food and wild animal food did not constitute a significant health risk to wild birds, small animals or humans who handle the food." (Am. Compl. ¶ 89 ; *see also id.* at ¶; Ex. A.)  After independent study, Scotts concluded that the wild bird food did not, in fact, pose a significant health risk to birds or other wildlife.  Scotts never claimed that there was no risk at any hypothetical dosage level.  Scotts merely stated it believed that its wild bird food did not "constitute a *significant* health risk."  (*Id.  See also* Ex. A.)  Plaintiffs do not make any allegations about the risk the Pesticides presented to wild birds at the levels actually applied.  Thus, with this theory as well, Plaintiffs fail to allege any misrepresentation that could have tolled the statutes of limitations.

1    In any case, Plaintiffs reasonably could have discovered their claims through

2  the exercise of due diligence in the spring of 2008.  Scotts' voluntary product recall,

3  which began in mid-March 2008 (*see* Ex. A), was the subject of publicity in the

4  spring of 2008.  (*See* Ex. D (article publicly posted to an online source in April

5  2008 regarding the recall).)  Plaintiffs all were regular wild bird food purchasers, so

6  they were even more likely than the general public to be aware of the recall.  (Am.

7  Compl. ¶¶ 13–28.)  The recall was more than "sufficient to put [Plaintiffs] on

8  inquiry" of their alleged injuries.  *See Baker*, 39 Cal. App. 3d at 321.  Plaintiffs

9  could have easily followed up with Scotts by visiting Scotts' website or contacting

10  the FDA or the EPA.  By doing so, if they really did not know from publicly

11  available information, they could have discovered Scotts' use of the Pesticides and

12  begun assessing their purchases and any alleged injuries.

13    Plaintiffs do not allege that they took any action in response to the recall.

14  Instead, they claim that they could not have discovered their claims in the spring of

15  2008 because they did "not have at their disposal anywhere near the investigative

16  tools and resources that the government used to expose" Scotts' conduct "including

17  the federal grand jury's subpoena power."  (Am. Compl. ¶ 90.)  That assertion is

18  not well taken.  For one thing, Scotts voluntarily revealed the Pesticide use to the

19  government in March 2008 (*see* Ex. A); thus, it is not clear what Plaintiffs mean

20  when they refer to the need to "expose" Scotts' conduct.  For another, Plaintiffs did

21  not need subpoena power to diligently pursue their claims.  Plaintiffs could have

22  read Scotts' website or otherwise contacted Scotts, the FDA, or the EPA for

23  additional information.  But Plaintiffs fail to allege that they took *any* action

24  following Scotts' voluntary recall.  Accordingly, they have failed to meet their

25  burden of showing that they could not have discovered their claims through the

26  exercise of reasonable diligence.  *See Klehr*, 521 U.S. at 194.  Plaintiffs therefore

27  cannot claim equitable tolling.

28

(d) **Plaintiffs' Asserted Wild Bird Food Purchases After 2008 Do Not Save Their Expired Claims.**

Apparently recognizing that many of their claims are time-barred, Plaintiffs ambiguously claim that "Defendants continued using toxic chemicals to treat" wild bird food "even after 2008." (Am. Compl. ¶ 92.) Plaintiffs' new vague allegations of other "chemicals" only highlight the fatal flaws in Plaintiffs' original complaint. In an effort to "fix" those flaws, Plaintiffs have made matters worse. Plaintiffs now seek to impose liability for hypothetical injuries arising out of unspecified sales of products containing unidentified "chemicals" without any allegations that anything was even wrong with the products. This they cannot do.

