ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON A. FORGE (181542)
RACHEL L. JENSEN (211456)
PHONG L. TRAN (204961)
JENNIFER N. CARINGAL (286197)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
rjensen@rgrdlaw.com
ptran@rgrdlaw.com
jcaringal@rgrdlaw.com
        – and –
PAUL J. GELLER
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com

Co-Lead Counsel and Counsel for Cyphert Plaintiffs

DOWD & DOWD P.C.
DOUGLAS P. DOWD
ALEX R. LUMAGHI
211 North Broadway, Suite 4050
St. Louis, MO  63102
Telephone:  314/621-2500
314/621-2503 (fax)
doug@dowdlaw.net
alex@dowdlaw.net

THE DRISCOLL FIRM, P.C.
JOHN J. DRISCOLL
CHRISTOPHER QUINN
GREGORY PALS
211 N. Broadway, Suite 4050
St. Louis, MO  63102
Telephone:  314/932-3232
314/932-3233 (fax)

Co-Lead Counsel and Counsel for Dowd/Driscoll Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re MORNING SONG BIRD FOOD LITIGATION<br><br>This Document Relates To:<br><br>        ALL ACTIONS. | Lead Case No. 3:12-cv-01592-JAH-RBB<br><br>CLASS ACTION<br><br>PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES AND APPOINTMENT OF CLASS COUNSEL<br><br>JUDGE:    Hon. John A. Houston<br>DATE:     November 24, 2014<br>TIME:     2:30 p.m.<br>CTRM:     13B (13th Floor Annex) |

976673_1

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................... 1

II.     FACTS THAT ARE COMMON TO THE CLASS ........................................ 2

    A.      Overview of Defendants' Scheme to Make and Sell so-Called Bird "Food" Containing Bird Poison .......................................... 2

    B.      In 2012, Defendants Pleaded Guilty to the Crime of Illegally Using Toxic Pesticides in Bird Food ....................................... 5

    C.      Defendants Knew About the Crime but Hid It for Years ................. 6

    D.      Prior to 2012, Defendants' Lulling Communications Concealed the True Nature of the Defect from the Public ........................ 8

    E.      There Has Been No Consumer Recall Program ............................ 10

III.    CLASS CERTIFICATION IS WARRANTED HERE ............................... 10

    A.      Applicable Legal Standards ............................................ 10

    B.      The Requirements of Rule 23(a) Are Readily Met ...................... 11

        1.      The Class Is Sufficiently Numerous ........................... 11

        2.      There Are Common Questions of Fact or Law ................... 11

        3.      Plaintiffs' Claims Are Typical of the Class ................. 12

        4.      Plaintiffs Will Adequately Represent the Class ............. 13

        5.      Co-Lead Counsel Are Qualified to Serve as Class Counsel Pursuant to Rule 23(a) and (g)(1) ................. 14

    C.      Rule 23(b)(3)'s Requirements Are Readily Met ........................ 15

        1.      Common Issues of Law and Fact Will Predominate ............. 15

            a.      The RICO Claim Raises Common Questions that Will Turn on Common Proof that Will Yield Common Answers ........................................ 16

            b.      The California Consumer Fraud Claims Will Turn on Common Proof ......................................... 21

            c.      The Missouri Consumer Fraud Claims Will Turn on Common Proof ......................................... 22

            d.      The Minnesota Consumer Claims Turn on Common Proof ............................................... 23

1

2                                                                           **Page**

3

            e.      Full Refunds Are an Appropriate Methodology for
4                   Determining Damages Classwide .................................. 23

5       2.      Class Treatment Is Superior in This Case ............................... 24

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Affiliated Ute Citizens v. U.S.*,
   406 U.S. 128 (1972) ........................................................................ 19

*Amchem Prods. v. Windsor*,
   521 U.S. 596 (1997) ........................................................................ 15

*Bateman v. Am. Multi-Cinema, Inc.*,
   623 F.3d 708 (9th Cir. 2010) .......................................................... 10

*BCS Servs. v. Heartwood 88, LLC*,
   637 F.3d 750 (7th Cir. 2011) .......................................................... 20

*Binder v. Gillespie*,
   184 F.3d 1059 (9th Cir. 1999) ........................................................ 19

*Blackie v. Barrack*,
   524 F.2d 891 (9th Cir. 1975) ............................................................ 2

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008) ................................................................... 18, 24

*Butler v. Sears*,
   702 F.3d 359 (7th Cir. 2012) .................................................... 15, 16

*Carlson v. Chisholm-Moore Hoist Corp.*,
   281 F.2d 766 (2d Cir.1960) ............................................................ 20

*Carnegie v. Household Int'l*,
   376 F.3d 656 (7th Cir. 2004) .......................................................... 16

*Carter v. Berger*,
   777 F.2d 1173 (7th Cir. 1985) ........................................................ 24

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158 (2001) ........................................................................ 17

*Certified Question United States Dist. Court Order v. Philip Morris*,
   621 N.W.2d 2 (Minn. 2001) ............................................................ 23

- iii -

**Page**

*Chavez v. Blue Sky Natural Bev. Co.*,
   268 F.R.D. 365 (N.D. Cal. 2010) ...................................................................... 22

*Colgan v. Leatherman Tool Grp., Inc.*,
   135 Cal. App. 4th 663 (2006).......................................................................... 22

*Crawford v. Honig*,
   37 F.3d 485 (9th Cir. 1994) ............................................................................. 14

*Dukes v. Wal-Mart Stores, Inc.*,
   603 F.3d 571 (9th Cir. 2010) ............................................................................. 2

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ........................................................................... 10

*Friedman v. 24 Hour Fitness USA, Inc.*,
   No. CV 06-6282 AHM, 2009 U.S. Dist. LEXIS 81975
   (C.D. Cal. Aug. 25, 2009) ............................................................................... 17

*Garner v. Healy*,
   184 F.R.D. 598 (N.D. Ill. 1999) ................................................................. 20, 23

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998)..................................................................... 16, 24

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ........................................................................... 13

*Hartless v. Clorox Co.*
   273 F.R.D. 630 (S.D. Cal. 2011) ...................................................................... 14

*Holmes v. Sec. Investor Prot. Corp.*,
   503 U.S. 258 (1992) .................................................................................... 18, 24

*In re Celexa & Lexapro Mktg. & Sales Pract. Litig.*,
   MDL No. 09-02067-NMG, 2014 U.S. Dist. LEXIS 3554
   (D. Mass. Jan. 10, 2014)................................................................................... 22

*In re First Alliance Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006) ........................................................................... 16

**Page**

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
    268 F.R.D. 652 (S.D. Cal. 2010) .................................................................. 2, 19

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
    No. 3:05-cv-1018-GPC-WVG, 2013 U.S. Dist. LEXIS 20314
    (S.D. Cal. Feb. 14, 2013) ..................................................................................... 18

*In re Neurontin Mktg. & Sales Practices Litig.*,
    712 F.3d 60 (1st Cir.), *cert. denied sub nom*,
    *Pfizer Inc. v. Kaiser Found. Health Plan, Inc.*,
    __ U.S. __, 134 S. Ct. 786 (2013) ........................................................................ 20

In *re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) ......................................................................................... 21

*In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.*,
    122 F.R.D. 251 (C.D. Cal. 1988) ......................................................................... 16

*Keegan v. Am. Honda Motor Co.*,
    284 F.R.D. 504 (C.D. Cal. 2012) ......................................................................... 21

*Kennedy v. Jackson Nat'l Life Ins. Co.*,
    No. C 07-0371 CW, 2010 U.S. Dist. LEXIS 63604
    (N.D. Cal. June 23, 2010) ..................................................................................... 19

*Lee v. Carter-Reed, LLC*,
    4 A.3d 561, 580 (2010) ......................................................................................... 24

*Leyva v. Medline Indus.*,
    716 F.3d 510 (9th Cir. 2013) ................................................................................ 23

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001) .............................................................................. 24

*Makaeff v. Trump Univ., LLC*,
    No. 10-cv-0940-GPC-WVG, 2014 U.S. Dist. LEXIS 22392
    (S.D. Cal. Feb. 21, 2014) ................................................................. 14, 15, 23, 25

*McKenzie v. Fed. Express Corp.*,
    275 F.R.D. 290 (C.D. Cal. 2011) ......................................................................... 18

**Page**

*McMahon Books, Inc. v. Willow Grove Assocs.*,
   108 F.R.D. 32 (E.D. Pa. 1985) ........................................................ 16