Scotts ceased using the Pesticides on March 12, 2008. (Ex. A.) Plaintiffs' Complaint arises out of the use of the Pesticides. Plaintiffs' vague allegations regarding other unidentified "toxic chemicals" is not sufficient to support any kind of relief. In the Complaint, Plaintiffs were obligated to provide "a short and plain statement of the claim showing that [they are] entitled to relief." Fed. R. Civ. P. 8(a); *Twombly*, 550 U.S. at 573. Plaintiffs' vague allegations of "toxic chemicals" used after 2008 do not provide Scotts with fair notice of the nature of Plaintiffs' claim. Scotts does not know what substances Plaintiffs refer to, what products are referenced, what risks were determined, what labeling issues were violated, or why the substances are claimed to be toxic. Put simply, Plaintiffs' allegation regarding "toxic chemicals or pesticides" other than Storcide II and Actellic do not meet basic notice pleading requirements as a matter of law.

**4.** **Count 1, Alleging That Defendants Violated RICO, Must Be Dismissed On Independent Bases Under Rule 12(b)(6).**

The Court should dismiss Count 1 of the Complaint, alleging violations of 18 U.S.C. §§ 1962 (c) and (d). (*See* Am. Compl. ¶ 106.) As previously demonstrated, Plaintiffs' RICO claims fail for lack of standing and because Plaintiffs cannot demonstrate actual monetary loss as a result of any alleged racketeering activity,

which is a required statutory element under any RICO theory.  18 U.S.C. § 1964.
The RICO Count also should be dismissed on the other grounds set forth below.

### (a)     The Law Of RICO

The distinct provisions of §§ 1962 (c) and (d) proscribe different types of
unlawful conduct.  *Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1079 n.20 (C.D.
Cal. 2009).  Section 1962(c) of RICO states that it is "unlawful for any person
employed by or associated with any enterprise . . . to conduct or participate . . . in
the conduct of such enterprise's affairs through a pattern of racketeering activity or
collection of unlawful debt."  18 U.S.C. § 1962(c); *see also Grimmet v. Brown*, 75
F.3d 506, 510 (9th Cir. 1996).

An "enterprise" is "any individual, partnership, corporation, association, or
other legal entity, and any union or group of individuals associated in fact although
not a legal entity."  18 U.S.C. § 1961(4).  The term "racketeering activity" includes
a number of so-called "predicate acts," including mail and wire fraud.  *Id.* at
§ 1961(1).  A "pattern of racketeering activity" requires the commission of at least
two predicate acts within a ten-year period.  *Id.* at § 1961(5).  To establish the
predicate acts of mail and wire fraud, a plaintiff must show a scheme to defraud,
involving use of the U.S. wires or mail, with the specific intent to defraud.  *See
Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1399-1400 (9th
Cir. 1986); *see also Ice Cream Distrib. of Evansville, LLC v. Dreyer's Grand Ice
Cream, Inc.*, No. 09-5815CW, 2010 WL 3619884, at *3 (N.D. Cal. Sept. 10, 2010).

"To establish liability under § 1962(c) one must allege and prove the
existence of two distinct entities: (1) a "person"; and (2) an "enterprise" that is not
simply the same "person" referred to by a different name.'"  *Living Designs,* 431
F.3d at 361 (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161
(2001)).  This requirement that the RICO enterprise be distinct from the RICO
person is often called the "distinctness requirement."  *See Cedric Kushner
Promotions*, 533 U.S. at 162.  For a corporation to be named as a defendant

1  "person" under § 1962(c), it must be engaged in a pattern of racketeering activity

2  through an enterprise that includes *more than itself, its affiliates, it employees, and*

3  *its agents*.  An "enterprise" consisting only of a corporation and its employees

4  acting on the corporation's behalf fails for lack of distinctiveness because the

5  "person" (the corporate entity) and the "enterprise" are the same.  *See Living*

6  *Designs*, 431 F.3d at 361 ("To be sure, if the 'enterprise' consisted only of

7  [defendant corporation] and its employees, the pleading would fail for lack of

8  distinctiveness.").  If not for the distinctness requirement, RICO would encompass

9  every fraud case against a corporation, a "far-fetched" result.  *See Fitzgerald. v.*

10  *Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997).  Section 1962(d) of RICO

11  provides that it is "unlawful for any person to conspire to violate" § 1962(c).