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
   238 F.R.D. 482 (C.D. Cal. 2006) ............................................... 16, 19

*Oki Semiconductor Co. v. Wells Fargo Bank*,
   298 F.3d 768 (9th Cir. 2002) ...................................................... 18, 19

*Pac. Gas & Elec. Co. v. Howard P. Foley Co.*,
   No. 85-2922 SW, 1993 U.S. Dist. LEXIS 21414
   (N.D. Cal. July 27, 1993) .................................................................. 24

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ............................................... 11, 12, 13

*Peterson v. H&R Block Tax Servs.*,
   174 F.R.D. 78 (N.D. Ill. 1997) ......................................................... 20

*Plascencia v. Lending 1st Mortgage*,
   259 F.R.D. 437 (N.D. Cal. 2009) ..................................................... 19

*Plubell v. Merck & Co., Inc.*,
   289 S.W.3d 707 (Mo. App. W.D. 2009) .......................................... 22

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ......................................................................... 17

*Rosales-Martinez v. Palmer*,
   753 F.3d 890 (9th Cir. 2014) ............................................................. 3

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) ......................................................................... 17

*Slaven v. BP Am., Inc.*,
   190 F.R.D. 649 (C.D. Cal. 2000) ..................................................... 11

*Suchaneck v. Sturm Foods, Inc.*,
   764 F.3d 750, 2014 U.S. App. LEXIS 16259
   (7th Cir. Aug. 22, 2014) ...........................................................*passim*

**Page**

*Sykes v. Mel Harris & Assocs. LLC,*
  285 F.R.D. 279 (S.D.N.Y. 2012)..........................................................................11

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,*
  209 F.R.D. 159 (C.D. Cal. 2002) ..........................................................................21

*United States v. Kennedy,*
  726 F.3d 968 (7th Cir. 2013) ................................................................................24

*United States v. Peterson,*
  538 F.3d 1064 (9th Cir. 2008) ..............................................................................18

*Vasquez v. Superior Court,*
  4 Cal. 3d 800 (1971) .............................................................................................22

*Wal-Mart Stores, Inc. v. Dukes,*
  __ U.S. __, 131 S. Ct. 2541 (2011) ......................................................................11

*Wolin v. Jaguar Land Rover N. Am., LLC,*
  617 F.3d 1168 (9th Cir. 2010) ..............................................................................15

*Yokoyama v. Midland Nat'l Life Ins. Co.,*
  594 F.3d 1087 (9th Cir. 2010) ..............................................................................21

**STATUTES, RULES AND REGULATIONS**

18 U.S.C.
  §1964(c)..................................................................................................................23

California Civil Code
  §17500 ...................................................................................................................22

1

2                                                                    **Page**

3
Federal Rules of Civil Procedure
4
   Rule 23....................................................................................*passim*

5   Rule 23(a) ........................................................................... 11, 14
   Rule 23(a)(1)............................................................................ 11
6   Rule 23(a)(2)............................................................................ 11
   Rule 23(a)(3)............................................................................ 12
7   Rule 23(a)(4)............................................................................ 13
   Rule 23(b)(3) ............................................................ 15, 16, 24
8   Rule 23(g)(1) ......................................................................... 14
9

10   **OTHER AUTHORITIES**

11   *Manual of Model Criminal Instructions for the District Courts of the Ninth Circuit*,
12   Nos. 8.121 & 8.124......................................................... 17

13   Jed S. Rakoff, RICO: CIVIL & CRIMINAL LAW & STRATEGY (Supp. 2013)
14   §4.02[3] ................................................................................ 24

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.     INTRODUCTION

This case pits completely innocent individual victims against an admittedly, yet unapologetically, guilty conglomerate.   Defendant Scotts Miracle-Gro has been convicted of multiple crimes of dishonesty, including years of illegal Pesticide Misuse.  SMG[1] has admitted that it illegally sold tens of millions of bags of Morning Song Bird Food ("MSBF") that it had illegally treated with pesticides that are expressly labeled as hazardous to birds.  ¶2.[2]  No consumer would have knowingly purchased such a product, which SMG confirmed by dumping in landfills over two million bags of it.  Yet, consumers were left holding the bag – over 60 million bags to be more precise.  This is a prototypical pursuit of justice, and the class-action vehicle is the only way to reach that destination.

Despite SMG's guilty plea, its admissions, and its professed "no quibble" money back guarantee policy, SMG refuses to refund the hundreds of millions of dollars consumers spent on a product that was illegal to sell, improper to use, and fit for nothing other than burial in landfills.  This is precisely the type of wrong that Rule 23 was intended to right: "'a case involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost on any one of them large enough to justify the expense of an individual suit.'"  *Suchaneck v. Sturm Foods, Inc.*, 764 F.3d 750, 2014 U.S. App. LEXIS 16259, at *22 (7th Cir. Aug. 22, 2014).[3]

This entire case consists of common questions whose common answers are provided by common evidence.  Did Defendants illegally treat bird "food" with a pesticide that was hazardous to birds and other animals?  Did Defendants conceal this information from consumers?  Was this information something that would have had a natural tendency to influence a reasonable consumer?  Did Defendants' acts and

---

[1]    Capitalized terms have the same meaning as Plaintiffs' Amended Consolidated Class Action Complaint ("Complaint"), filed on January 31, 2013.  Dkt. No. 26.

[2]    "¶__" references are to the Complaint.

[3]    Here and throughout, citations are omitted and emphasis is added unless noted.

omissions cause consumers to pay for defendants' illegal product?   However favorably or unfavorably these questions are answered, the answers must be the same for all proposed class members.   That is why certifying this case as a class action is not just the right way to proceed.   It is the only reasonable way to proceed.

Plaintiffs respectfully request that the Court certify the following Class for their RICO claims (Count 1):   All persons who purchased, and have not yet received a full refund for, a Scotts Miracle-Gro wild bird food product containing Storcide II, Actellic 5E, or their active ingredients, chlorpyrifos-methyl or pirimiphos-methyl, respectively ("MSBF").   All persons who purchased, and have not yet received a full refund for, a Scotts Miracle-Gro wild bird food product between November 2005 and May 2008 are necessarily part of this class.   Plaintiffs further request the Court certify three subclasses for claims in California (Counts 3-5), Missouri (Count 10), and Minnesota (Count 9).[4]

## II.   FACTS THAT ARE COMMON TO THE CLASS

### A.   Overview of Defendants' Scheme to Make and Sell so-Called Bird "Food" Containing Bird Poison

As alleged in the Complaint,[5] Defendants engaged in an illegal nationwide scheme to make and distribute tens of millions of bags of "premium" bird food containing bird poison.   Defendants marketed these products under various brand names, including Morning Song, Country Pride, Scotts' Songbird Selection, and

---

[4]   In the interest of judicial economy, Plaintiffs have limited the claims for which they are presently seeking class certification.  If granted, these claims will protect the interests of all victims of Defendants' alleged nationwide scheme.  While Plaintiffs are mindful of the Court's and the parties' time and resources, class certification is an interlocutory issue, and Plaintiffs reserve the right to move for leave to seek class certification on the other claims in this case, depending on the Court's decision.

[5]   With this reference, Plaintiffs incorporate all of the Complaint's allegations.  "On a motion for class certification, the Court 'is bound to take the substantive allegations of the complaint as true.'  *Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir. 1975).  However, the Court is 'explicitly requir[ed] . . . to probe behind the pleadings if doing so is necessary to make findings on the Rule 23 certification decision.'  *Dukes v. Wal-Mart Stores, Inc.,* 603 F.3d 571, 589 (9th Cir. 2010)."   *In re Nat'l W. Life Ins. Deferred Annuities Litig.,* 268 F.R.D. 652, 659 (S.D. Cal. 2010) ("*Nat'l W. Life. I*").

Scotts' Wild Bird Food.[6]  Defendants executed the scheme through the enterprise, Gutwein, a separately-incorporated entity that SMG and Defendant Scotts LLC managed and operated during the relevant time frame.  *See* ¶¶47-52.  Using the cover of Gutwein's separate corporate status, Defendants executed the scheme by using illegal pesticides to extend the shelf life of the product; concealing the pesticide use; and pocketing the hundreds of millions in revenues and profits from the scheme.