12  **(b)**     **Overview of Plaintiffs' RICO Allegations.**

13       The Complaint alleges that the RICO "persons" in this action are SMG,

14  Scotts LLC, and the "Doe" defendants, who are claimed to be "individual

15  employees of SMG and/or its subsidiaries, defendant Scotts LLC and Gutwein[]"

16  (collectively, "Defendants").  (Am. Compl. ¶¶ 33-34, 107.)  Gutwein, SMG's own

17  wholly owned subsidiary and the sister company to Scotts LLC, is alleged to be the

18  RICO "enterprise" through which the Defendants allegedly conducted a pattern of

19  racketeering activity.  (*Id.* at ¶¶ 31-32, 47-50, 52.)

20       Although Scotts voluntarily disclosed the bird food error to the public, its

21  retailers, and the government in early 2008 (*see id.* at ¶¶ 5-6; *see also* Ex. A),

22  Plaintiffs allege that Scotts and the Doe defendants executed a purported scheme

23  and engaged in a conspiracy with the very purpose of selling "toxic" wild bird food

24  to the public.  (*Id.* at ¶¶ 45, 67-68, 107-10.)  The Complaint further alleges that

25  Defendants' pattern of racketeering activity involved the commission or aiding and

26  abetting of the "predicate acts" of wire and mail fraud.  (*See., e.g., id.* at ¶¶ 78-80,

27  107, 113-14.)  The only injury Plaintiffs claim is the "purchase price of the

28  product."  (*Id.* at ¶ 119.)

1

2

**(c)      Count 1 Must Be Dismissed Because It Does Not Meet Rule 9(b)'s Heightened Pleading Standard.**

3      Count 1 must be dismissed because the Complaint fails to allege the "what,"

4  "where," "who," "when," and "how" of the purported predicate acts of racketeering

5  activity.  *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales*

6  *Prac., & Prods. Liab. Litig.*, 785 F. Supp. 2d 883, 918-19 (C.D. Cal. 2011)

7  (dismissing claims for alleged violations of §§ 1962(a), (b), (c), and (d) because

8  plaintiffs failed to "allege where they were exposed to the alleged

9  misrepresentations" and "lump[ed] all of the Defendants together instead of

10  'attributing specific conduct to individual defendants.'").

11      Rule 9(b) requires plaintiffs asserting RICO claims to "detail with

12  particularity the time, place, and manner of each act of fraud, plus the role of each

13  defendant in each scheme."  *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*,

14  940 F.2d 397, 405 (9th Cir. 1991) (plaintiff's "contentions regarding the use of the

15  mails are too generalized to satisfy the dictates").  The plaintiff also must allege

16  specifically how the mail or wires were employed in furtherance of each fraudulent

17  act of mail or wire fraud.  *See Nuñag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*,

18  790 F. Supp. 2d 1134, 1149 (C.D. Cal. 2011) (allegation that "'RICO Defendants

19  utilized the telephone, facsimile, postal system, and/or email of the United States to

20  organize, plan, and coordinate the RICO Enterprise'. . . is not a sufficient allegation

21  that either Navarro or UPI specifically used mail or wires, when they used them, or

22  how any such use concerned a scheme to defraud.").

23      Here, the Complaint generally alleges that the fraudulent use of the mails and

24  wires included "marketing materials, advertisements, product packaging, labels,

25  and the 'Fellow Bird Lover' letter" that allegedly contained "misrepresentations

26  and material omissions about the presence of toxic chemicals" in the wild bird food;

27  "distribution and receipt of dangerous pesticides, seeds, and other ingredients…";

28  "distribution and receipt" of the wild bird food; "invoices and payments related to

Defendants' improper scheme"; "deposit of proceeds"; "agreements"; and "other documents and things."  (Am. Compl. ¶ 79; *see also id.* at ¶ 114.)  The Complaint also lists the months and years that containers of Storcide II were shipped (presumably) to the Gutwein facility in Reynolds, Indiana; certain of Scotts' voluntary recall communications; and certain credit card authorizations identified as being from two California Wal-Mart stores to a bank in Missouri.  (*Id.* at ¶¶ 82-83.)