Specifically, Defendants manufactured, distributed, and sold Morning Song Bird Food treated with Storcide II and Actellic 5E pesticides, both of which are banned for use in bird food because they are known to be toxic to birds and wildlife.[7]  Until SMG pleaded guilty to this federal crime in 2012, Defendants had concealed this critical fact to consumers.  ¶29.  Defendants avoided detection by marketing the products as food for wild birds and animals, which Defendants expected would take the feed and fly, swim, or scurry away, so that any toxic effects of the "food" would go undetected.  ¶42.

These pesticides are so toxic to birds that it is a federal crime to use them in bird food, and the EPA-mandated Storcide II label (which Defendants' employees handled on a daily basis) expressly warns against giving birds access to seeds treated with this pesticide, let alone enticing them to feed on the seeds:[8]

---

[6]   *See* ¶2; *see, e.g.*, Ex. 2 (DEFS_E00000177 at 182-87) (4/10/08 and 4/17/08 emails from Scotts LLC and Guwein to the FDA, attaching spreadsheet of affected products and estimate of units at that time); *see also* Ex. 3 at 4, Scotts' Verified Responses to Plaintiffs First Set of Interrogatories ("Scotts' Rog Responses") (verifying that Defendants sent email to the FDA).

[7]   *See* Ex. 4, (*U.S. v. The Scotts Miracle Gro-Co.*, 2:12-cr-00024-JLG (S.D. Ohio, filed Jan. 25, 2012) ("*SMG Criminal Case*") Dkt. Nos. 3, 23 (Plea Agreement & Judgment)).  Plaintiffs request that the Court take judicial notice of these documents. *See Rosales-Martinez v. Palmer*, 753 F.3d 890, 894 (9th Cir. 2014) ("It is well established that we may take judicial notice of judicial proceedings in other courts.").

[8]   Ex. 5 (DEFS_E00000049 at 52) (Storcide II label); *see also* Ex. 6 (DEFS0000560 at 565) (Storcide II Material Safety Data Sheet ("MSDS") warns:  "Highly toxic to fish.  Toxic to birds.  Toxic to wildlife.").

**ENVIRONMENTAL HAZARDS**

STORCIDE II insecticide is extremely toxic to fish and toxic to birds and other wildlife. Do not apply directly to water, or to areas where surface water is present or to intertidal areas below the mean high water mark. Do not discharge directly or indirectly into surface waters. Do not contaminate water by cleaning of equipment or disposal of wastes.

Exposed treated seeds are hazardous to birds and other wildlife. Dispose of all excess treated seeds and seed packaging by burial away from bodies of water.

This pesticide is highly toxic to bees exposed to direct treatment or residues on crops or weeds. Do not apply STORCIDE II insecticide or allow it to drift onto crops or weeds on which bees are actively foraging.

¶43(d). Storcide II's primary active ingredient is chlorpyrifos-methyl, which is known to be "moderately to very highly toxic to birds."[9] The "EPA requires precautionary language on chlorpyrifos product labels, warning of the hazard that this insecticide poses to birds, wildlife and aquatic organisms." *Id.* And, in fact, the Storcide II label says any treated seeds are so hazardous to birds and other wildlife that they should be disposed of "by burial away from bodies of water." *Id.* Yet, instead of burying the treated seed as required, Defendants brazenly bagged it up and sold the treated seed to the consuming public for the express purpose of feeding birds.

Similarly, it is a federal crime to use Actellic 5E in bird food.[10] ¶3. Actellic 5E's common name or synonym is pirimiphos-methyl,[11] which is known to be "highly toxic to birds and aquatic organisms."[12] Though Defendants claim they "recalled" all products treated with Actellic 5E (*i.e.*, pirimiphos-methyl) in 2008, laboratory testing found pirimiphos-methyl in the Morning Song Bird Food purchased by the Cypherts

---

[9]   Ex. 7 (Pesticide Information Profile of Chlorpyrifos).

[10]   *See supra* n.7; Exs. 4 & 8 (Plea Agreement & Information).

[11]   *See* Ex. 9 (Actellic 5E MSDS, which says at page 1 the pesticide's "common name" is Pirimiphos methyl); Ex. 10 (DEFS_E00000073 at 73) (prior Actellic 5E MSDS says that the synonym for Actellic 5E is "Pirimiphos methyl").

[12]   Ex. 9 (Actellic 5E MSDS at page 4 says "[t]his product is considered to be highly toxic to birds and aquatic organisms."); Ex. 11 (EPA Fact sheet for Pirimiphos-methyl says at page 2 "pirimphos-methyl is highly toxic to birds and fish"; though it says risks are not of concern based on "use pattern", uses do not include bird food).

in late 2009.[13]   The product was sent for testing after the Cypherts used the seed once to feed the 100 finches in their aviary and all but 8 died.[14]

**B.   In 2012, Defendants Pleaded Guilty to the Crime of Illegally Using Toxic Pesticides in Bird Food**

In January 2012, SMG entered into a plea agreement with the federal government, admitting guilt to 11 counts of separate misdemeanors relating to its misuse and misbranding of various pesticides.  Among other crimes, SMG admitted that it had for years ***knowingly*** manufactured, marketed, and sold tens of millions of bags of Morning Song Bird Food it had illegally treated with pesticides.  SMG was sentenced to pay $4.5 million in penalties and charitable donations; its fine was the largest criminal penalty to date under the federal FIFRA, which governs pesticide use. ¶36.

In its plea agreement, SMG "admit[ted] to the facts alleged in the Information, that it committed the offenses charged in the Information and that it is in fact guilty of these offenses."[15]   These facts included that Defendants distributed for sale 73 million units of Morning Song Bird Food treated with Storcide II and Actellic 5E, which are illegal in bird food and expressly labeled as toxic to birds, and that SMG continued to do so for months even after employees warned them to stop.[16]

SMG's plea agreement was the first time SMG publicly revealed its crimes and

---

[13]   *See* Ex. 13 (FOIA FDA 0000025 at 5) (2/10/10 DHHS report says sample #349570 was taken from bag used to feed birds, and sample #349571 was taken directly from feeder); Ex. 14 (FOIA FDA 0000119) (reflecting lab results from sample #349570, which states the conclusion that it contained "pirimiphos-methyl"); Ex. 15 (FOIA FDA 0000131) (reflecting lab results from sample #349571, which states the conclusion that it contained "pirimiphos-methyl").

[14]   *See id.*; Declaration of Laura Cyphert in Support of Class Certification ("L. Cyphert Decl."), ¶5; *see generally* Declaration of Milton Cyphert in Support of Class Certification, ("M. Cyphert Decl."), ¶5.

[15]   *See* Ex. 4 at 2 (*SMG Criminal Case* Dkt. No. 3).

[16]   *See* Ex. 8 (*SMG Criminal Case*, Dkt. No. 1, at 4-5 (Information)).  Plaintiffs also request that the Court take judicial notice of the Information, whose allegations Defendants admitted in their Plea Agreement.  *See supra*, n.7.

1  the identities of the toxic pesticides Defendants had knowingly and illegally used.

2      **C.   Defendants Knew About the Crime but Hid It for Years**

3        Contrary to Defendants' representations to this Court, as well as to Judge

4  Graham of the Southern District of Ohio, they did not voluntarily stop as soon as they

5  discovered the crime.[17]  Defendants have admitted that they knew about the illegal

6  pesticides throughout the entire time they used them, and at least by June 2006, when

7  SMG's Environmental, Health and Safety Regional Manager, Sara Brenner, flagged

8  the issue during her site visit to SMG's Doland, South Dakota plant.[18]  But,

9  Defendants continued to use the pesticides for another two years, because there was a

10  competitive advantage, and thus a profit, in doing so.  ¶38.

11        By summer of 2007, Defendants had received "reports about birds dying all

12  over the United States . . . a lot of birds," including wild birds.[19] On August 13, 2007,

13  a Texas customer complained that, ██████████████████████████████████

14  ████████████████████████████████████████████████████████████."[20]

15  And, on August 19, 2007, an Oklahoma customer called and "█████████████████

16  ██████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████"[21]

18        Defendants received additional complaints from within their own organizations.

19  _____

20  [17]  *See* Dkt. No. 32-1 at 16-17 (Defs' Motion to Dismiss Cmpt.).