These general allegations do not describe with particularity the "what," "where," "who," "when," and "how" of *any* of the supposedly false statements under Rule 9(b).  *See, e.g., Lancaster Cmty. Hosp.*, 940 F.2d at 405; *Nuñag-Tanedo*, 790 F. Supp. 2d at 1149.  Other than the "Dear Fellow Bird Lover" communication, the Complaint fails to describe with particularity the content of any individual communication or document.  Plaintiffs also fail to specify *what* particular acts of wire or mail fraud they personally were exposed to; *where* they personally were exposed to them; *when* they personally were exposed; and *how* (*i.e.*, the method) they were personally exposed.  In other words, the Complaint fails to tie any specific Plaintiff to any specific instance of mail and wire fraud beyond allegations that they purchased wild bird food.  (*Id.*)  Accordingly, Count 1 must be dismissed.  *See, e.g., In re Toyota*, 785 F. Supp. 2d at 918-19 ("Plaintiffs fail to allege the 'where' and 'who' of the predicate acts with the requisite particularity.  Although Plaintiffs include allegations regarding where each Plaintiff lives and where each Plaintiff purchased or leased his or her vehicle, Plaintiffs do not allege where they were exposed to the alleged misrepresentations.").

Count 1 also fails under Rule 9(b) because "[P]laintiffs lump all of the Defendants together instead of 'attributing specific conduct to individual defendants.'"  *In re Toyota*, 785 F. Supp. 2d at 919 (quoting *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)).  The Complaint goes on for nearly eleven pages about Defendants' alleged RICO violations relating to the manufacturing and sale of the wild bird food and yet provides no indication

1  whatsoever as  to which Defendant is alleged to be doing what particular act of

2  racketeering.[18]  This will not do.  *See id.*  Because Plaintiffs fail to plead their RICO

3  allegations with the specificity that Rule 9(b) demands, Count 1 must be dismissed.

    **(d)  Count 1 Must Be Dismissed Because Plaintiffs'
Allegations Under Section 1962(c) Fail The "Separate
and Distinct" Test.**

6      Plaintiffs also fail to plead that Scotts was engaged in a pattern of

7  racketeering through an enterprise separate from itself, its affiliates, its employees,

8  or its agents.  *See, e.g., Cedric Kushner Promotions*, 533 U.S. at 161 ("to establish

9  liability under § 1962(c) one must allege and prove the existence of two distinct

10  entities:  (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person'

11  referred to by a different name."); *Living Designs*, 431 F.3d at 361 (observing that,

12  where "the 'person' [alleged] was [the corporate defendant] ... if the 'enterprise'

13  consisted only of [the corporate defendant] and its employees, the pleading would

14  fail for lack of distinctiveness"); *In re Toyota*, 785 F. Supp. 2d at 922 (dismissing

15  1962(c) claim on the basis that plaintiffs did not satisfy the distinctness requirement

16  where "Plaintiffs explicitly allege that the Toyota 'Defendants are "persons" as

17  defined by 18 U.S.C. § 1961(3),' and the Toyota 'Defendants, their worldwide

18  affiliates, and their salespersons' constitute the 'enterprise.'") (citations omitted).