21  [18]  *See* Ex. 16 (DEFS0002877) (████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████

24  ██████████████████████ resolution listed o████████████████████████████

25  [19]  Ex. 18 (CYPHERT 00000223-225) (Ohio Bureau of Criminal Identification and

26  Investigation, 11/20/08 Investigative Report re: Return Telephone Call from Mario A. Olmos).

27  [20]  Ex. 19 (DEFS_E00000003).

28  [21]  Ex. 20 (DEFS_E00000006).

1  Mario Olmos, an ornithologist; its Senior Specialist in the Regulatory Department

2  (Kris Mantey); and its Director of Regulatory Affairs (Kathleen Lee), all tried to stop

3  SMG's illegal practice.  By October 16, 2007, the matter was of such grave concern

4  that SMG's Director of Innovations, Andy Wong, seized an opportunity to implore

5  Defendants' highest-ranking officers to end this illegal practice, which Mr. Wong

6  explained coincided with a number of customer complaints about bird deaths.  SMG's

7  CEO and Chairman, James Hagedorn, and Senior Counsel, Juan Johnson, were among

8  those present to hear Mr. Wong's plea.[22]  But that plea fell on deaf ears, as Defendants

9  continued with their illegal scheme for another five months while they illegally sold

10  millions more bags of this illicit product to unwitting consumers.[23]

11      As Wong urged SMG's highest-ranking officers to follow the law, Mantey and

12  Olmos told senior-level employees to stop using Storcide II.[24]  In an October 19, 2007

13  email, Mantey wrote: "█████████████████████████████████████████

14

_____

15  [22]

16  ████████████████████████████████████████████████████████████████

17                                     4 & Ex. A thereto); Exs. 23-24

18  (DEFS_E00004968; DEFS_E00005142-43) (meeting agenda); Ex. 3 (Scotts' Rog. Responses, Interrogatory No. 1(b), (c)); Ex. 25 (DEFS_E00005015); Ex. 26

19  (DEFS_E00000011) (10/17/07 Email from Kris Mantey relaying that Wong had mentioned the bird deaths at the meeting).

20  [23]  See, e.g., Ex. 27 (DEFS_E00000035) (11/1/07 Email from Kris Mantey to

21  Hegewald and Medley asking to confirm they stopped); Ex. 28 (DEFS_E00000036) (11/12/07 Email from Dir. Regulatory Affairs requesting action); Ex. 29

22  (DEFS_██████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████

24  ███████████████████████████████████████

25  ████████████████████████████████████████████████████████████████

26  ███████████████████████████████████████████████████████

27  [24]  See ¶¶43(b), (d); Ex. 3 (Defs' Rog. Responses, Interrogatory No. 2(a)); Ex. 31 (DEFS_E00000058) (Kris Mantey and Mario Olmos told Jeff Medley and Glenn

28  Hegewald to stop using Storcide as it is illegal and toxic to birds and wildlife).

1  ████████████████████████████████ [25] But SMG's management

2  ignored their own regulatory affairs personnel and these recommendations went

3  unheeded.[26] By November, a Director of Regulatory Affairs had taken up the torch

4  with the Director of Bird Food in an effort to stop the illegal conduct.[27]

5      By the spring of 2008, Olmos was so upset with Defendants' continued use of

6  the pesticides that he threatened to report Defendants to the EPA.  ¶5.  By that time,

7  Defendants knew they were the subjects of an EPA investigation into other

8  misconduct.  *Id*.  That made the threat of going to the EPA a potent weapon.  *Id*.  Due

9  to these pressures, Defendants decided to shift their tactics in spring of 2008.  *Id*.

10  **D.    Prior to 2012, Defendants' Lulling Communications**
        **Concealed the True Nature of the Defect from the Public**

11      Yet, even as they were cornered, Defendants refused to come clean.  On March

12  26, 2008, Scotts LLC sent a letter to the FDA, purporting to be a notice of voluntary

13  recall framed as a technical violation.[28]  Moreover, Scotts misrepresented that its

14  "executive management was informed of the use of the pesticides on March 10, 2008

15  after the Company reviewed a consumer complaint it received [about caged, domestic

---

[25]  Ex. 31 (DEFS_E00000058) (10/19/07 Email from Kris Mantey memorializing the meeting and attaching labels and MSDS's for Storcide II and Actellic 5E); *see also* Ex. 32 (DEFS_E00001580 (Kris Mantey's notes from 10/18/07, ████████ h Glenn H████████████████████s:  Storcide II has been "████████████████████████████████████").

[26]  *See* Ex. 27 (DEFS_E00000035) (11/1/07 Email from Kris Mantey to managers asking to confirm they had stopped using Storcide II, to which there is no response).

[27]  Ex. 28 (DEFS_E00000036) (11/12/07 Email from Kathleen Lee, Dir. Regulatory Affairs, requesting action from Joe Pellegrin

[28]  ¶5; Ex. 33 (DEFS_E00001414 at 15) (3/26/08 Letter from Scotts to FDA).

1    birds] on February 28, 2008." *Id.*  Defendants' letter in turn caused the FDA to issue a

2    misleading enforcement report indicating the product should be used ***only*** for feeding

3    wild birds and animals, as opposed to domestic birds and pets.  ¶43(d).

4            On March 25, 2008, Defendants perpetuated their fraud with an innocuously

5    worded letter to "Fellow Bird Lover[s]" that said Scotts was "replacing" Morning

6    Song Bird Food products as "█████████████████████████████████

7    ████"[29]  However, Defendants knew about but concealed the identities of the

8    pesticides, concealed the warnings on their labels, concealed the danger those

9    pesticides posed to birds, concealed the illegality of their use, lied about the fact

10   Defendants had known about it for years, and did not offer to take back any unused

11   product or provide refunds and failed to instruct them to dispose of the seeds by

12   burying them away from bodies of water as the Storcide II label required, or to throw

13   them into landfills, which is what Defendants ultimately did.[30]  *Id.*  Still worse,

14   Defendants placed Olmos's name and his title as an Ornithologist at the bottom of the

15   letter, representing that the bird expert had penned the letter.  The clear implication

16   was that, if he as an expert was not concerned, no one else need be.  *Id.*  But Olmos

17   had not written the letter, nor approved it, nor authorized his name to be placed on it.[31]

18           Accordingly, some retailers did not remove the product from their shelves and

19   consumers continued to purchase and use the product without being apprised of the

20   pesticides.  ¶6.  Of the 60-70 million units sold to consumers, none was recovered as a

21   result of Defendants' "Fellow Bird Lover" letter because Defendants did not invite

22   consumers to return this product – Defendants extended such an invitation only to

[29]  Ex. 34 (DEFS0002846).

[30]  Ex. 33 (DEFS_E00001414 at 21) ██████████nts' disposal process to the FDA as transporting the product to "█████████████" for disposal).

[31]  Ex. 18 (Ohio Bureau of Criminal Identification and Investigation, 11/20/08 Investigative Report re: Return Telephone Call from Mario A. Olmos).

1    retailers, who returned less than two million bags.[32]

2    **E.    There Has Been No Consumer Recall Program**

3    Even though Defendants represent that they initiated a "voluntary recall" of

4    their hazardous bird food, it was neither voluntary nor a consumer recall program (as

5    explained above).[33]   Thus, there has never been a consumer recall, and Defendants

6    have not refunded consumers' hard-earned money.

7    And despite Defendants' representations that the bird poison was withdrawn

8    from the market in 2008, there is evidence it was not.  In fact, the Morning Song Bird

9    Food purchased by the Cypherts in January of 2010 contained the very same poison

10   pirimiphos-methyl that SMG had told the government it stopped using in 2008.[34]

11   **III.    CLASS CERTIFICATION IS WARRANTED HERE**

12   **A.    Applicable Legal Standards**

13   Courts certify a class pursuant to Rule 23 when:

14   (1) the class is so numerous that joinder of all members is impracticable;
     (2) there are questions of law or fact common to the class; (3) the claims
15   or defenses of the representative parties are typical of the claims of the
     class; and (4) the representative parties will fairly and adequately protect
16   the interests of the class[,]

17   and the class satisfies the predominance and superiority prongs. Fed. R. Civ. P. 23.

18   In deciding motions for class certification, the Court "examine[s] the merits of

19   the underlying claim . . . only inasmuch as it must determine whether common

20   questions exist; not to determine whether class members could actually prevail on the

21   merits of their claims." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th

22   Cir. 2011).  The Court has broad discretion to grant class certification.  *See Bateman*

23   *v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010).  The Court of Appeals

24   
25   [32]   ¶41; Ex. 8 (*SMG Criminal Case*, Dkt. No. 1, at 5 (Information)).