19      Here, Count 1 alleges that the RICO "persons" are SMG,  Scotts LLC, and

20  unidentified employees of SMG, Scotts LLC, and Gutwein.  (Am. Compl. ¶¶ 33,

21  107.)  The alleged RICO enterprise is Gutwein, SMG's wholly owned subsidiary

22  and Scotts LLC's sister company.  (*Id.* at ¶¶ 31-32, 47, 49, 52.)  Such allegations

23  fail to satisfy the "distinctness" requirement of § 1962(c).  *See, e.g., In re Toyota*,

24  785 F. Supp. 2d at 922 ("[I]nsofar as RICO seeks 'to prevent a person from using a

25  corporation for criminal purposes, . . . the person and the tool are different entities,

26  not the same.'  Here, Plaintiffs allege that the person and the tool are the same

27      [18] "A Complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997).

1   entities and, therefore, Plaintiffs have not met the distinctness requirement.")

2   (quoting *Cedric Kushner Promotions*, 533 U.S. at 162) (citations omitted); *In re*

3   *Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 601 F. Supp. 2d

4   1201, 1213 (S.D. Cal. 2009) (the RICO person must be distinct from the

5   enterprise).[19]  Count 1 thus must be dismissed on those grounds as well.

6          (e)      **Count 1 Also Must Be Dismissed Because It Fails To State A Conspiracy Claim Under Section 1962(d).**

8        Plaintiffs also allege that Defendants conspired to violate § 1962(c) in

9   violation of the RICO conspiracy provision, § 1962(d).  Because Count 1 fails to

10   state a claim under § 1962(c), Plaintiffs' conspiracy claim also fails.  *See Wagh v.*

11   *Metris Direct, Inc.*, 363 F.3d 821, 830 (9th Cir. 2003) (holding that, since plaintiff

12   had "not satisfied the pleading requirements for" subsections (a), (b), or (c) of

13   § 1962, "he has also not alleged sufficient facts to state a claim under" § 1962(d));

14   *see also In re Toyota*, 785 F. Supp. 2d at 922 (same).

15          **5.**      **Counts 2 And 12, Plaintiffs' Express Warranty and Magnuson-Moss Warranty Act Claims, Fail As A Matter Of Law.**

17          (a)      **Plaintiffs Fail To Plead Breach Of An Express Warranty.**

19        "To prevail on a breach of express warranty claim under California law, a

20   plaintiff must prove:  (1) the seller made an affirmation of fact or a promise, or

21   otherwise described the goods; (2) the statement formed part of the basis of the

22   bargain; (3) the express warranty was breached; (4) the plaintiff was harmed; and

---

23       [19] *See also Lorenz v. CSX Corp.*, 1 F.3d 1406, 1412 (3d Cir. 1993) (dismissing RICO claim under § 1962(c) for failure to satisfy distinctness requirement; "[T]he alleged enterprise is

24   B & O.  The defendants are CSX and its wholly owned subsidiary C & O.  Defendant C & O owns 99.63% of B & O's shares".); *Compagnie De Reassurance D'Ile de France v. New England*

25   *Reins. Corp.*, 57 F.3d 56, 92 (1st Cir. 1995) (affirming the district court's ruling that the distinctness requirement was not met where three related corporate entities were the defendants

26   and the alleged RICO enterprise was a separate, wholly-owned subsidiary of one of the corporate defendants that did not take actions independent of its parent); *Fogie v. Thorn Americans, Inc.*,

27   190 F.3d 889, 896-98 (8th Cir. 1999) (granting summary judgment in favor of defendants on RICO claim where certain related corporate entities were alleged to be the "persons" while other

28   corporate entities related to the RICO "persons" were alleged to make up the "enterprise").

(5) the breach of warranty was a substantial factor causing the plaintiff's harm." *Edmunson v. Procter & Gamble Co.*, No. 10-CV-2256-IEG (NLS), 2011 WL 1897625, at *5 (S.D. Cal. May 17, 2011). *See also* Cal. Civ. Code § 2313(1) (codifying the requirements for breach of express warranty). A "plaintiff must allege the 'exact terms of the warranty'" to recover. *Id.* (quoting *Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 142 (Cal. Ct. App. 1986)).