26   [33]   *See* Dkt. No. 37-2 (Retailer & Distributor Telephone Script, attached as Ex. 1 to
     Forge Decl. in Support of Pls' Opp. to Defs' Motion to Dismiss Cmpt.) (Defendants'
27   admission that "*we do not intend to pursue a consumer recall*").

28   [34]   *See supra* n.13.

1   "accords the district court noticeably more deference than when it reviews a denial of

2   class certification."  *Parsons v. Ryan*, 754 F.3d 657, 673 (9th Cir. 2014).

3         **B.**    **The Requirements of Rule 23(a) Are Readily Met**

4         In making its decision, this Court examines Plaintiffs' showing on each of the

5   requisite prongs of Rule 23, starting with Rule 23(a)'s numerosity, commonality,

6   typicality, and adequate representation prongs. *See Parsons*, 754 F.3d at 674.

7         **1.**    **The Class Is Sufficiently Numerous**

8         Rule 23(a)(1) requires that "the class is so numerous that joinder of all class

9   members is impracticable."  Numerosity is satisfied when the class exceeds forty

10  members.  *See Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000).  Here,

11  the Class consists of millions of persons who purchased the Morning Song Bird Food,

12  and the proposed subclasses consist of tens of thousands of people each.

13        **2.**    **There Are Common Questions of Fact or Law**

14        Rule 23(a)(2) requires "questions of law or fact common to the class."  Fed. R.

15  Civ. P. 23(a)(2).  The Supreme Court has said that, to satisfy commonality, "even a

16  single common question will do."  *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S.

17  Ct. 2541, 2556 (2011).  As the Ninth Circuit put it, "[w]here the circumstances of each

18  particular class member vary but retain a common core of factual or legal issues with

19  the rest of the class, commonality exists."  *Parsons*, 754 F.3d at 675 (alteration in

20  original).  And, commonality exists where "the plaintiffs' claims and those of the class

21  they would like to represent all derive from a single course of conduct by [the

22  defendant]," such as the "marketing and packaging" of an allegedly falsely advertised

23  or defective product.  *Suchaneck*, 2014 U.S. App. LEXIS 16259, at *14.

24        Here, Plaintiffs' RICO claims readily satisfy commonality, as they focus on

25  Defendants' scheme, which ensnared Plaintiffs and the other Class Members alike.

26  *See, e.g.*, *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D. 279, 290 (S.D.N.Y. 2012)

27  (RICO claim involving false affidavits to obtain fraudulent default judgments).  As

28  Plaintiffs allege that the Class's "injuries derive from defendants' alleged 'unitary

1  course of conduct,'" they have sufficiently "identified a unifying thread that warrants

2  class treatment." *Id.*  Similarly, commonality exists for the state claims as Plaintiffs'

3  and the classes' claims "derive from a single course of conduct" – Defendants'

4  distribution of Morning Song Bird Food without disclosing that the seed were illegally

5  treated with toxic pesticides that are hazardous to birds.  ¶3; *see Suchaneck*, 2014 U.S.

6  App. LEXIS 16259, at *14.

7       The Seventh Circuit recently reversed denial of class certification in case about

8  a coffee product, finding whether the "packaging was likely to deceive a reasonable

9  consumer" satisfies commonality.[35] *See Suchaneck*, 2014 U.S. App. LEXIS 16259, at

10 *15, *19-*20.  There, the district court rejected commonality because the class could

11 include members unharmed by the misleading marketing.  *See id.* at *16-*17.  The

12 Seventh Circuit reversed:  "If the court thought that no class can be certified until

13 proof exists that every member has been harmed, it was wrong."  *Id.*

14      Even the rejected standard in *Suchaneck* would be satisfied here, as SMG has

15 admitted it illegally sold an illegal product, and Defendants conceded the

16 worthlessness of that product when they dumped two million bags of it in landfills.  In

17 any event, the deceptiveness and materiality of Defendants' concealment of their

18 admittedly illegal conduct and the illegality of their admittedly poison-laced product

19 are plainly common questions of law and fact for all class members and all claims.

20              **3.     Plaintiffs' Claims Are Typical of the Class**

21      "Rule 23(a)(3) requires that 'the claims or defenses of the representative parties

22 are typical of the claims or defenses of the class." *Parsons*, 754 F.3d at 685 (quoting

23 Fed. R. Civ. P. 23(a)(3)).  Typicality is met if the class representative's claim is

24 "reasonably co-extensive with those of absent class members; they need not be

25

---

26 [35]  As the Court noted, the "question whether the [product] packaging was likely to
   mislead a reasonable consumer" is "an objective question, not one that depends on
27 each purchaser's subjective understanding of the package." *Id.* at *19.  Packaging
   may be misleading even if it does not contain a literal falsehood, and the resolution of
28 this issue is more closely akin to a finding of fact, than a question of law.  *Id.* at *28.

1   substantially identical." *Id.*  "The purpose of the typicality requirement is to assure

2   that the interest of the named representative aligns with the interests of the class."

3   *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992).  Where the plaintiff

4   suffered a similar injury and other class members were injured by the same course of

5   conduct, typicality is satisfied.  *See Parsons*, 754 F.3d at 685.

6       Here, the same course of conduct that injured Plaintiffs also injured other Class

7   members.  From 2005 to 2010, the Robbins Geller Plaintiffs Cypherts were duped into

8   purchasing Morning Song Bird Food.  *See* L. Cyphert Decl., ¶3; M. Cyphert Decl., ¶3.

9   Predictably, the Cypherts cannot say exactly how many bags of Morning Song Bird

10  Food they purchased, but they can with certainty testify that from November 2005

11  through December 2009, they purchased an absolute ***minimum*** of four large bags per

12  year, beginning with one in late 2005.  *See* L. Cyphert Decl., ¶3; M. Cyphert Decl., ¶3.

13  The Cypherts would not have purchased a single bag had Defendants disclosed it was

14  illegally treated with pesticides that are toxic and hazardous to birds and other

15  wildlife.  *See* L. Cyphert Decl., ¶4; M. Cyphert Decl., ¶4.

16      Similarly, the Dowd/Driscoll Plaintiffs Barbara Cowin, Ellen Larson, and David

17  Kirby all bought Morning Song Bird Food products on a weekly or routine basis from

18  2005 until 2012, for their wild bird feeders.  *See* Declaration of Barbara Cowin in

19  Support of Class Certification ("Cowin Decl."), ¶3; Declaration of Ellen Larson in

20  Support of Class Certification, ¶3 ("Larson Decl."); and Declaration of David Kirby in

21  Support of Class Certification, ¶3 ("Kirby Decl."). These Plaintiffs, too, would not

22  have purchased a single bag had Defendants disclosed it was illegally treated with

23  pesticides that are toxic and hazardous to birds.  *Id*.  As the scheme that harmed

24  Plaintiffs is the same as to the Class, typicality is readily met.

25          **4.    Plaintiffs Will Adequately Represent the Class**

26      Rule 23(a)(4) requires the representatives to adequately protect the Class.  This

27  turns "on the qualifications of counsel for the representatives, an absence of

28  antagonism, a sharing of interests between representatives and absentees, and the

1    unlikelihood that the suit is collusive." *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir.

2    1994)).

3    Plaintiffs do not have any interests antagonistic to Class members and will

4    vigorously protect their interests.  L. Cyphert Decl., ¶9; M. Cyphert Decl., ¶7; Cowin

5    Decl., ¶7; Larson Decl. ¶7; Kirby Decl. ¶7.  These Plaintiffs, like each Class member,

6    have a strong interest in proving Defendants' scheme and obtaining refunds.

7    Moreover, Plaintiffs propose the Robbins Geller Plaintiffs, the Cypherts, will

8    represent California; Dowd/Driscoll Plaintiff Ms. Cowin will represent Missouri; and

9    Dowd/Driscoll Plaintiff Ms. Larson will represent Minnesota to ensure the proposed

10   Class representatives' claims are materially identical to other Class members they

11   seek to represent.  As Plaintiffs and the Class claims arise from the same course of

12   conduct, typicality is met.  *See Hartless v. Clorox*, 273 F.R.D. 630, 637 (S.D. Cal.

13   2011).