To constitute an express warranty, the alleged statements "must describe specific characteristics of the product; vague or highly subjective product superiority claims often amount to non-actionable puffery." *Edmunson,* 2011 WL 1897625 at *5 (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997). In *Edmunson*, for example, packaging for Fusion Power brand razors stated: [f]or best results, power up with the Fusion Power razor." *Id.* at *6. The packaging also touted Fusion Power razors as more effective than a comparable Mach 3 brand razor. The court dismissed the plaintiff's express warranty claim, finding that "statements related to obtaining 'best results' or whether Fusion products provide a better and more comfortable shave than other razors are non-actionable puffery and do not establish express warranties." *Id.*

Here, as in *Edmunson,* Plaintiffs have not alleged breach of an express warranty. It is well known that pesticides are used to grow and preserve agriculture products. Wild bird food is no different. As with most agriculture products, Scotts never claimed or warranted that no pesticides were used in its production or storage of wild bird food. Instead, Plaintiffs allege five other so-called express warranties that they allege Scotts breached:

> (a) Morning Song® Premium Year-Round Wild Bird Food is a mixture of song-birds' favorite seeds, such as sunflower seed, safflower seed and white millet. This combination of seeds can be offered year-round to attract and retain the most appealing variety of wild birds.
>
> (b) Attract your favorite birds[:] Cardinals[;] Finches[;]

1

> Chickadees[;] Nuthatches[;] Titmice[;] Jays[.]

2

3

> (c)  Essentials for Attracting a Variety of Wild Birds.
> Food:  Offer a fresh, consistent food supply to attract and
> keep wild birds in your backyard.  For best results, use
> separate feeding stations filled with different Morning
> Song food mixes, suets, and pressed seed.

4

5

6

> (d)  INGREDIENTS:  Milo, White Millet, Black Oil
> Sunflower, Safflower[.]

7

8

> (e)  GUARANTEED ANALYSIS:  Crude Protein (min)
> 9%[;] Crude Fat (min) 4%[;] Crude Fiber (max) 6%[;]
> Moisture (max) 12%[.]

9

10

11   (Am. Compl. ¶ 248.)  They allege that these "warranties" were made in Scotts'

12   "marketing and advertising." (*Id.* at ¶ 249.)  According to Plaintiffs, Scotts

13   "expressly warranted that [its wild bird food] was safe for consumption by birds

14   and wildlife" (*id.* at ¶ 246) and "breached the terms of their contracts, including the

15   express warranties" by not providing the food "as advertised." (*Id.* at ¶ 252.)

16          Plaintiffs have not adequately pled breach of any express warranty.

17   Statements that Scotts' wild bird food includes a "mixture of song-birds' favorite

18   seeds," attracts the "most appealing variety of wild birds," and appeals to

19   customers' "favorite birds" (*id.* at ¶ 248(a)-(c)) do not identify specific

20   characteristics of Scotts' wild bird food.  Instead, they amount to "non-actionable

21   puffery." *Edmunson,* 2011 WL 1897625 at *5.  Instructions for how to obtain the

22   "best results" (Am. Compl. ¶ 248(c)) are puffery as well.  *Id.* at *6.  None of these

23   statements amount to an express warranty.  Moreover, Plaintiffs must plead that a

24   breach  occurred in order to state a claim.  *See Rodarte v. Philip Morris, Inc.*, No.

25   CV03-0353FMC(CTX), 2003 WL 23341208, *6 (C.D. Cal. June 23, 2003).

26   Plaintiffs cite the wild bird food "INGREDIENTS" list and "GUARANTEED

27   ANALYSIS" as express warranties (Am. Compl. ¶ 248(d) and (e)), but do not

28   allege that ingredients were inaccurate.  Plaintiffs do not allege, for example, that

the wild bird food they purchased did not contain Safflower or did not have at least 9% crude protein.  (*See id.* at ¶ 248(d) and (e)).  Due to the absence of either an express warranty or a breach, Plaintiffs' claim must be dismissed.