14   Finally, the Robbins Geller Plaintiffs, the Cypherts, and the Dowd/Driscoll

15   Plaintiffs, Cowin, Larson, and Kirby, understand their duties as class representatives;

16   agree to consider Class members' interests; and have, and will continue to, actively

17   participate in this litigation.  *See* L. Cyphert Decl., ¶¶9-10; M. Cyphert Decl., ¶¶7-8;

18   Cowin Decl., ¶¶7-8; Larson Decl. ¶¶7-8; Kirby Decl. ¶¶7-8.

19   **5.    Co-Lead Counsel Are Qualified to Serve as Class
              Counsel Pursuant to Rule 23(a) and (g)(1)**

20

21   Adequacy also "depends on the qualifications of counsel for the

22   representatives . . . ." *Crawford*, 37 F.3d at 487.  Rule 23(g)(1) requires the Court to

23   appoint class counsel, considering:  (i) counsel's work in investigating potential

24   claims; (ii) their experience in class actions and the types of claims asserted in the

25   action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that

26   counsel will commit to the case. *See Makaeff v. Trump Univ., LLC*, No. 10-cv-0940-

27   GPC-WVG, 2014 U.S. Dist. LEXIS 22392, at *61 (S.D. Cal. Feb. 21, 2014).

28

1  Co-Lead Counsel are highly-qualified lawyers who have experience in
2  successfully prosecuting high-stakes complex cases and consumer class actions. *See,*
3  *e.g.*, *Makaeff*, 2014 U.S. Dist. LEXIS 22392, at *64 (appointing same attorneys from
4  Robbins Geller to serve as co-class counsel). As support, Co-Lead Counsel submit
5  their firm resumes setting forth their experience and expertise in class actions and the
6  claims that Plaintiffs seek to certify: RICO and state consumer fraud statutes. *See*
7  Declaration of Jason A. Forge, ¶¶8-9, 12, 14 & Ex. 1; Declaration of Douglas P.
8  Dowd, ¶¶5-12, 14 & Ex. 1; Declaration of John J. Driscoll, ¶¶5-13 & Ex. 1. These
9  firms have already undertaken substantial work in this litigation and stand ready,
10 willing and able to devote the resources necessary to see this case through to a
11 successful outcome. *See* Forge Decl. ¶15; Dowd Decl. ¶15; Driscoll Decl. ¶23.

12 **C.   Rule 23(b)(3)'s Requirements Are Readily Met**

13 "The [Rule 23](b)(3) 'opt-out' class facilitates the 'vindication of the rights of
14 groups of people who individually would be without effective strength to bring their
15 opponents into court at all.'" *Suchanek*, 2014 U.S. App. LEXIS 16259, at *22
16 (quoting *Amchem Prods. v. Windsor*, 521 U.S. 596, 617 (1997)). Plaintiffs must show
17 (i) "that the questions of law or fact common to class members predominate over any
18 questions affecting only individual members," and (ii) that a class action is "superior
19 to other available methods for fairly and efficiently adjudicating the controversy."
20 Fed. R. Civ. P. 23(b)(3). This case satisfies both predominance and superiority.

21 **1.   Common Issues of Law and Fact Will Predominate**

22 "Predominance is a question of efficiency." *Butler v. Sears*, 702 F.3d 359, 362
23 (7th Cir. 2012). Predominance is readily met in consumer cases like this one. *See*
24 *Amchem Prods.*, 521 U.S. at 625. Consumer claims based on uniform omissions are
25 readily certifiable where the claims are "susceptible to proof by generalized
26 evidence," even if individualized issues remain. *Wolin v. Jaguar Land Rover N. Am.,*
27 *LLC*, 617 F.3d 1168, 1173, 1176 (9th Cir. 2010).

28

1    Indeed, "[e]very consumer fraud case involves individual elements of reliance
2    or causation. . . .  [A] rule requiring 100% commonality would eviscerate consumer-
3    fraud class actions." *Suchanek*, 2014 U.S. App. LEXIS 16259, at *22.  "And because
4    few if any injured parties would bring suit to recover the paltry individual damages
5    available in most consumer fraud cases, such a rule would undermine enforcement
6    against 'tortious harms of enormous aggregate magnitude but so widely distributed as
7    not to be remediable in individual suits,' in direct contradiction of Rule 23(b)(3)'s
8    purpose." *Id.* at *22-*23 (citing *Butler*, 727 F.3d at 798; citing *Carnegie v. Household
9    Int'l*, 376 F.3d 656, 661 (7th Cir. 2004) ("The **realistic** alternative to a class action is
10   not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic
11   sues for $30.")).  If common issues "present a significant aspect of the case and they
12   can be resolved for all members of the class in a single adjudication," then it is a
13   suitable case for classwide adjudication.  *See Hanlon v. Chrysler Corp.*, 150 F.3d
14   1011, 1022 (9th Cir. 1998).  Common issues present a significant aspect of this case
15   and, thus, it is a good candidate for certification.

16                  a.      **The RICO Claim Raises Common Questions that Will
                            Turn on Common Proof that Will Yield Common
17                          Answers**

18           First, in denying in large part Defendants' motions to dismiss, the Court found
19   that Plaintiffs had sufficiently stated claims under the federal RICO Statute.  *See* Dkt.
20   No. 44 at 19.  Not only are Plaintiffs' RICO claims legally sufficient, but they are
21   susceptible to classwide treatment on a nationwide basis.

22           The Ninth Circuit favors class treatment of fraud claims stemming from a
23   "common course of conduct," like the scheme that is alleged here.  *See In re First
24   Alliance Mortg. Co*., 471 F.3d 977, 990 (9th Cir. 2006)); *see, e.g.*, *Negrete v. Allianz
25   Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 492 (C.D. Cal. 2006) (common questions
26   about the "overarching fraudulent scheme" to sell deferred annuities predominated for
27   RICO claims).  With respect to RICO, "[t]he issues of law and fact in making out a
28   RICO violation will generally be common to all Plaintiffs' claims, because Plaintiffs

are asserting a single fraudulent scheme by the defendants which injured each plaintiff."  *In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.*, 122 F.R.D. 251, 255 (C.D. Cal. 1988) (citing *McMahon Books, Inc. v. Willow Grove Assocs.*, 108 F.R.D. 32, 38-39 (E.D. Pa. 1985)); *accord Friedman v. 24 Hour Fitness USA, Inc.*, No. CV 06-6282 AHM (CTx), 2009 U.S. Dist. LEXIS 81975, at *22-*23 (C.D. Cal. Aug. 25, 2009) ("Common issues frequently predominate in RICO actions that allege injury as a result of a single fraudulent scheme.").

The elements of Plaintiffs' RICO claims include Defendants' "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Dkt. No. 44 at 15; *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)); *see Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 160 (2001).  Plaintiffs must also show harm to their business or property by the racketeering activity.  *Id.*

As to each of these elements, every Class member would prove them with the same evidence, and the answer would be the same as to each.  For example, under the first element, SMG either did or did not conduct the Morning Song Bird Food Enterprise.  "In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  This element must be proved through common proof about Defendants' mutual participation and control of the scheme to sell the Morning Song Bird Food without disclosing the toxic pesticide use.  The same is equally true for the remaining three elements, as the Enterprise itself and Defendants' pattern of racketeering activity will all be proven with the same evidence as to each Class member.  Therefore, both the proof and the answer as to each element will be the same for each Class member.

To establish the predicate acts of mail and wire fraud, Plaintiffs must prove that: (1) Defendants devised a scheme to defraud by means of false or fraudulent pretenses; (2) the statements made or facts omitted were material – that is, they had a natural tendency to influence, or were capable of influencing, a person to pay money;

(3) Defendants acted with the intent to defraud – that is, the intent to deceive or cheat; and (4) Defendants used, or caused to be used, the mails or wires in furtherance of the scheme. *See Manual of Model Criminal Instructions for the District Courts of the Ninth Circuit*, Nos. 8.121 & 8.124. Whether or not facts omitted are material (*i.e.*, "capable of influencing") is an objective test. *See, e.g.*, *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008). It is clear from these elements that the proof of the predicate acts will concern the scheme itself and its **objective** effect, *i.e.*, whether Defendants' omissions were "capable of influencing" the class to pay money. Therefore, whether Defendants targeted one or one million victims is irrelevant; the proof and determination as to each element will be the same.