**(b)** **Plaintiffs' Magnuson-Moss Warranty Act Claim Fails.**

For a MMWA claim to arise under federal law, a plaintiff must allege sufficient facts to establish a written warranty under the MMWA.  *Hairston v. South Beach Beverage Co.*, No. CV 12-1249-JFW (DTBx), 2012 WL 1893818, at *5 (C.D. Cal. May 18, 2012).  The MMWA narrowly defines "written warranty" as a "written affirmation of fact or a written promise" that "affirms or promises that . . . material or workmanship is defect free or will meet a specified level of performance over a specified period of time."  15 U.S.C. § 2301(6)(A).  The MMWA provides that warrantors must "fully and conspicuously disclose in simple and readily understood language the terms and conditions of such warranty."  15 U.S.C. § 2302(a).  For example, express warrantors must make clear whether a warranty is "full" (including a statement of duration) or "limited."  28 U.S.C. § 2303(a).  "[A]dvertisements" and "promotional materials" are "product descriptions" that are distinct from a promise that a product is "defect free" or that it will reach "a level of performance over a specified period of time."  *Hairston*, 2012 WL 1893818 at *6 (finding that a Sobe Lifewater drink label neither promised a defect-free product nor provided specific performance guarantees).

Here, Plaintiffs never allege a federal MMWA violation separate from their generic state law warranty claims, nor could they possibly do so.[20]  Plaintiff also cannot plead facts sufficient to establish a "written warranty" under 15 U.S.C. § 2301(6)(A) of the MMWA.  Plaintiffs allege that an express warranty arises

---

[20] *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 833 (Cal. Ct. App. 2006) ("Magnuson-Moss 'calls for the application of state written and implied warranty law, not the creation of additional federal law,' except in specific instances in which it expressly prescribes a regulating rule."); *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (Magnuson-Moss Act claims generally "stand or fall with . . . express and implied warranty claims under state law.").

because of Scotts' "marketing and advertising" (Am. Compl. ¶ 247), but they do not allege that Scotts warranted the wild bird food as "defect free" or that the food would "meet a specified level of performance over a specified period of time." 15 U.S.C. § 2301(6)(A). The "marketing and advertising" Plaintiffs cite are nothing more than "product descriptions." *See Hairston,* 2012 WL 1893818 at *6. As a result, Plaintiffs' federal MMWA claim must be dismissed.

6.      **Counts 3–10 and 15–16 Fail Because The Plaintiffs Do Not Plead Their Claims With The Specificity Required Under Rule 9(b).**

Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud[.]" Rule 9(b) requires that a complaint allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and where possible, the identity of the person engaged in the fraud. *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1547-49 (9th Cir. 1994), *superseded on other grounds by statute,* Private Securities Litigation Reform Act of 1995. To do so, the pleader must answer the "who, what, when, where, and how" of the alleged fraud. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). A cause of action for negligent misrepresentation or fraudulent concealment must be pled with the heightened specificity required under Rule 9(b). *See Meridian Project Sys., Inc. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214, 1219 (E.D. Cal. 2005). Rule 9(b) also applies to most of the consumer protection statutes sounding in fraud for which the Complaint alleges violations.[21]

---

[21] *See Kearns*, 567 F.3d at 112 (California's UCL, FAL, and CLRA); *Kinzler v. PNC Bank N.A.*, No. 4:12-CV-00097 BRW, 2012 WL 956165, at *2 (E.D. Ark. Mar. 21, 2012) (Arkansas Deceptive Trade Practices Act ("DTPA")); *Global Total Office LP v. Global Allies, LLC*, No. 10 C 1896, 2011 WL 3205487, at *1 (N.D. Ill. July 28, 2011) (Illinois DTPA); *Midwest Theatres Corp. v. IMAX Corp.*, Civil No. 08-5823 (DSD/SRN), 2009 WL 649701, at *2 (D. Minn. Mar. 11, 2009) (Minnesota Consumer Fraud Act ("CFA")); *Owen v. General Motors Corp.*, No. 06-4067-CV-C-NKL, 2006 WL 2808632, at *7 (W.D. Mo. Sept. 28, 2006) (Missouri Merchandising Practices Act ("MPA")); *Hollon v. Consumer Plumbing Recovery Ctr.*, Civil Action No. 5:05-414-JMH, 2006 U.S. Dist. LEXIS 29872, at *13 (E.D. Ky. May 15, 2006) (Kentucky CPA claims based on fraud).