Here, Plaintiffs will prove Defendants engaged in a scheme to make and sell the Morning Song Bird Food with common proof of their conduct and knowledge and uniform omissions. If Plaintiffs succeed in proving the scheme, the claims of all Class members will be not just substantially advanced; they will be proven. *See McKenzie v. Fed. Express Corp.*, 275 F.R.D. 290, 299-300 (C.D. Cal. 2011).

Likewise, RICO does not require Plaintiffs to prove individual reliance. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 660 (2008) ("RICO's text provides no basis for imposing a first-party reliance requirement."). RICO requires only "but for" and proximate causation – *i.e.*, a direct relation between the misconduct and the injury. *See In re Nat'l W. Life Ins. Deferred Annuities Litig.*, No. 3:05-cv-1018-GPC-WVG, 2013 U.S. Dist. LEXIS 20314, at *12 (S.D. Cal. Feb. 14, 2013) ("*Nat'l W. Life II*") (denying defendant's motion for decertification). Proximate causation under RICO "is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge*, 553 U.S. at 654 (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 272, n.20 (1992)). Instead, proximate causation is generally satisfied if the injury is "a foreseeable and natural consequence" of the scheme. *See Bridge.*, 553 at 658. The scheme need not be the "sole cause" of the injury; it is sufficient to show the defendant's misconduct was "a

1  substantial factor in the sequence of responsible causation." *Oki Semiconductor Co. v.*
2  *Wells Fargo Bank*, 298 F.3d 768, 773 (9th Cir. 2002).

3        And even if reliance is required here, Plaintiffs' RICO claims are entitled to a
4  presumption of reliance as they "primarily allege[] omissions." *Binder v. Gillespie*,
5  184 F.3d 1059, 1064 (9th Cir. 1999) (citing *Affiliated Ute Citizens v. U.S.*, 406 U.S.
6  128, 153-54 (1972)).  For claims alleging misrepresentations by omission, "[a]ll that is
7  necessary is that the facts withheld be material, in the sense that a reasonable person
8  might have considered them important in making his or her decision." *Plascencia v.*
9  *Lending 1st Mortgage*, 259 F.R.D. 437, 447 (N.D. Cal. 2009) (alteration in original).
10  Here, Defendants concealed the fact that they used illegal pesticides labeled as toxic
11  and hazardous to birds and other wildlife.  It is self-evident that reasonable consumers
12  buying bird food would have considered the presence of bird poison in that food to be
13  an important factor in making their decision to purchase, but Plaintiffs have also
14  submitted evidence that such a fact would have been important to them.  *See* L.
15  Cyphert Decl., ¶4; M. Cyphert Decl., ¶4; Cowin Decl., ¶4; Larson Decl. ¶4; Kirby
16  Decl. ¶4.  And, whether ultimately Defendants' omission was material is up to the
17  jury.  *See Plascencia*, 259 F.R.D. at 447.

18        Even if the Court does not apply a presumption of reliance, certification of the
19  RICO claims is still warranted as the material omissions were "a substantial factor in
20  the sequence of responsible causation" as to all Class members, and the causal
21  relationship between Defendants' scheme and the victims is the same for everyone.
22  The natural and intended consequence of the omissions about the pesticides was that
23  Plaintiffs and the Class would purchase the Morning Song Bird Food.  Thus, it would
24  be almost irrational to say that Defendants' material omissions were not "a substantial
25  factor in the sequence of responsible causation." *Oki Semiconductor*, 298 F.3d at 773.

26        This "'common sense' or 'logical explanation' for the behavior of plaintiffs and
27  the members of the class" is a completely acceptable method of proving causation.
28  *Nat'l Western Life I*, 268 F.R.D. at 665-66; *Negrete*, 238 F.R.D. at 491; *Kennedy v.*

1  *Jackson Nat'l Life Ins. Co.*, No. C 07-0371 CW, 2010 U.S. Dist. LEXIS 63604, at *28

2  (N.D. Cal. June 23, 2010) (allowing inference of RICO causation where annuities

3  were allegedly worth less than represented); *Garner v. Healy*, 184 F.R.D. 598, 602

4  (N.D. Ill. 1999) (classwide proof of RICO causation permissible where car "wax"

5  product was not actually "wax"); *Peterson v. H&R Block Tax Servs.*, 174 F.R.D. 78,

6  85 (N.D. Ill. 1997) (classwide presumption of RICO causation permissible where class

7  paid fees for services for which they were ineligible).

8         The First Circuit recently confronted a similar question in another RICO case

9  involving off-label promotion of Neurontin.  *In re Neurontin Mktg. & Sales Practices*

10  *Litig.*, 712 F.3d 60, 68 (1st Cir.), *cert. denied sub nom, Pfizer Inc. v. Kaiser Found.*

11  *Health Plan, Inc.*, __ U.S. __, 134 S. Ct. 786 (2013).  Although *Neurontin* was not a

12  class action, the question on appeal was whether the district court erred by not

13  requiring plaintiff health-benefits-providers to prove on a prescription-by-prescription

14  basis that the defendants' marketing campaign caused them to pay for more Neurontin

15  prescriptions than they otherwise would have.  *Id.*  The first Circuit affirmed:

16         A tort plaintiff need not "prove a series of negatives; he doesn't have to
          'offer evidence which positively exclude[s] every other possible cause of
17         the accident.'"  *BCS Servs. v. Heartwood 88, LLC*, 637 F.3d 750 (7th
          Cir. 2011) (alteration in original) (quoting *Carlson v. Chisholm-Moore*
18         *Hoist Corp.*, 281 F.2d 766, 770 (2d Cir.1960)).  "Once a plaintiff presents
          evidence that he suffered the sort of injury that would be the expected
19         consequence of the defendant's wrongful conduct," the burden shifts to
          the defendant to rebut this causal inference.  *Id.* at 758.

20  *Id.*

21

22         Here, too, given that Plaintiffs and the Class paid for bird food but received bird

23  poison, proximate cause for purposes of the RICO claim will be simple to resolve on a

24  classwide basis.  Even if Defendants argue that proximate causation for RICO

25  purposes requires individual inquiry, that does not preclude class certification as it is

26  still more efficient to try this case as a class action one time than to try entire

27  individual cases a million times.  *See Suchanek*, 2014 U.S. App. LEXIS 16259, at

28  *21-*24.

### b. The California Consumer Fraud Claims Will Turn on Common Proof

In addition, this Court has sustained Plaintiffs' California consumer fraud claims, including their UCL, CLRA, and FAL claims. *See* Dkt. No. 44 at 8-9. These claims will also be proved with common proof of Defendants' material omissions about the illegal use of pesticides that are toxic and hazardous to birds.

There is no reason to look at the circumstances of each individual Class member because these claims focus on Defendants' misrepresentations (made by omission), and the fact finder need only determine if they would mislead a reasonable consumer. *See Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir. 2010). California consumer fraud claims based on uniform sales practices, such as those alleged here, are precisely the types of cases that courts certify. *See, e.g.*, *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 541 (C.D. Cal. 2012) ("The touchstone of each state's law [California, New York and Florida] is whether a reasonable person would have found the relevant omission misleading."). Common issues will predominate as the claims are about the deceptive marketing by Defendants. Courts frequently find that common questions of law and fact predominate when the focus of the proposed class action "will be on the words and conduct of defendants rather than on the behavior of individual Class members," as is the case here. *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 167 (C.D. Cal. 2002).

Here, individual issues will not predominate because the success of Plaintiffs' California claims will depend on the effect of Defendants' failure to disclose its illegal use of Storcide II and Actellic 5E "upon a reasonable consumer, not a particular consumer[.]" *Yokoyama*, 594 F.3d at 1094. Indeed, "relief under the UCL is available without individualized proof of deception, reliance and injury." In re *Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009). Because "[f]requently numerous consumers are exposed to the same dubious practice by the same seller so that proof

of prevalence of the practice as to one consumer would provide proof for all," a case should be certified if it appears the defendant engaged in a common course of conduct. *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971). Similarly, for CLRA claims, "reliance on the alleged misrepresentations may be inferred as to the entire class if the named plaintiff can show that material misrepresentations or omissions were made to the class members. *Chavez v. Blue Sky Natural Bev. Co.*, 268 F.R.D. 365, 376 (N.D. Cal. 2010). Finally, false advertisements in violation of §17500 are suitable for class treatment where, as here, defendant disseminated standardized materials, such as the packaging, that did not disclose the pesticides. *See, e.g.*, *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 700 (2006) (claims re: tools as "Made in U.S.A." certifiable). Common issues will predominate here.