The Complaint fails to plead Counts 3–10 and 15–16 with the particularity required under Rule 9(b).  Plaintiffs generally allege that Scotts "misrepresented various material facts regarding the quality and character" of its wild bird food through "various advertising and marketing" disseminated by Scotts "officers, agents, representatives, servants or employees."  (Am. Compl. ¶ 274.)  Plaintiffs further assert that Scotts "failed to disclose the true nature of the [wild bird food] as containing toxins that are not approved for birdseed and not safe for use of the same." (*Id.* at ¶ 158.)

Those general allegations do not meet the requirements of Rule 9(b).  Plaintiffs fail to specify *what* specific advertising and marketing they viewed.  They also fail to provide allegations about *where* they viewed the advertising and marketing (*i.e.* which publication format and which state or even region); *how* they viewed the misleading advertising and marketing (*i.e.* print, audio, or video); and *when* they viewed the advertising and marketing (date or even general time frame). *See Kearns*, 567 F.3d at 1124.  Moreover, Plaintiffs have not alleged the specific *content* of the allegedly misleading advertising and marketing they viewed; *which* specific representations were false; or *which* information was omitted from the representations provided.  *See In re GlenFed Sec. Litig.*, 42 F.3d at 1547-49.  At bottom, Plaintiffs claim they viewed "marketing and advertising" (Am. Compl. ¶ 274), but give no indication of what they are referring to, when they were exposed, or why the specific advertising and marketing is fraudulent.  Because Plaintiffs have not pled Counts 3–10 and 15–16 with the required particularity, those Counts should be dismissed.

### 7. Count 17, Plaintiffs' Unjust Enrichment Claim, Is Not A Proper Cause Of Action.

"[A] cause of action for unjust enrichment is not cognizable under California law." *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1307 (S.D. Cal. 2009). *See also Melchior v. New Line Productions, Inc.*, 106 Cal. App. 4th 779, 793 (Cal.

Ct. App. 2003) ("[T]here is no cause of action in California for unjust enrichment.").  Indeed, "[t]he phrase 'Unjust Enrichment' does not describe a theory of recovery, but an effect:  the result of a failure to make restitution under circumstances where it is equitable to do so." *Lauriedale Assocs. v. Wilson*, 7 Cal. App. 4th 1439, 1448 (Cal. Ct. App. 1992.  It is "'a general principle, underlying various legal doctrines and remedies,' rather than a remedy itself." *Melchior*, 106 Cal. App. 4th at 793 (quoting *Dinosaur Development, Inc. v. White*, 216 Cal. App. 3d 1310, 1315 (Cal. Ct. App. 1989)).  Because a cause of action for unjust enrichment cannot be brought under California law, Plaintiffs' unjust enrichment claim should be dismissed.  *See Lorenzo*, 603 F. Supp. 2d at 1307 (dismissing an unjust enrichment claim).

## IV.    CONCLUSION

For all the foregoing reasons, Scotts requests that Plaintiffs' Amended Complaint be dismissed in its entirety with prejudice for lack of subject matter jurisdiction and failure to state a claim.

Dated:         February 28, 2013          Respectfully submitted,

Jones Day


By:  /s/ *Edward Patrick Swan, Jr.*
       Edward Patrick Swan, Jr.

An Attorney for Defendants
THE SCOTTS MIRACLE-GRO
COMPANY AND THE SCOTTS
COMPANY LLC