### c. The Missouri Consumer Fraud Claims Will Turn on Common Proof

The Court also sustained Plaintiffs' MMPA claims. *See* Dkt. No. 44 at 10. These claims will also be proved with common proof. Here, Plaintiffs must show Ms. Cowin and the Class "suffered an 'ascertainable' loss of money or property[.]" *In re Celexa & Lexapro Mktg. & Sales Pract. Litig.*, MDL No. 09-02067-NMG, 2014 U.S. Dist. LEXIS 3554, at *22-*23 (D. Mass. Jan. 10, 2014) (certifying MMPA claim for omission about Celexa and Lexapro's efficacy in treating depression in children). Reliance is ***not*** an element of an MMPA claim. *See Plubell v. Merck & Co., Inc*., 289 S.W.3d 707, 714 (Mo. App. W.D. 2009). An ascertainable loss includes the harm to consumers deprived of the ability to make an informed choice about the product, such as material omissions about the safety of a product. *See Celexa*, 2014 U.S. Dist. LEXIS 3554, at *24. Because individualized reliance is not required, courts routinely find common issues predominate in MMPA claims. *See, e.g.*, *id.*

Here, Plaintiffs and the Class suffered an ascertainable loss as the product was worthless as bird food or any use other than sitting in a landfill. §II.E. Plaintiffs and the Class were deprived of their ability to make an informed choice about the Morning

Song Bird Food because Defendants failed to disclose their illegal pesticide use. There is no honest debate that common issues will predominate for the MMPA claims.

### d.   The Minnesota Consumer Claims Turn on Common Proof

The Court also sustained Plaintiffs' Minnesota claims. *See* Dkt. No. 44 at 10. The Minnesota Consumer Fraud Act does not require a showing of individualized reliance. *See Certified Question United States Dist. Court Order v. Philip Morris*, 621 N.W.2d 2, 14-15 (Minn. 2001) (holding that a plaintiff may prove causation through circumstantial evidence). These claims will be also be proven by common evidence.

### e.   Full Refunds Are an Appropriate Methodology for Determining Damages Classwide

"'At class certification, plaintiff must present a likely method for determining class damages, though it is not necessary to show that his method will work with certainty at this time.'" *Makaeff*, 2014 U.S. Dist. LEXIS 22392, at *46. The amount of damages, even if it is an individual question, does not defeat class certification. *Id.* at *47 (citing *Leyva v. Medline Indus.*, 716 F.3d 510, 514 (9th Cir. 2013)).

Here, Plaintiffs allege they are entitled to full refunds for every bag of Morning Song Bird Food purchased, which is subject to mandatory trebling under the RICO Statute. *See* ¶¶30, 72; 18 U.S.C. § 1964(c). Each bag was worthless as bird food because it was coated with bird poison. Indeed, the Storcide II label reads: "Exposed treated seeds *are* hazardous to birds and other wildlife. Dispose of all excess treated seeds and seed packaging by burial away from bodies of water." §II.A., p.4. SMG has pled guilty to knowingly manufacturing, marketing, and selling Morning Song Bird Food with harmful pesticides that are known to be, and labeled as, toxic to birds and other wildlife. And Defendants have recognized the products' worthlessness by burying recouped product in landfills. §II.E.

This is nearly identical to the situation in *Garner*, 184 F.R.D. 598. There, the court used a full-refund approach where the plaintiffs ''paid money for a 'wax,' but instead received a worthless 'non-wax' product[.]'' *Id.* at 602. Likewise, the

damages are analogous to the losses suffered by the victims in *United States v. Kennedy*, 726 F.3d 968, 974 (7th Cir. 2013), who paid for fraudulent artwork. Last year, the Seventh Circuit concluded that the "actual loss" attributable to such a fraud and the appropriate amount of restitution is the ***entire amount paid*** "for artwork that turned out to be fraudulent." *Id.*; *Lee v. Carter-Reed, LLC*, 4 A.3d 561, 580 (2010) (each bottle of fat-reduction pills was a "bottle of broken promises").

Plaintiffs' method of calculating damages based upon trebled refunds is appropriate. Courts have emphasized: "***A plaintiff injured by civil RICO violations 'deserves a complete recovery***[.]'" *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001); *Carter v. Berger*, 777 F.2d 1173, 1176 (7th Cir. 1985) (holding that, under RICO, "the directly injured party should receive a complete recovery, no matter what"); *Pac. Gas & Elec. Co. v. Howard P. Foley Co.*, No. 85-2922 SW, 1993 U.S. Dist. LEXIS 21414, at *8-*9 (N.D. Cal. July 27, 1993) ("A plaintiff prosecuting a civil RICO claim is entitled to complete recovery for the harm that proximately results from the predicate acts."). And RICO provides flexible concepts of causation and damages to ensure a defendant is held liable "'for the consequences of that person's own acts.'" *Bridge*, 553 U.S. at 654 (quoting *Holmes*, 503 U.S. at 268). Plaintiffs may recover all damages that are the "foreseeable and natural consequence[s]" of the fraud. *See id.* at 658. This includes the return of monies paid by them. *See* Jed S. Rakoff, RICO: CIVIL & CRIMINAL LAW & STRATEGY, §4.02[3] (Supp. 2013).

## 2. Class Treatment Is Superior in This Case

Rule 23(b)(3) requires a class action to be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3)). This factor "requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023.

Two key factors for "determining superiority are the 'extent and nature of any litigation concerning the controversy already commenced by or against members of the class,' and 'the likely difficulties in managing a class action.'" *Id.* Here, Plaintiffs

1    are not aware of any other litigation commenced by the Class for refunds for the

2    Morning Song Bird Food.  And there will be no difficulty in managing this case as a

3    class action as it would involve one nationwide claim and only three state subclasses.

4    *See, e.g.*, *Makaeff*, 2014 U.S. Dist. LEXIS 22392, at *62-*63 (certifying five

5    subclasses, including California, Florida, and New York).

6         Further, courts consider "the difficulty and complexity of the class-wide issues

7    as compared with the individual issues."  *Suchanek*, 2014 U.S. App. LEXIS 16259, at

8    *24.  This takes into account the reality that "class issues often will be the most

9    complex and costly to prove, while the individual issues and the information needed to

10   prove them will be simpler and more accessible to individual litigants."  *Id.*

11        Here, for example, resolution of the class issues will require extensive

12   discovery into Defendants' scienter, manufacturing processes, and marketing

13   materials, whereas proving the individual amount of damages for each Class Member

14   can be adjudicated "in individualized follow-on proceedings."  *See id.*  Moreover,

15   Plaintiffs would not be able to pay an attorney to pursue their claims individually.  L.

16   Cyphert Decl., ¶11; M. Cyphert Decl., ¶9; Cowin Decl., ¶9; Larson Decl. ¶9; Kirby

17   Decl. ¶9.  Indeed, no rational plaintiff would bear the cost of this lawsuit to recover

18   the amount of money spent on Morning Song Bird Food; thus, proceeding as a class

19   action is superior.  *See Suchanek*, 2014 U.S. App. LEXIS 16259, at *25.

20   DATED:  October 20, 2014              ROBBINS GELLER RUDMAN
21                                             & DOWD LLP
                                           JASON A. FORGE
22                                                  s/ Jason A. Forge
23                                           JASON A. FORGE

24                                         RACHEL L. JENSEN
25                                         PHONG L. TRAN
                                           JENNIFER N. CARINGAL
26                                         655 West Broadway, Suite 1900
                                           San Diego, CA  92101
27                                         Telephone:  619/231-1058
                                           619/231-7423 (fax)
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

Co-Lead Counsel and Counsel for Cyphert
Plaintiffs

DOWD & DOWD P.C.
DOUGLAS P. DOWD
ALEX R. LUMAGHI
211 North Broadway, Suite 4050
St. Louis, MO  63102
Telephone:  314/621-2500
314/621-2503 (fax)

THE DRISCOLL FIRM, P.C.
JOHN J. DRISCOLL
CHRISTOPHER QUINN
GREGORY PALS
211 N. Broadway, Suite 4050
St. Louis, MO  63102
Telephone:  314/932-3232
314/932-3233 (fax)

Co-Lead Counsel and Counsel for
Dowd/Driscoll Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2014, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 20, 2014.

s/ Jason A. Forge
JASON A. FORGE

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:       jforge@rgrdlaw.com